**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KALSHIEX LLC,<br><br>       *Plaintiff*,<br><br>       vs.<br><br>ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission; SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission; and NEW YORK STATE GAMING COMMISSION,<br><br>       *Defendant*s. | Case No.: 1:25-cv-08846<br><br><br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**<br><br>**(ORAL ARGUMENT REQUESTED)** |

## TABLE OF CONTENTS

**INTRODUCTION**................................................................................................ 1

**BACKGROUND** ................................................................................................ 3

A.    The Exclusive Federal Scheme for Regulating Futures Markets on Regulated Exchanges. ........................................................................................................ 3

B.    Kalshi's Registration as a CFTC-Designated Contract Market Under Federal Law. ........ 6

C.    The New York Regulatory Scheme for Gambling. ...................................... 7

D.    The Gaming Commission's Cease-and-Desist Letter to Kalshi. ....................... 8

**ARGUMENT** ..................................................................................................... 9

A.    Kalshi Is Likely to Succeed Because New York's Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations. ................................. 10

    1.    New York Gambling Laws Are Field Preempted as Applied to Kalshi's Event Contracts. ............................................................................... 10

    2.    New York Laws Are Conflict-Preempted as Applied to Kalshi. ...................... 16

B.    Kalshi Will Suffer Irreparable Harm Without a Temporary Restraining Order and Preliminary Injunction. ...................................................................... 19

C.    The Balance of the Equities and Public Interest Favor a Preliminary Injunction............ 23

D.    No Security—Or Only a *De Minimis* Security—Is Appropriate. ..................... 24

**CONCLUSION** ................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
   977 F.2d 1147 (7th Cir. 1992) ...................................................................................6, 7, 16

*Amarin Pharma, Inc. v. FDA.*,
   119 F. Supp. 3d 196 (S.D.N.Y. 2015)..........................................................................23

*Arizona v. United States*,
   567 U.S. 387 (2012)..........................................................................11, 14, 28, 23

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ..........................................................................21

*Cipollone v. Liggett Grp., Inc.*,
   505 U.S. 504 (1992)..........................................................................11

*City of New York v. Permanent Mission of India to United Nations*,
   618 F.3d 172 (2d Cir. 2010)..........................................................................12

*Massachusetts v. KalshiEX LLC*,
   No. 2584-cv-02525 (Mass. Sup. Ct.) ..........................................................................20

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000)..........................................................................10, 16, 18

*Doctor's Assocs., Inc. v. Stuart*,
   85 F.3d 975 (2d Cir. 1996)..........................................................................24

*Fid. Fed. Sav. & Loan Ass'n v. De la Cuesta*,
   458 U.S. 141 (1982)..........................................................................10

*Ford v. Reynolds*,
   316 F.3d 351 (2d Cir. 1989)..........................................................................21

*FTC v. Ken Roberts Co.*,
   276 F.3d 583 (D.C. Cir. 2001) ..........................................................................12

*Hines v. Davidowitz*,
   312 U.S. 52 (1941)..........................................................................10, 11, 17

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987)..........................................................................14

*Int'l Trading, Ltd. v. Bell*,
    556 S.W.2d 420 (Ark. 1977) ................................................................................ 13

*John E. Andrus Mem'l, Inc. v. Daines*,
    600 F. Supp. 2d 563 (S.D.N.Y. 2009) ................................................................. 21

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996) .................................................................................. 20

*KalshiEX LLC v. Commodity Futures Trading Comm'n*,
    No. CV 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024) ................. 3

*KalshiEX LLC v. Flaherty*,
    No. 25-cv-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) ...... *passim*

*KalshiEX LLC v. Hendrick*,
    No. 2:25-cv-00575-APG-BNW, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) ............... *passim*

*KalshiEX LLC v. Martin*,
    No. 25-cv-1283-ABA, 2025 WL 2194908 (D. Md. Aug. 1, 2025) ........................ 12

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ............................................................................................ 14

*Leist v. Simplot*,
    638 F.2d 283 (2d Cir. 1980) ..................................................................... 13, 16, 17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) ....................................................................................... 13, 14

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ............................................................................................ 20

*N. Am. Derivatives Exch., Inc. v. Nevada*,
    No. 25-cv-978-APG, 2025 WL 2916151 (D. Nev. Oct. 14, 2025) ...................... 12

*Nat'l Meat Ass'n v. Harris*,
    565 U.S. 452 (2012) ............................................................................................ 19

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983) ............................................................................................ 11

*Park Irmat Drug Corp. v. OptumRx, Inc.*,
    152 F. Supp. 3d 127 (S.D.N.Y. 2016) .................................................................. 9

*Register.com, Inc. v. Verio, Inc*,
    356 F.3d 393 (2d Cir. 2004) ................................................................................ 22

*Rice v. Bd. of Trade of Chi.*,
    331 U.S. 247 (1947)...................................................................................14

*Rufo v. Inmates of Suffolk Cnty. Jail*,
    502 U.S. 367 (1992)...................................................................................23

*Tom Doherty Assocs, Inc.. v. Saban Ent. Inc.*,
    60 F.3d 27 (2d Cir. 1995)..........................................................................22

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ..................................................................20

*Volokh v. James*,
    656 F. Supp. 3d 431 (S.D.N.Y. 2023)......................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................9

*Ex parte Young*,
    209 U.S. 123 (1908)...................................................................................21

**Statutes**

7 U.S.C. § 1a .....................................................................................................5

7 U.S.C. § 2 .............................................................................................. *passim*

7 U.S.C. § 7(a) ..............................................................................................4, 14

7 U.S.C. § 7a-2(c) ...........................................................................5, 6, 15, 18

7 U.S.C. § 8(b) ................................................................................................22

7 U.S.C. § 13a-2(1) .........................................................................................15

7 U.S.C. § 16(e) .......................................................................................11, 15

N.Y. Penal Law § 225.00 ..................................................................................8

N.Y. Penal Law § 225.10 .............................................................................8, 18

N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 104 ..............................................8

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1367 ........................................8, 19

**Other Authorities**

17 C.F.R. § 1.31 ...............................................................................................14

17 C.F.R. § 38.3(a) .................................................................................................4

17 C.F.R. § 38.100 ...............................................................................................14

17 C.F.R. § 38.150 ...............................................................................................19

17 C.F.R. § 38.151(b) ....................................................................................19, 22

17 C.F.R. § 38.152 .................................................................................................7

17 C.F.R. § 38.250 .................................................................................................7

17 C.F.R. § 38.255 ........................................................................................19, 22

17 C.F.R. § 38.450 ...............................................................................................14

17 C.F.R. § 38.950 ...............................................................................................14

17 C.F.R.  § 38.1101(a)(2) ...................................................................................15

17 C.F.R. § 40.2(a) ...........................................................................................5, 14

17 C.F.R. § 40.11 .........................................................................................5, 6, 15

120 Cong. Rec. 30464 (1974) ..............................................................................13

*Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837and H.R. 13113,* 93d Cong., 2d Sess. 848 (1973) ......................................................................4

Fed. R. Civ. P. 65(c) ............................................................................................24

H.R. Conf. Rep. No. 93-1383 (1974) ................................................................4, 13

H.R. Rep. No. 93-975 (1974) .....................................................................13, 14, 16

H.R. Rep. No. 97-565, pt. 1 (1982) .................................................................11, 16

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act,* 58 Chi.-Kent L. Rev. 657, 692-93 (1982) ..................................................................14, 15

Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1 (1976) ............................................10

*Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agriculture*, 93d Cong., 1st Sess., 128 (1973) ................................................................................................................4

S. Rep. No. 93-1131 (1974) ..........................................................................................4, 13

## INTRODUCTION

Defendants Robert Williams, Brian O'Dwyer, John A. Crotty, Sylvia B. Hamer, Martin J. Mack, Peter J. Moschetti, Jr., Marissa Shorenstein, Jerry Skurnik, and the New York State Gaming Commission (the "Gaming Commission") (together, "Defendants") are unconstitutionally threatening to prohibit trading of event contracts on Kalshi's designated contract market, even though those contracts are federally authorized and Kalshi is overseen by the Commodity Futures Trading Commission ("CFTC")—the federal agency that Congress endowed with "exclusive jurisdiction" to regulate trading on exchanges like Kalshi. The Gaming Commission's unlawful actions threaten Kalshi with criminal prosecution and civil enforcement unless Kalshi accedes to the Gaming Commission's unconstitutional demands. These threats violate the Commodity Exchange Act ("CEA") and subject Kalshi to irreparable harm that requires preliminary relief.

Federal district courts in two other states have already entered preliminary injunctions in Kalshi's favor based on similar threats. *KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025); *KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025). On April 9, 2025, the U.S. District Court for the District of Nevada granted Kalshi a preliminary injunction to prevent Nevada gaming authorities from enforcing state law against Kalshi's event contracts. Chief Judge Gordon found that the CEA establishes a comprehensive federal framework for regulating commodity futures trading, and that, because Kalshi is a CFTC-designated contract market, Kalshi "is subject to the CFTC's exclusive jurisdiction and state law is field preempted." *Hendrick*, 2025 WL 1073495, at *6. Chief Judge Gordon further noted that other States—now like New York—have sent Kalshi cease-and-desist letters, which "highlights the problem of allowing the States to regulate a national exchange." *Id.* at *7. Preventing the "difficulties" that would arise from many

different states subjecting Kalshi to conflicting rules "is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges." *Id.* Several weeks later, the U.S. District Court for the District of New Jersey agreed, reasoning that "at the very least field preemption applies" to prevent states from regulating trading on designated contract markets like Kalshi. *Flaherty*, 2025 WL 1218313, at *6.

Much like the Nevada and New Jersey authorities, the Gaming Commission has threatened Kalshi with criminal and civil penalties unless Kalshi halts access to event contracts for users in New York. *See* Declaration of Karen Wong ("Wong Decl."), Ex. 1 at 1-2, 4. And just as in Nevada and New Jersey, the Gaming Commission is preempted from attempting to regulate trading on a federally regulated exchange.

Immediate action is required to avoid irreparable harm to Kalshi, its representatives, and its users. The Gaming Commission's cease-and-desist letter confronts Kalshi with a "Hobson's choice"—either face "civil and criminal liability" in New York, or "incur substantial economic and reputational harm as well as the potential existential threat of the CFTC taking action against it for violating the CFTC's Core Principles." *Hendrick*, 2025 WL 1073495, at *7. Kalshi respectfully requests that this Court issue a temporary restraining order and preliminary injunction enjoining Defendants from enforcing preempted state law against Kalshi.

***

Kalshi has no option but to seek judicial relief. The Gaming Commission's cease-and-desist letter, sent late on a Friday afternoon, demands that Kalshi immediately cease operating in New York or face criminal and civil liability. Because Kalshi listed contracts that were traded over the weekend, it has no choice but to bring this suit immediately or else face the risk of an unlawful state criminal or civil enforcement action first thing Monday morning.

## BACKGROUND

### A. The Exclusive Federal Scheme for Regulating Futures Markets on Regulated Exchanges.

Derivative contracts are financial tools that traders use to mitigate risk. *See KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694, at *1-2 (D.D.C. Sept. 12, 2024)  Event contracts are a type of derivative contract—they are financial instruments that identify a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. *Id.* at *2.  Event contracts are typically traded on an exchange, and their value is determined by market forces. *Id.*  This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a uniquely sensitive financial instrument that tracks real-world market perceptions. *Id.*  During the period of a contract, individuals can buy and sell the contract at its changing prices; no user is locked into a contract and may trade her contract in accordance with her desire to hedge her economic risk. Compl. ¶¶ 30, 33. The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates. *See KalshiEX*, 2024 WL 4164694, at *2. For example, a property owner on the Gulf Coast may place a position on whether a hurricane will strike the area around his property within the 2025 calendar year. *Id.*  If a hurricane strikes, the property owner will receive the ultimate value of the contract and can thereby hedge risk by offsetting losses incurred due to the hurricane. *Id.*

Congress passed the CEA in 1936 to regulate derivatives exchanges, but chose not to preempt state regulation of those exchanges.  In 1974, Congress amended the CEA to establish the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA and to grant the CFTC "exclusive jurisdiction" to regulate trading on the exchanges it oversees.  These

amendments were designed to "[b]ring[] all futures trading under federal regulation." *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong., 2d Sess. 848 (1974) (hereinafter "Senate Hearings"). Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction." *Hearings Before the House Comm. on Agriculture*, 93d Cong., 1st Sess., at 128 (1973). Subjecting exchanges to "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark).

Congress also deliberately reinforced the CFTC's exclusive jurisdiction. After House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "the Commission's jurisdiction, where applicable supersedes State as well as Federal agencies." *Id.* at 23. The Senate also "struck" the existing CEA provision that preserved states' authority to regulate derivatives transactions. H.R. Conf. Rep. No. 93-1383, at 35. As the conference report explained, the amendments were designed to "preempt the field insofar as futures regulation is concerned." *Id.*

The CFTC's regulatory framework is extensive, comprehensive, and exclusive. To obtain approval from the CFTC, an exchange must first apply for and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The exchange's application must detail its capacity to comply with all CFTC rules and regulations through a series of written submissions and exhibits. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the exchange's designation. *Id.*

Once the CFTC designates an entity as a contract market—known as a "DCM"—the CFTC has "exclusive jurisdiction" over derivatives traded on the market, including "accounts,

4

agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event contracts." *See id.* § 1a(47)(A)(ii), (iv), (vi).

DCMs are subject to the CFTC's extensive regulatory framework as set out in Part 38 of Title 17 of the U.S. Code and in CFTC regulations. Together, these provisions establish a comprehensive scheme for regulating DCMs. *See Hendrick*, 2025 WL 1073495, at *3-4 (summarizing CFTC's regulatory scheme).

The CEA prescribes a specific method by which the CFTC may approve new contracts on DCMs. A DCM that abides by the requirements set forth in the CEA may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The contracts are immediately effective unless and until the CFTC initiates review of any contract. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B). If a DCM offers a contract in violation of the CEA or CFTC regulations, the CFTC has an array of enforcement mechanisms, including but not limited to revocation of licensing, civil penalties, and criminal enforcement.

In 2010, Congress amended the CEA to add a "Special Rule" specifically addressing event contracts. The Special Rule authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CEA specifically authorizes the CFTC to reject event contracts if the Commission deems them to be "contrary to the public interest" and if they "involve" an "activity that is unlawful under any

Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest."  *Id.*; *see also* 17 C.F.R. § 40.11(a) (implementing Special Rule).  The decision to prohibit an event contract that falls within any of these categories is subject to the CFTC's evaluation of the "public interest."  *See KalshiEX*, 2024 WL 4164694, at *3 ("the CFTC may determine that an agreement, contract, or transaction is contrary to the public interest only if it involves" one of the enumerated categories).  The Special Rule further provides that no contract "determined by the Commission to be contrary to the public interest . . . may be listed or made available for clearing or trading on or through a registered entity."  7 U.S.C. § 7a-2(c)(5)(C)(ii).

**B.  Kalshi's Registration as a CFTC-Designated Contract Market Under Federal Law.**

In 2020, the CFTC unanimously certified Kalshi as a DCM that offers event contracts, affirming that its platform complies with the CEA's regulatory requirements.  *See KalshiEX*, 2024 WL 4164694, at *4.  Because Kalshi is a DCM, its event contracts are subject to the "exclusive jurisdiction" of the CFTC.  7 U.S.C. § 2(a)(1)(A).  Federal law requires Kalshi to comply with a host of federal requirements designed to ensure market integrity.  An exchange's status as a DCM "imposes upon it a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances."  *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1150-1151 (7th Cir. 1992).

Kalshi offers many kinds of event contracts related to climate, technology, health, crypto, popular culture, sports, politics, and economics.  Compl. ¶ 46.  For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030.  As relevant here, Kalshi also offers

sports-event contracts. Kalshi self-certified and listed sports-related contracts on its exchange on January 24, 2025, allowing users to place positions on, for example, which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Tournament. *Id.* ¶ 47. Kalshi's sports-event contracts were immediately effective upon self-certification and the CFTC has declined to review them. *Id.* Thus, Kalshi's sports-event contracts are legal under federal law. *Id.* While federal law requires the CFTC to prohibit contracts it considers "gaming" if it concludes those contracts are contrary to the public interest, the CFTC has declined to prohibit Kalshi's contracts.

Kalshi's sports-related contracts involve sporting events, but there are crucial differences between Kalshi's exchange and a sportsbook that justify the different regulatory models under which they function. A financial exchange is an investment marketplace where traders enter into contracts with other traders—not with a casino or "house" that stacks the odds in its own favor. Declaration of Xavier Sottile ("Sottile Decl.") ¶¶ 26-27. For that reason, federal law as enforced by the CFTC focuses on preventing market manipulation and disruption and ensuring market efficiency nationwide. *See* 17 C.F.R. §§ 38.250, 38.152; *see Am. Agric. Movement*, 977 F.2d at 1156.

### C. The New York Regulatory Scheme for Gambling.

The New York State Gaming Commission regulates gambling in the state of New York through a licensing regime. Compl. ¶ 25. It oversees licensing, regulating, investigating, and penalizing casino operators, management companies, holding companies, key employees, casino gaming employees, and gaming related vendors in New York. *Id.* As the state's gaming regulator, the Gaming Commission has jurisdiction over all persons that participate in casino gaming. *Id.* Particularly relevant to the present dispute are New York's laws on gambling enterprises. New

York requires that any gambling enterprise that offers sports gaming—including wagers on sporting events—seek a license from the Gaming Commission. N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1367-a(4)(b). Under New York law, sports wagering is defined as "wagering on sporting events or any portion thereof, or on the individual performance statistics of athletes participating in a sporting event, or combination of sporting events . . . ." N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1367(1)(x). New York law only permits wagers to be made by individuals at a casino or on licensed mobile sports wagering platforms. N.Y. Rac. Peri-Mut. Wag. & Breed. Law §§ 1367(2)(a); 1367-a(2)(a). Offering sports gaming in New York in a manner that violates the state's gaming laws can constitute a felony, exposing any violators to civil and criminal penalties. N.Y. Penal Law §§ 225.00 *et seq*.; N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 104(9).

### D. The Gaming Commission's Cease-and-Desist Letter to Kalshi.

At 5:55 PM on October 24, 2025, the Gaming Commission sent a cease-and-desist letter to Kalshi, claiming that 20 of its federally self-certified event contracts were unlawful "sports wagering…opportunities" in violation of New York's Racing Law and Penal Law, which carries criminal penalties. Wong Decl., Ex. 1 at 1-2. The Gaming Commission demanded that Kalshi immediately cease and desist its operations in New York or face "civil penalties and fines" pursuant to New York gambling laws. The Gaming Commission, moreover, accused Kalshi of violating state criminal laws that could subject Kalshi or its officers to imprisonment. *See id.* at 1-2, 4; *see also* N.Y. Penal Law § 225.10; N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 104(9). The Gaming Commission sent the cease-and-desist letter at the very end of the day on a Friday, did not provide Kalshi any opportunity to discuss the matter with representatives of the Gaming Commission, and demanded *immediate* compliance. Thus, absent judicial relief, Kalshi faced the prospect of civil or criminal enforcement as early as the morning of Monday, October 27, 2025.

Immediately after filing the Complaint in this action, Kalshi informed the Gaming Commission of Kalshi's suit, provided the Gaming Commission a copy of the Complaint, and noted that Kalshi intended to seek preliminary relief. Wong Decl., Ex. 2. Counsel for Kalshi also requested that the Gaming Commission forbear any enforcement against Kalshi pending the resolution of Kalshi's suit, or at minimum, this Court's consideration of Kalshi's motion for preliminary injunction. *Id.* Kalshi explained that such forbearance would avoid the need to burden this Court with emergency motion practice. Kalshi requested a response by 11:00 a.m. on October 27, 2025. Kalshi did not receive a response. At 11:30 a.m. on October 27, 2025, Kalshi's counsel called the Gaming Commission and asked to speak to a representative of the Gaming Commission regarding Kalshi's intention to seek emergency relief, and emphasized the urgent nature of the request. Kalshi's counsel was placed on hold and then informed that someone would return the call at an unspecified time. Kalshi's counsel reiterated the request's urgent nature. As of this filing, the Gaming Commission has not responded to Kalshi. Kalshi thus respectfully requests that this Court enter a temporary restraining order and preliminary injunction.

## ARGUMENT

Kalshi is entitled to a temporary restraining order and preliminary injunction. Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction and temporary restraining order. *Park Irmat Drug Corp. v. OptumRx, Inc.*, 152 F. Supp. 3d 127, 131 (S.D.N.Y. 2016). To obtain such relief, the moving party must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). For the same reasons the Districts of Nevada and New Jersey granted Kalshi a preliminary injunction in similar cases, Kalshi meets each element of the inquiry.

**A. Kalshi Is Likely to Succeed Because New York's Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations.**

A "fundamental principle of the Constitution" is that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law either expressly or impliedly. One manner of preemption is known as field preemption, which occurs where Congress manifests an intent to exclusively occupy an entire field of regulation. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Alternatively, federal law can preempt state law where compliance with both is impossible or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," known as conflict preemption. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). It is well-settled that the CEA and its implementing regulations have "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976). New York's gambling and nuisance laws are no exception.

**1. New York Gambling Laws Are Field Preempted as Applied to Kalshi's Event Contracts.**

Field preemption exists where a federal regulatory scheme is "so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it." *de la Cuesta*, 458 U.S. at 153 (quotation omitted). Field preemption can be either express or implied. *See Crosby*, 530 U.S. at 372 n.6 (the preemption "categories" "are not 'rigidly distinct,'" and "'field' preemption may fall into any of the categories of express, implied, or conflict preemption"). "[T]he ultimate touchstone of pre-emption analysis" is the "purpose of Congress." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). Congress's intent to occupy a field can be apparent in the statutory text and history. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation*

& *Dev. Comm'n*, 461 U.S. 190, 203-13 (1983).  Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards . . . designed [to function] as a 'harmonious whole.' "  *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines*, 312 U.S. at 72).  "Where Congress occupies an entire field . . . even *complementary* state regulation is impermissible."  *Id.* (emphasis added).

Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation.  As federal courts in New Jersey and Nevada have already held, the CEA clearly evidences Congress's intent to occupy the field of futures trading on CFTC-regulated exchanges.  *Hendrick*, 2025 WL 1073495, at *6; *Flaherty*, 2025 WL 1218313, at *6.  Every marker of congressional intent confirms that Congress has preempted the field.

<u>*Statutory Text*</u>:  The text of the 1974 amendments to the CEA could hardly be clearer.  Congress established the CFTC and granted it "*exclusive jurisdiction*" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A) (emphasis added).  Kalshi's event contracts are traded on a contract market designated by the CFTC, and the CFTC therefore has "exclusive jurisdiction" to regulate these contracts.

Congress in the 1974 Act did not preempt regulation of *all* derivatives contracts.  Instead, Congress cabined federal preemption to contracts traded *on DCMs*.  The statute preserves concurrent state regulation for commodities and futures contracts traded *outside of DCMs*. 7 U.S.C. §§ 2(a), 16(e); H.R. Rep. No. 97-565, pt. 1, at 44 (1982) (acknowledging that federal and state agencies may police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC") (emphasis

added).  Thus, federal preemption of the New York law as to Kalshi does not call into question the state's regulation of casinos or other gambling establishments, none of which are DCMs.

For CFTC-designated exchanges like Kalshi, however, the CFTC has "exclusive jurisdiction."  7 U.S.C. 2(a)(1)(A).  Courts have easily found that statutes containing similar language preempt parallel state law regulation.  *See City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 187 (2d Cir. 2010) ("A federal agency 'may preempt state regulation and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law' provided the agency is 'acting within the scope of its congressionally delegated authority.'").  District courts in Nevada and New Jersey recently granted Kalshi a preliminary injunction on the ground that the statute's "plain and unambiguous language grants the CFTC exclusive jurisdiction" over contracts and swaps "that are traded or executed on exchanges that the CFTC has designated."  *Hendrick*, 2025 WL 1073495, at *5; *see also Flaherty*, 2025 WL 1218313, at *6 (agreeing that "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction").[1]

*Statutory Purpose*:  Congress in the 1974 Act sought to prevent exchanges from being subjected to fragmented regulatory demands that could differ from one jurisdiction to the next.  One "aim" of the 1974 Act was to "avoid unnecessary, overlapping and duplicative regulation."  *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001).  As one sponsor of the 1974 Act

---

[1] A district court in Maryland reached a different conclusion, but Kalshi has appealed that decision to the Fourth Circuit.  *See KalshiEX LLC v. Martin*, No. 25-cv-1283-ABA, 2025 WL 2194908, at *1 (D. Md. Aug. 1, 2025), *appeal filed*, No. 25-1892 (4th Cir. 2025).  And in denying a motion for a preliminary injunction sought by another DCM, Chief Judge Gordon reaffirmed the CFTC's exclusive jurisdiction over the regulation of swaps.  *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-cv-978-APG, 2025 WL 2916151, at *5 (D. Nev. Oct. 14, 2025).

explained, "different State laws would just lead to total chaos."  Senate Hearings at 685 (statement of Sen. Clark).

Congress thus placed "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 79 (1974). The Conference Report confirmed Congress's intent to preempt the field:  "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) *would preempt the field insofar as futures regulation is concerned*."  H.R. Conf. Rep. No. 93-1383 at 35 (emphasis added).

Courts agree that Congress intended to preclude states from exercising parallel authority over commodity futures trading in exchanges designated by the CFTC.  Writing for the Second Circuit, for example, Judge Friendly explained that the CEA "preempts the application of state law" regarding trading on federal exchanges.  *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982); *see also Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (Ark. 1977) (exclusive jurisdiction clause "is a clear indication that Congress intended no regulation in this field except under the authority of the act"); *see, e.g.*, *Hendrick*, 2025 WL 1073495, at *6.  The Gaming Commission's effort to regulate Kalshi's event contracts cannot be reconciled with that clear congressional purpose.

*Drafting history*:  The drafting history of the 1974 Act eliminates all doubt as to Congress's intent to preempt state laws like those Defendants have threatened to enforce against Kalshi.  To "assure that Federal preemption is complete," the Senate deleted the provision the Supreme Court had previously interpreted to preserve the states' authority over futures trading.  120 Cong. Rec. 30464 (1974) (statement of Sen. Curtis); *see Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947). And after House drafters introduced a state-law savings clause, the Senate added language making

clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "the Commission's jurisdiction, where applicable supersedes State as well as Federal agencies." *Id.* at 23. These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court had previously relied on "to hold that the CEA did not preempt state regulation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692-93 (1982). "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987). The Senate's decision to omit provisions allowing concurrent state jurisdiction over trading on DCMs is yet further proof of Congress's intent to preempt parallel state regulation.

*Comprehensive regulatory scheme*: The comprehensive nature of the regulatory scheme Congress created for CFTC-authorized exchanges is further evidence that Congress intended to foreclose concurrent state jurisdiction. *See Arizona*, 567 U.S. at 401; *La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368-69 (1986).

As the Supreme Court has found, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch,* 456 U.S. at 356 (quoting H.R. Rep. No. 93-975, at 1 (1974)). An exchange may only offer futures contracts after undergoing an extensive review process and receiving the CFTC's designation as a DCM. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100. Once an exchange is designated as a DCM, the CFTC enjoys "exclusive jurisdiction" over the derivatives traded on the market. 7 U.S.C. § 2(a)(1)(A). DCMs are subject to an extensive framework of CFTC oversight, involving recordkeeping requirements, 17 C.F.R. §§ 38.950, 1.31, reporting obligations, *id.* § 38.450, pt. 16, liquidity

14

standards, *id.* § 38.1101(a)(2), and penalties for noncompliance, *id.* pt. 38. And Congress elected to allow DCMs to list contracts—including event contracts—by self-certifying that they comply with the CEA's requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(3)(iv). Congress then gave the CFTC the back-end authority to conduct a review of a contract if it believes the contract may run afoul of any statute or regulation. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). Failure to abide by the CFTC's contract determinations can result in civil and criminal penalties, which the CFTC may pursue at its discretion.

Of particular relevance here, the CEA specifically authorizes the CFTC to reject certain event contracts deemed to be "contrary to the public interest" ***and*** "involv[ing]" certain types of activities. 7 U.S.C. § 7a-2(c)(5)(C)(i). The statute is not mandatory—the CFTC "may" reject a contract involving a listed activity ***or*** it may determine that such a contract would not be contrary to the public interest. *Id.* Congress thus left the decision about the public interest to one federal authority—not 50 separate states and the District of Columbia.

Congress dictated an enforcement role for states—but that role expressly *excludes* the right to enforce state laws against DCMs. The CEA authorizes appropriate officials "of any State" to bring suit regarding "any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the [CFTC] thereunder"—but a proviso to this provision allows states to enforce the CEA against parties "*other than a [designated] contract market*." 7 U.S.C. § 13a-2(1) (emphasis added). Congress added this proviso because it "wanted the power to enforce the CEA *with respect to organized exchanges* to remain solely in the CFTC." Van Wart, *supra*, at 708. Congress further made clear that the CEA does not "supersede or preempt" the application of state law to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so. 7 U.S.C. § 16(e)(1)(C). In other words, Congress granted the CFTC exclusive

power to regulate contracts traded on the exchanges it oversees but permitted federal and state agencies to police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC."  H.R. Rep. No. 97-565, pt. 1, at 44 (1982) (emphasis added).  This comprehensive regulatory scheme for regulating trading on licensed exchanges evinces a strong congressional intent to preempt the field.

### 2. <u>New York Laws Are Conflict-Preempted as Applied to Kalshi</u>.

New York's gambling laws are also conflict-preempted as applied to Kalshi because it would be "impossible" for Kalshi "to comply with both state and federal law," and because New York's laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA.  *Crosby*, 530 U.S. at 372-73.  In at least three respects, subjecting Kalshi's event contracts to New York law would conflict with the CEA.

*First*, Congress passed the 1974 Amendments to the CEA to bring futures markets regulation "under a uniform set of regulations."  *Am. Agric. Movement,* 977 F.2d at 1156; *see also Leist*, 638 F.2d at 291-93.  "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors."  *Am. Agric. Movement,* 977 F.2d at 1156.  The Seventh Circuit found that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted."  *Id.* at 1156-57 (citation omitted).

In *Leist*, the Second Circuit also considered the history of the congressional regulation of futures trading and the legislative history of the CEA.  The court concluded that the purpose of the CEA's exclusive jurisdiction clause was to "separate the functions of the new CFTC from those of the SEC and other *regulators*" bringing "[a]ll commodities trading in futures [] within federal

regulation under the aegis of the new [CFTC]." 638 F.2d at 314 (citing H.R. Rep. No. 93-975, pt. 1, at 3 (1974)). The court also concluded that the purpose of the CEA's savings clause was to clarify that federal and state courts would retain their jurisdiction, permitting private causes of action under the CEA. In conducting its analysis, the Second Circuit considered whether the causes of action were ones "traditionally relegated to state law, so that it would be inappropriate to infer [] cause[s] of action based solely on federal law." *Id.* at 322. The court found that the analysis of such a question needed "little space," because the "federal government has been vitally concerned with trading in futures since 1922; indeed, the courts have held that [Section] 2(a)(1) of the CEA preempts the application of state law." *Id*.

Defendants' actions clearly conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes. Defendants intend to deploy state laws to regulate Kalshi's contract market—exactly what Congress did not want states to regulate. The conflict is even clearer when considering the possibility that 49 other states and the District of Columbia might equally attempt to subject Kalshi to their own state laws. This outcome would erect "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S. at 67; *Hendrick*, 2025 WL 1073495, at *7 ("Preventing the difficulties" created by multiple state enforcement efforts "is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges").

<u>Second</u>, a state law stands as an "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals and a state law hampers "the careful balance struck by Congress." *Arizona*, 567 U.S. at 406. Where Congress "entrust[s]" the federal government with "discretion" over violations of federal law, a state regime that allows for state prosecutions of the same actions is "preempted by federal law." *Id.* at 407-09. Otherwise, a

state could bring charges against an individual "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402.

That is exactly the risk posed by Defendants' actions. Under federal law, once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts by self-certifying that these contracts comported with federal law. The CFTC had the authority to review that self-certification on the ground that these contacts were "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i), but chose not to do so. Compl. ¶ 47. The CFTC's Enforcement Division has authority to investigate and initiate enforcement actions seeking an array of penalties in federal court or administrative proceedings, but, again, chose not to do so. Congress thus gave the CFTC a variety of tools for enforcing federal law against federally designated contract markets and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate.

Subjecting federally regulated exchanges to state laws like New York's would disrupt "the congressional calibration of force." *Crosby*, 530 U.S. at 380. New York criminal law imposes penalties that would substantially interfere with the CFTC's discretion. For example, New York authorities threatened Kalshi with violations of statutes that carry penalties of fines and *imprisonment*. *See, e.g.,* N.Y. Penal Law § 225.10. Absent a finding of preemption, the carefully calibrated federal enforcement scheme would be displaced by a blunt application of mandatory state criminal penalties.

*Third*, it is impossible for Kalshi to comply with the Gaming Commission's demands while continuing to adhere to the Core Principles on which Kalshi's designation as a CFTC-approved market depends. To secure a license in New York, Kalshi would need to limit access to the

exchange solely to persons making trades in New York. *See* N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1367(1)(b) ("'Authorized sports bettor' means an individual who is physically present in this state when placing a sports wager, who is not a prohibited sports bettor, and who participates in sports wagering offered by a casino or a mobile sports wagering licensee."). But the requirement to accept trades only within one state would be impossible for a nationwide exchange like Kalshi required by federal law to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." 17 C.F.R. § 38.151(b) (emphasis added); *see also id.* § 38.150. Attempting to comply with New York's scheme would therefore present Kalshi with an impossible choice—either to accept trades exclusively from persons within New York or to close its exchange to New York in violation of its impartial access obligations. And subjecting Kalshi to state law would mean that 49 other states would be free to subject Kalshi to the same impossible choice, resulting in precisely the state-by-state patchwork that Congress in 1974 sought to avoid. This is a classic example of impossibility preemption— where federal law "forbids what the state law requires." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012).[2]

**B.    Kalshi Will Suffer Irreparable Harm Without a Temporary Restraining Order and Preliminary Injunction.**

The Gaming Commission's cease-and-desist letter threatens Kalshi with a classic "Hobson's choice" giving rise to irreparable harm—either "continually violate [state] law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the

---

[2] Even if Kalshi could somehow exclude New York residents from participating in its exchange, CFTC's Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of *price distortions and market disruptions*." 17 C.F.R. § 38.255 (emphasis added). Abruptly closing Kalshi's event contracts to anyone located in New York as a result of the Gaming Commission's threats of criminal liability would constitute exactly that sort of market disruption.

pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). As the district courts in Nevada and New Jersey recognized in similar circumstances, Kalshi suffers irreparable harm along several dimensions.

*First*, if Kalshi chooses not to comply with the Gaming Commission's unconstitutional threats, Kalshi and its officers face the extraordinary harms associated with the threat of civil liability and criminal prosecution. The Supreme Court has recognized that a party facing the threat of imminent enforcement under a preempted state statute suffers "irreparable injury." *Id.* The Second Circuit agrees that there is a "presumption of irreparable injury that flows from a violation of constitutional rights" and that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (plaintiff establishes a likelihood of irreparable harm when it demonstrates a "credible threat of prosecution" under a preempted state statute). The Gaming Commission "reserve[d] all rights to investigate further and to levy and collect civil penalties and fines" and threatened criminal prosecution against Kalshi if it failed to immediately cease "illegally operating, advertising, promoting, administering, managing, or otherwise making available sports wagering and/or a mobile sports wagering platform," making clear that the threat of enforcement is imminent. Wong Decl., Ex. 1 at 4. One other state recently commenced enforcement proceedings against Kalshi under state gaming laws, confirming that the threat of enforcement here is not speculative. *See Massachusetts v. KalshiEX LLC*, No. 2584-cv-02525 (Mass. Sup. Ct.).

*Second*, attempting to comply with the Gaming Commission's unconstitutional threat would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation. Kalshi has nearly 175,000 users in New York, many of whom have open

investments on the platform.    Sottile Decl. ¶ 47.    If Kalshi complied with the Gaming Commission's unconstitutional threat during the pendency of this litigation, it would forgo business in this market, with no prospect of recouping its losses even if it ultimately prevails. Moreover, it is not at all clear that Kalshi has the capacity to comply with the threat to cease "immediately" as the Gaming Commission demands, and any attempt at complying would subject Kalshi to extraordinary technological challenges and costs.    Kalshi has no need currently to comprehensively geolocate its users on a state-by-state basis because it is regulated federally.  *Id.* ¶ 18.    Attempting to implement geolocation capabilities would take months and cost tens of millions of dollars annually.  *Id.* ¶¶ 21-22.    And because the Eleventh Amendment permits only *injunctive relief* against state officials enforcing unconstitutional state law, *see Ex parte Young*, 209 U.S. 123, 155 (1908); *Ford v. Reynolds*, 316 F.3d 351, 355 (2d Cir. 1989), Kalshi would have no clear way of seeking damages if it ultimately prevailed.  *See John E. Andrus Mem'l, Inc. v. Daines*, 600 F. Supp. 2d 563, 572 n.6 (S.D.N.Y. 2009) (plaintiffs "unable to collect a judgment for monetary damages" due to "sovereign immunity under the Eleventh Amendment" may have irreparable injury "presumed" because "the only relief available . . . is injunctive"); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (monetary harm "is irreparable here because [plaintiffs] will not be able to recover monetary damages" due to damages immunity).

*Third*, a preliminary injunction is needed not just to protect Kalshi, but also Kalshi's users. Users who trade on Kalshi's platform enter into contracts with other users.  Immediately shuttering access to these contracts for New York users could require Kalshi unilaterally to terminate users' contracts and liquidate their positions, or to pause trading on these contracts pending the outcome of litigation months or more in the future.  Sottile Decl. ¶¶ 29, 36.  Under either scenario, this would be an extraordinary and disruptive act, harming users not just in New York but nationwide,

because cutting off access to users in one state would substantially distort the markets even for users in other states. Such an impairment of existing contractual obligations for Kalshi's users easily constitutes irreparable harm. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (company's "loss of reputation, good will, and business opportunities" from a breach of contract can constitute irreparable harm).

*Fourth*, Kalshi will face irreparable reputational harm if no injunction is granted. If Kalshi chooses not to comply on the ground that New York law is preempted, the threat of prosecution—not to mention being labelled a willful violator of New York law—would undermine the reputation that Kalshi has cultivated over many years and that resulted in Kalshi being the first event market designated by the CFTC. But bowing to the Gaming Commission's threat by abruptly ending its business in New York would undermine users' confidence in Kalshi's exchange and make them fear that their own investments are at risk. *See* Sottile Decl. ¶¶ 12-13, 30-37, 47. This loss of "goodwill" could not easily be regained even if Kalshi ultimately prevails and constitutes a distinct form of irreparable harm. *Tom Doherty Assocs, Inc. v. Saban Ent. Inc.*, 60 F.3d 27, 37 (2d Cir. 1995). Moreover, the Gaming Commission's demands jeopardize Kalshi's status as a CFTC-designated contract market—and thus pose an existential threat to Kalshi. Abruptly terminating its event-based contracts in New York would risk violating the CFTC Core Principles to which Kalshi is subject, including the obligation to provide "impartial access" to its markets, 17 C.F.R. § 38.151(b), and the obligation to reduce the risk of "market disruptions," *id.* § 38.255. Should the CFTC conclude that closing Kalshi's markets in New York violates federal law, it could respond by seeking to revoke Kalshi's designation. 7 U.S.C. § 8(b). A preliminary injunction is needed to prevent Kalshi from suffering irreparable harm during the pendency of this litigation.

**C. The Balance of the Equities and Public Interest Favor a Preliminary Injunction.**

The public has a first-order interest in ensuring that preempted New York laws are not enforced against federally regulated entities. Enjoining the unconstitutional application of a statute "serves the public interest . . . because . . . the Government does not have an interest in the unconstitutional enforcement of a law." *Amarin Pharma, Inc. v. FDA.*, 119 F. Supp. 3d 196, 237 (S.D.N.Y. 2015) (citations and internal quotation marks omitted). By the same token, Defendants cannot show any harm "as a result of being prevented from enforcing an unconstitutional statute[.]" *Volokh v. James*, 656 F. Supp. 3d 431, 447 (S.D.N.Y. 2023). Both courts to have addressed the question in the related litigations have accordingly found that enjoining a preempted law comports with the public interest. *Hendrick,* 2025 WL 1073495, at *8; *Flaherty*, 2025 WL 1218313, at *7. New York retains no reciprocal interest because it lacks any interest in enforcing a state law that is preempted. *See Arizona*, 567 U.S. at 401.

Beyond that, the failure to issue an injunction here would "reach beyond the parties involved directly in the suit and impact the public's right[s]." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 381 (1992). Immediate compliance with New York law to avoid criminal penalties will harm Kalshi's users in New York and impose intractable technological difficulties on a very short timeframe. Sottile Decl. ¶¶ 12-28. Abrupt cessation would make it difficult to inform users in New York of their rights and obligations regarding ongoing event contracts and would risk cutting off users' access to their investments on Kalshi's exchange. *Id*. ¶¶ 29-37. Given that the New York laws are clearly preempted by federal law as applied to Kalshi, the balance of the equities and public interest firmly favor preliminary relief.

**D.  No Security—Or Only a *De Minimis* Security—Is Appropriate.**

Federal Rule of Civil Procedure 65(c) requires a party seeking a preliminary injunction to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  "[T]he amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court."  *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).  Defendants will suffer no nonspeculative damage by halting enforcement against Kalshi during the pendency of this litigation.  Accordingly, no security is needed.  *Id.* (affirming decision not to require bond).  Alternatively, should the Court require a security, only a *de minimis* security is warranted.  The District of Nevada, for example, ordered Kalshi to provide "a de minimis $10,000 bond." *Hendrick*, 2025 WL 1073495, at *8.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant a temporary restraining order and preliminary injunction.

Dated:    October 27, 2025
          New York, New York

Respectfully submitted,

 */s/ Grant R. Mainland*

Grant R. Mainland
Andrew L. Porter
Karen Wong
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
GMainland@milbank.com
APorter@milbank.com
KWong3@milbank.com

Joshua B. Sterling (pro hac vice forthcoming)
William E. Havemann (pro hac vice forthcoming)
**Milbank LLP**
1101 New York Avenue NW
Washington D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586
JSterling@milbank.com
WHavemann@milbank.com

*Attorneys for Plaintiff*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 7,583 words.