## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KALSHIEX LLC, | Case No.: 1:25-cv-08846 |
| *Plaintiff*, | **COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |
| vs. | |
| ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission; SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission; and the NEW YORK STATE GAMING COMMISSION, | |
| *Defendant*s. | |

## INTRODUCTION

1.     This action challenges the State of New York's intrusion into the federal government's exclusive authority to regulate derivatives trading on exchanges overseen by the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). The New York State Gaming Commission seeks to prevent Plaintiff KalshiEX LLC ("Kalshi") from offering event contracts for trading on its federally regulated exchange. It does so by threatening Kalshi with imminent civil penalties and fines for offering these contracts. New York's attempt to regulate

Kalshi intrudes upon the federal regulatory framework that Congress established for regulating derivatives on designated exchanges. The state's efforts to regulate Kalshi are both field-preempted and conflict-preempted. This Court should therefore issue both a preliminary and a permanent injunction, as well as declaratory relief.

2.      Kalshi is a federally designated derivatives exchange, subject to the CFTC's exclusive jurisdiction. It offers consumers the chance to trade in many types of event contracts, including, as relevant here, sports-event contracts. These contracts are subject to exclusive federal oversight, and—critically—they are *lawful* under federal law.

3.      Commodity futures regulation has long been under the exclusive purview of the federal government. In 1936, Congress passed the Commodity Exchange Act ("CEA"), which enacted a federal regulatory framework for derivatives. In 1974, Congress established a federal agency called the CFTC to oversee it.

4.      The text, purposes, and statutory history of the CEA leave no question that Congress sought to preempt state regulation of derivatives on exchanges overseen by the CFTC, known as "designated contract markets" or "DCMs." The text of the statute gives the CFTC "exclusive jurisdiction" over trading on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). During the drafting process of the 1974 amendments to the CEA, Congress deleted a provision that would have granted states concurrent jurisdiction over futures trading. *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge). One of Congress's avowed goals in creating the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a patchwork of 51 different—and potentially conflicting—state laws. *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113,* 93d Cong. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen.

Clark).  As the conference report to the 1974 amendments explained, they were designed "preempt the field insofar as futures regulation is concerned."  H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).  And the statute gives the CFTC comprehensive authority over regulated exchanges, including the authority to approve or reject certain categories of event contracts as against the public interest.

5.     For that reason, courts have easily found state laws preempted in similar contexts. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.).  The CFTC itself agrees.  It recently informed the U.S. Court of Appeals for the D.C. Circuit that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi.  Appellant Br. *27, *KalshiEx LLC v. CFTC*, 119 F.4th 48 (D.C. Cir. 2024) (emphasis added).

6.     Earlier this year, federal courts in Nevada and New Jersey granted Kalshi preliminary injunctions to prevent similar state overreach.  These courts enjoined state officials from attempting to prohibit Kalshi's event contracts, explaining that "because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted."  *KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025); *see also KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) ("at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi); *but see KalshiEX LLC v. Martin*, No. 25-cv-1283, 2025 WL 2194908, at *13 (D. Md. Aug. 1, 2025), *appeal docketed*, No. 25-1892 (4th Cir. 2025).

7.     The district courts in Nevada and New Jersey both also found that Kalshi faced irreparable harm because it:

> faces a 'Hobson's choice': if it does not comply with the defendants'
> demand to cease it faces civil and criminal liability, but if it does comply it
> will incur substantial economic and reputational harm as well as the
> potential existential threat of the CFTC taking action against it for violating
> the CFTC's Core Principles if Kalshi disrupts contracts or geographically
> limits who can enter contracts on what is supposed to be a national
> exchange.

*Hendrick*, 2025 WL 1073495, at *6; *Flaherty*, 2025 WL 1218313, at *7 ("This is virtually the same 'Hobson's choice' discussed in *Hendrick*.").

8.      In ruling for Kalshi, the district court in Nevada pointed out that other states—like New York here—"have sent or intend to send Kalshi cease-and-desist letters," which "highlights the problem of allowing the States to regulate a national exchange" because it "raises the possibility that another State would have different rules than not only [] the CFTC, but other States." *Hendrick*, 2025 WL 1073495, at *7.  As the court explained, "[p]reventing the difficulties that would create is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges." *Id.*

9.      Defendants' actions have confirmed the Nevada district court's warning.  The New York State Gaming Commission and its officers (the "Individual Defendants") seek to intrude on the comprehensive federal scheme for regulating designated exchanges by attempting to prohibit Kalshi from offering contracts that federal law permits.

10.     Even though Kalshi's contracts are subject to the CFTC's exclusive jurisdiction, Defendants have implicitly threatened Kalshi with criminal action and explicitly threatened Kalshi

with civil penalties, including fines, unless it shuts down these contracts in New York *immediately*. Defendants thus seek to subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent, and to interfere with the CFTC's exclusive authority to regulate derivatives trading on the exchanges it oversees.

11.    Defendants' actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has expressly and impliedly occupied the field of regulating futures trading on CFTC-approved exchanges, and because Defendants' acts would squarely conflict with federal law.  Kalshi is entitled to declaratory and injunctive relief to prevent New York authorities from enforcing their preempted state laws against Kalshi.

12.    Defendants' actions threaten immediate and irreparable harm, not just to Kalshi but to its customers and commercial counterparties.  Shutting down its event contracts in New York would threaten Kalshi's viability and require devising complex technological solutions whose feasibility is entirely untested and unclear.  Defendants' acts also impair Kalshi's existing contracts with consumers and business partners, subject Kalshi's users to uncertainty and loss, undermine confidence in the integrity of Kalshi's platform, threaten its prospective business relationships, and jeopardize Kalshi's status as a CFTC-approved exchange.  For that reason, concurrently with the filing of this complaint, Kalshi seeks an emergency temporary restraining order and preliminary injunction to avoid the immediate and irreparable harm that would result from Defendants' unlawful acts.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution.  The federal

question presented is whether New York law is preempted by the CEA, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

14.    The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials.  The Eleventh Amendment, as construed in *Ex parte Young*, 209 U.S. 123 (1908), "permits a private party to seek prospective injunctive relief against state officials in their official capacity before those officials violate the plaintiff's federal constitutional or statutory rights."  *Block v. Canepa*, 74 F.4th 400, 406 (6th Cir. 2023).

15.    Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).  The Individual Defendants perform their duties and thus reside in the State of New York.  Plaintiff Kalshi is headquartered in this District.  A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

16.    Plaintiff Kalshi is a financial services company with its principal place of business in Manhattan.  Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts.  Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq.*

17.    Defendant Robert Williams is sued in his official capacity as the Executive Director of the New York State Gaming Commission.

18.    Defendant Brian O'Dwyer is sued in his official capacity as the Chair and Commissioner of the New York State Gaming Commission.

19.    Defendant John A. Crotty is sued in his official capacity as Commissioner of the New York State Gaming Commission.

20.     Defendant Sylvia B. Hamer is sued in her official capacity as Commissioner of the New York State Gaming Commission.

21.     Defendant Martin J. Mack is sued in his official capacity as Commissioner of the New York State Gaming Commission.

22.     Defendant Peter J. Moschetti, Jr. is sued in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission.

23.     Defendant Marissa Shorenstein is sued in her official capacity as Commissioner of the New York State Gaming Commission.

24.     Defendant Jerry Skurnik is sued in his official capacity as Commissioner of the New York State Gaming Commission.

25.     Defendant New York State Gaming Commission is sued as the state agency that regulates legal gambling in the State of New York by conducting licensing, permitting, collecting, auditing, testing, programming, inspecting, investigating, prosecuting, and reporting activities with respect to covered entities.  The Gaming Commission oversees licensing, regulating, investigating and penalizing casino operators, management companies, holding companies, key employees, casino gaming employees, and gaming-related vendors in New York.  As the state's gaming regulator, the Gaming Commission has jurisdiction over all persons participating in casino gaming.

26.     Together, defendants Robert Williams, Brian O'Dwyer, John A. Crotty, Sylvia B. Hamer, Martin J. Mack, Peter J. Moschetti, Jr., Marissa Shorenstein, Jerry Skurnik, and the New York State Gaming Commission would be responsible for enforcing any demand for Kalshi to comply with New York state law that is preempted by federal law.

## FACTUAL ALLEGATIONS

**A.  An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.**

27.    Derivatives contracts are financial tools used to mitigate risk.  Event contracts are a quintessential example of a derivatives contract—they are a type of option.  This type of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date.  Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position.  For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025.  A purchaser may trade on either the "yes" or the "no" position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

28.    Event contracts are traded on an exchange.  Traders exchange positions with other traders in the marketplace.  Importantly, event contracts do not reflect a "bet" against the "house." Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.").  Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

29.    The value of an event contract is determined by market forces.  An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence.  During that period,

individuals can buy and sell the contract at its fluctuating prices. The ultimate value of an event contract is determined at its expiration date. If the underlying event occurs, the holder of the "yes" position is entitled to its full value. But if the underlying event does not occur, the holder of the "no" position gets the payment.

30.    Traders price event contracts by reference to available information at any given time. If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase. The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur. Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year. The 30% figure can be informed by datapoints the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

31.    Event contracts are a valuable means to hedge against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market. There is no other financial instrument with the unique capability to capture the risks of an event with potential economic consequences.

32.    Sports events can have significant economic consequences for a broad ecosystem of stakeholders. Advertisers, sponsors, television networks, local communities, and state-based sportsbooks all stand to gain or lose substantial sums depending on the outcomes of sports events. Sports-event contracts thus offer these entities opportunities to hedge their exposure. For example, sponsors of a particular team or athlete can use event contracts to hedge against the risk that the

team or athlete underperforms.  Or sportsbooks, which take on significant financial risk related to sporting events, can use sports-event contracts to reduce their exposure.

33.    Event contracts are a valuable means of communicating information to the public because contract prices reflect prevailing market opinions and conditions.  Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders— including businesses, individuals, governments, and educational institutions.  Data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event.  *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

**B. Congress Delegated the Power to Regulate Event Contracts That Are Offered by a Regulated Exchange to the CFTC.**

34.    Futures contracts have long been regulated by the federal government.  In 1936, Congress passed the CEA, which provides for federal regulation of all commodities and futures trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

35.    In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA.  Proponents of the 1974 Act were concerned that the "states . . . might step in to regulate the futures markets themselves," thus subjecting futures exchanges to "conflicting regulatory demands."  *Am. Agric. Movement*, 977 F.2d at 1156.  One Senator remarked that "different State laws would just lead to total chaos."  Senate Hearings at 685 (statement of Sen. Clark).  As a solution, the House Committee on Agriculture put "all

exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states' authority over futures trading. *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge).

36. The public can only trade derivatives on a board of trade that the CFTC has designated as a contract market, or DCM. 7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a). An entity must first submit an application to the CFTC detailing how the entity complies with the Core Principles of the CEA. 17 C.F.R. § 38.3(a)(2). Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300. Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission. 17 C.F.R. § 38.3(a)(1).

37. Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives traded on the market. Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of

a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event" contracts. *See id.* § 1a(47)(A)(ii), (iv), (vi).

38.     Once the CEA designates a board of trade as a DCM, the market is subject to an extensive framework for CFTC oversight. Part 38 of Title 17, Chapter 1 of the Code of Federal Regulations comprehensively regulates DCMs, ensuring that these markets continue to comply with the CEA. Exchanges must meet detailed requirements to maintain their designations as DCMs. 17 C.F.R. pt. 38. Among other things, DCMs must abide by recordkeeping requirements that specify the form, manner, and duration of retention. 17 C.F.R. §§ 38.950, 1.31. DCMs must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC. 17 C.F.R. § 38.450, pt. 16. Part 38 also imposes specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more.

39.     The CEA allows DCMs to list contracts on its exchange without pre-approval from the CFTC. To do so, a DCM self-certifies that a given contract complies with the CEA and CFTC regulations by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC may initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).

40.     Alternatively, exchanges have the option of submitting contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA. 7 U.S.C. § 7a-2(c)(5)(B). Substantially all contracts listed by DCMs for trading are self-certified by the listing DCMs; it is extremely rare for a DCM to seek CFTC approval of individual contracts.

41.    The CEA's enforcement process rounds out the comprehensive federal framework that regulates futures derivatives sold on DCMs.  The CEA gives the CFTC discretion as to how to police and enforce violations of the CEA for DCMs.  The CFTC includes an Enforcement Division, which may initiate investigations and, with the approval of a majority of the CFTC, pursue enforcement actions in federal court or administrative proceedings.  If the Division concludes that there has been a violation of the CEA, it may recommend to the Commission that it seek a wide range of enforcement measures, including (1) civil monetary penalties, (2) restitution, (3) disgorgement, (4) suspension, denial, revocation, or restriction of registration and trading privileges, and (5) injunctions or cease-and-desist orders.  *See* CFTC Division of Enforcement, Enforcement Manual (May 20, 2020), https://www.cftc.gov/media/1966, at § 3.3. If the Division suspects that an entity has engaged in criminal violations, the Division may also refer the matter to the Department of Justice or the appropriate state authority for prosecution.  *Id.*

42.    The CFTC regulates derivatives that reference physical commodities like "wheat, cotton, rice, corn, oats."  7 U.S.C. § 1a(9)  The CFTC also regulates derivatives on "excluded commodit[ies]" like interest rates, other financial instruments, economic indices, risk metrics, and—as particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences.  *Id.* § 1a(19)(iv); *see* 7 U.S.C. § 1a(9).  The CFTC regulates event contracts as a type of "swap" contract.  *See id.* § 1a(47)(A)(ii), (iv), (vi); *see KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024).  "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities."  7 U.S.C. § 7a-2(c)(5)(C)(i).

43.     In 2010, Congress amended the CEA to address event contracts specifically. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.*

**C. After an Extensive Regulatory Process, the CFTC Registered Kalshi as a Contract Market That Operates Under Federal Law.**

44.     Kalshi is a regulated exchange and prediction market where users can trade on the outcome of real-world events. In 2020, the CFTC unanimously designated Kalshi as a contract market, affirming that its platform complied with the CEA. Since then, Kalshi has been fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

45.     Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

46.     Kalshi offers many kinds of event contracts related to an array of substantive areas like climate, technology, health, crypto, popular culture, and economics. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030. Kalshi offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

47.     Among its menu of event contracts, Kalshi offers sports-event contracts. On January 22, 2025, Kalshi self-certified, pursuant to section 7a-2(c)(1) of the CEA, the first of a

number of sports contracts that are now available on its exchange. Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review. *See, e.g.*, Ex. 1. Kalshi's sports-related contracts allow users to place positions on, for example, which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship. While the CEA allows the CFTC to subject these contracts to a 90-day public interest review if the CFTC determines these contracts involve "gaming," the CFTC has declined to review any of Kalshi's sports-event contracts. Unless and until the CFTC takes action on Kalshi's sports-event contracts—all of which have been self-certified under the CEA—they are authorized under federal law. 7 U.S.C. § 7a-2(c)(5).

**D. The New York State Gaming Commission Threatens Kalshi with State Civil Penalties with Regard to Its Sports-Event Contracts.**

48.     On October 24, 2025, the New York State Gaming Commission (the "Gaming Commission") sent Kalshi a cease-and-desist letter claiming that offering event contracts based on sporting events "within New York State" without a sports gaming license violated New York law. The letter directed Kalshi to "cease and desist immediately from illegally advertising, promoting, administering, managing, or otherwise making available sports wagering and/or a mobile sports wagering platform in New York." Ex. 2 at 4.

49.     The Gaming Commission warned that offering sports gaming in New York "in connection with any sports event" under its Racing Laws empowers it to "levy and collect civil penalties and fines for any violation of the Racing Law." *Id*. at 1. Listing 20 of Kalshi's federally self-certified event contracts as unlawful, the Gaming Commission demanded Kalshi cease and desist operations and without providing a compliance date. *Id*. at 1-2.

50.     The Gaming Commission added that the activity described on Kalshi's website is "offering sports wagering gambling opportunities to Kalshi customers within the meaning of Penal Law § 225.00(2)" because the customer "is staking or risking 'something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome' with respect to a sports event within the meaning of Racing Law section 1367(1)(t)." *Id*. at 2 (citing Penal Law § 225.00(2); Racing Law § 1367(1)(t)).  Consequently, the Gaming Commission claimed that it had the power to "investigate further and to levy and collect civil penalties and fines in connection with Kalshi's prior, current, and any future activity related to sports wagering and/or mobile sports wagering in New York." *Id*.

51.     The Gaming Commission demanded that Kalshi confirm that it had complied with the cease-and-desist letter and halted its offerings of sports-event contracts in New York.  *Id*. Again, the Gaming Commission warned that it "reserves all rights to investigate further and to levy and collect civil penalties and fines in connection with Kalshi's prior, current, and any future activity related to sports wagering and/or mobile sports wagering in New York." *Id*. at 4.

52.     Kalshi has no option but to seek judicial relief.  The Gaming Commission's cease-and-desist letter, sent on a Friday evening, demands that Kalshi immediately cease operating in New York or face criminal and civil liability.  Because its platform listed contracts that were be traded over the weekend, Kalshi has no other practical choice to protect its commercial interests and those of its users except to bring this suit.  Absent judicial relief, Kalshi faces the prospect of criminal enforcement and civil penalties in New York as of the date of this filing.

**REQUISITES FOR RELIEF**

53.     As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions, including, but not limited to, the enforcement of preempted state law threatened by the cease-and-desist letter, will violate the Supremacy Clause of the U.S. Constitution and subject Kalshi and its customers to irreparable harm.

54.     An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties.  Defendants' conduct alleged herein, including direct threats to Kalshi, has already and will continue to result in irreparable injury to Plaintiff, including but not limited to criminal liability, economic hardship, and impairment of existing contractual relationships.

55.     Plaintiff has no plain, speedy, or adequate remedy at law to address the wrongs described herein.  Plaintiff therefore seeks declaratory and injunctive relief restraining Defendants from enforcing New York law that interferes with the operation and function of Plaintiff's futures market described herein.

**COUNT I**

**(Supremacy Clause—Preemption by Commodity Exchange Act)**

56.     Plaintiff incorporates all prior paragraphs by reference.

57.     The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every

State shall be bound thereby, any Thing in the Constitution or

Laws of any State to the Contrary notwithstanding.

58.     The Supremacy Clause mandates that federal law preempt state law in any field

over which Congress has expressly or impliedly reserved exclusive authority to the federal

government, or where state law conflicts or interferes with federal law.

59.     Congress explicitly gave the CFTC "exclusive jurisdiction" to regulate futures

trading on approved exchanges.  7 U.S.C. § 2(a)(1)(A).  Without a unified approach to futures

regulation, Congress feared that fragmented and uncoordinated state regulation would lead to

"total chaos."  Senate Hearings, at 685 (statement of Sen. Clark).  Having analyzed the text,

purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt

state law in futures trading on CFTC-regulated exchanges.  *See, e.g., Am. Agric. Movement*, 977

F.2d at 1156; *Leist*, 638 F.2d at 322; *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D.

Kan. 1979); *Hofmayer v. Dean Witter & Co.,* 459 F. Supp. 733, 737 (N.D. Cal. 1978).

60.     In threatening to enforce Racing Law Sections 104 and 1367 and Penal Law Section

225.00(2), and any rules adopted thereunder against Kalshi, Defendants are impermissibly

intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated

exchanges.  Indeed, federal law authorizes the CFTC to "determine" whether event contracts

involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-

2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same

putative subject matter.  Likewise, Defendants' threats to abate Kalshi's website for supposedly

constituting a nuisance and to revoke the license of an entity that partners with a DCM intrudes on

the field that Congress has preempted.  Because federal law occupies the entire field of regulating

trading on designated contract markets, Defendants' threatened actions are both expressly and impliedly field-preempted under the Supremacy Clause.

61.    In addition, Defendants' threatened actions conflict with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized (and to subject the website on which such contracts are offered to abatement), which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges.  In addition, complying with Defendants' demand to immediately cease offering event contracts in New York could conflict with the federal law governing DCMs, and would thus imperil Kalshi's CFTC approval.  For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

62.    Defendants may not enforce New York's gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq.*

### **PRAYER FOR RELIEF**

WHERFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1.    Enter a judgment declaring that Racing Law Sections 104 and 1367 and Penal Law Section 225.00(2), any rules adopted thereunder, and any other New York law that is used in a manner to effectively regulate Plaintiff's designated contract market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2.    Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation

with them who receive actual notice of the injunction, from enforcing Racing Law Sections 104 and 1367 and Penal Law Section 225.00(2), any rules adopted thereunder, or any other New York law that attempts to effectively regulate Plaintiff's exchange, against Plaintiff;

3. Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Racing Law Sections 104 and 1367 and Penal Law Section 225.00(2), any rules adopted thereunder, or any other New York law that attempts to effectively regulate Plaintiff's designated contract market.

4. Any other relief within this Court's discretion that it deems just and proper.

Dated:      October 28, 2025
              New York, New York

          Respectfully submitted,

          */s/ Grant R. Mainland*

          Grant R. Mainland
          Andrew L. Porter
          Karen Wong
          **Milbank LLP**
          55 Hudson Yards
          New York, NY 10001
          Telephone: 212-530-5000
          Facsimile: 212-530-5219
          GMainland@milbank.com
          APorter@milbank.com
          KWong3@milbank.com

          Joshua B. Sterling (pro hac vice forthcoming)
          William E. Havemann (pro hac vice forthcoming)
          **Milbank LLP**
          1101 New York Avenue NW
          Washington D.C. 20005
          Telephone: 202-835-7500
          Facsimile: 202-263-7586
          JSterling@milbank.com
          WHavemann@milbank.com

          *Attorneys for Plaintiff*