UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KALSHIEX LLC, | |
| | Plaintiff, |
| -against- | |
| ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission; SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission; and the NEW YORK STATE GAMING COMMISSION, | 1:25-cv-08846-AT |
| | Defendants. |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General of the State of New York
*Attorney for Defendants*
28 Liberty Street
New York, New York 10005

KATHERINE RHODES JANOFSKY
ZACHARY MANLEY
Assistant Attorneys General

*Of Counsel*

**TABLE OF CONTENTS**

Page (s)

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ............................................................. 3

   A. NEW YORK LAW STRICTLY LIMITS SPORTS WAGERING ................................... 3

   B. FEDERAL REGULATION OF COMMODITY FUTURES TRADING .......................... 4

RELEVANT FACTS AND PROCEDURAL HISTORY ............................................................. 5

STANDARD REVIEW ............................................................................................................... 8

ARGUMENT ............................................................................................................................... 9

   I.     KALSHI HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS.... 9

        A.    KALSHI'S SPORT EVENTS-CONTRACTS ARE NOT "SWAPS" UNDER
            THE CEA.......................................................................................................... 9

            i.     Kalshi's Sports Event-Contracts Are "Outcome" Dependent, Falling
                 Outside The CEA ......................................................................................... 10

            ii.    Kalshi Cannot Establish That Sports Events-Contracts Are "Associated
                 With A Potential Financial, Economic, Or Commercial Consequence."...... 11

        B.    EVEN IF KALSHI'S SPORTS EVENT-CONTRACTS ARE "SWAPS,"
            THE CEA DOES NOT PREEMPT NEW YORK LAW...................................... 15

            i.     The CEA Does Not Field-Preempt New York Law...................................... 16
            ii.    The CEA Does Not Conflict-Preempt New York Law ................................. 19

        C.    THE ELEVENTH AMENDMENT BARS LITIGATION AGAINST GAMING
            COMMISSION ................................................................................................. 22

   II.    PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM..... 22

   III.   THE EQUITIES DO NOT FAVOR A PRELIMINARY INJUNCTION .................... 25

   IV.   THE COURT SHOULD IMPOSE A BOND ................................................................ 29

CONCLUSION .......................................................................................................................... 29

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

## Cases

*Barrett v. Harwood*,
  967 F. Supp. 744 (N.D.N.Y. 1997)........................................................................24

*Ah Sin v. Wittman*,
  198 U.S. 500 (1905)........................................................................................16

*Alvarez v. City of New York*,
  2 F. Supp. 2d 509 (S.D.N.Y. 1998)....................................................................23

*Am. Petroleum Inst. v. Jorling*,
  710 F. Supp. 421 (N.D.N.Y. 1989)....................................................................25

*Art & Antique Dealers League v. Seggos*,
  121 F.4th 423 (2d Cir. 2024) ........................................................................9, 20

*Beecham v. United States*,
  511 U.S. 368 (1994)........................................................................................12

*Blue Lake Rancheria v. Kalshi*,
  25-CV-06162, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) ................................7

*Bond v. United States*,
  572 U.S. 844 (2014)....................................................................................13, 18

*Buono v. Tyco Fire Products, LP*,
  78 F.4th 490 (2d Cir. 2023) ..............................................................................17

*Cayuga Nation v. Gaming Commission*,
  775 F. Supp. 3d 651 (N.D.N.Y. 2025)................................................................21

*Chan v. United States Dep't of Trans.*,
  23-cv-10365, 2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024)...........................24-25

*Cipollone v. Liggett Grp.*,
  505 U.S. 504 (1992)........................................................................................16

*Coal. for Competitive Elec. v. Zibelman*,
  272 F. Supp. 3d 554 (S.D.N.Y. 2017)................................................................17

*Cyan v. Beaver Cnty. Emps. Ret. Fund*,
  583 U.S. 416 (2018)........................................................................................13

*De Buono v. NYSA–ILA Med. & Clinical Servs. Fund,*
    520 U.S. 806 (1997)................................................................................15

*DTCC Data Repository (U.S.) v. CFTC,*
    25 F. Supp. 3d 9 (D.D.C. 2014)...........................................................12

*Dubin v. United States,*
    599 U.S. 110 (2023)..............................................................................11

*Epic Sys. Corp. v. Lewis,*
    584 U.S. 497 (2018).......................................................................13, 18

*Ex Parte Young,*
    209 U.S. 123 (1908)..............................................................................21

*Fellner v. Tri-Union Seafoods,*
    539 F.3d 237 (3d Cir. 2008)..................................................................21

*Figueroa v. Foster,*
    864 F.3d 222 (2d Cir. 2017)........................................................... 19-20

*Gazzola v. Hochul,*
    88 F.4th 186 (2d Cir. 2023) ..................................................................17

*Greater New Orleans Broad. Ass'n v. United States,*
    527 U.S. 173 (1999)..............................................................................16

*Horn v. Med. Marijuana,*
    80 F.4th 130 (2d Cir. 2023) ..................................................................11

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,*
    725 F.3d 65 (2d Cir. 2013)............................................................ 19-20

*Inv. Co. Inst. v. CFTC,*
    720 F.3d 370 (D.C. Cir. 2013) ...............................................................4

*Inv. Co. Inst. v. CFTC,*
    891 F. Supp. 162 (D.D.C. 2012) ..........................................................12

*KalshiEX LLC v. CFTC,*
    24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024).....................5, 13

*KalshiEX LLC v. CFTC,*
    CV-23-3257, 2024 WL 4164694 (D.D.C. Sept. 12, 2024)......................5

*KalshiEX LLC v. Flaherty,*
    25-CV-02152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025)..... 7, 14-15, 29

*KalshiEX LLC v. Martin*,
   793 F. Supp. 3d 667 (D. Md. 2025) ................................................................ passim

*KalshiEX, LLC v. Hendrick*,
   2:25-cv-00575, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) ......................................7

*KalshiEX, LLC v. Hendrick*,
   2:25-cv-00575, 2025 WL 3286282 (D. Nev. Nov. 25, 2025)........................... passim

*Kane v. De Blasio*,
   19 F.4th 152 (2d Cir. 2021) ....................................................................25

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988)....................................................................24

*Laugh Factory v. Basciano*,
   608 F. Supp. 2d 549 (S.D.N.Y. 2009) ..........................................................23

*Mader v. Experian Info. Sols.*,
   56 F.4th 264 (2d Cir. 2023) .....................................................................9

*Massachusetts v. KalshiEx LLC*,
   25-cv-12595, ECF 34 (D. Mass. Oct. 28, 2025) ............................................. 7-8

*Matsko v. N.Y..*,
   18-cv-857, 2022 WL 137724 (N.D.N.Y. Jan. 14, 2022) ........................................21

*Medtronic v. Lohr*,
   518 U.S. 470 (1996)...........................................................................16

*Merrill Lynch, Pierce, Fenner, & Smith v. Curran*,
   456 U.S. 353 (1982)..........................................................................4, 9

*Metro. Transp. Auth. v. Duffy*,
   784 F. Supp. 3d 624 (S.D.N.Y. 2025)..........................................................5

*Mullins v. City of New York*,
   626 F.3d 47 (2d Cir. 2010)....................................................................5

*Murphy v. National Collegiate Athletic Ass'n*,
   584 U.S. 453 (2018)..............................................................3, 16, 18, 27

*N. Am. Derivatives Exch. v. Nevada Gaming Control Bd.*,
   2:25-CV-00978, 2025 WL 2916151(D. Nev. Oct. 14, 2025)..........................7, 9, 10, 13, 28

*N. Am. Soccer League v. United States Soccer Fed'n*,
   883 F.3d 32 (2d Cir. 2018)....................................................................8

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*,
   612 F.3d 97 (2d Cir. 2010)................................................................15

*N.Y. State Firearms Ass'n v. James*,
   157 F.4th 232 (2d Cir. 2025) ......................................................... 8-9

*N.Y. State Telecomms. Ass'n. v. James*,
   101 F.4th 135 (2d Cir. 2024) ..........................................................16

*New Jersey v. Bessent*,
   149 F.4th 127 (2d Cir. 2025) ............................................................9

*Noda v. N.Y. State Gaming Comm'n*,
   233 A.D.3d 1123 (2024) ..................................................................22

*Robinhood Derivatives v. Dreitzer*,
   2:25-CV-01541, 2025 WL 3283308 (D. Nev. Nov. 25, 2025)..............24

*Saratoga County Chamber of Commerce v. Pataki*,
   798 N.E.2d 1047 (N.Y. 2003)............................................................3

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*,
   131 F.4th 102 (2d Cir. 2025)............................................................22

*Star Boxing v. Tarver*,
   02-CV-8446, 2002 WL 31867729 (S.D.N.Y. Dec. 20, 2002) ...............23

*Tom Doherty Assocs. v. Saban Ent.*
   60 F.3d 27 (2d Cir. 1995) ................................................................22

*U.S. v. Cohen*,
   260 F.3d 68 (2d Cir. 2001)...............................................................13

*United States v. Harris*,
   838 F.3d 98 (2d Cir. 2016)...............................................................12

*United States v. Phillips*,
   155 F.4th 102 (2d Cir. 2025) ...........................................................10

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
   549 F.3d 100 (2d Cir. 2008).............................................................24

*Walden v. Kosinski*,
   153 F.4th 118 (2d Cir. 2025) .............................................................8

*We The Patriots USA v. Hochul*,
   17 F.4th 266 (2d Cir. 2021) ........................................................ 24-25

v

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001)...........................................................................13

**STATE CONSTITUTIONS**

NY Const
  art I,§9...........................................................................................3

**STATE STATUTES**

N.Y. Civ. Prac. L. & R.
  Art. 78...........................................................................................22

N.Y. Racing, Pari-Mutuel Wagering and Breeding Law
  §1367...........................................................................................3
  §1367-a.........................................................................................1, 3
  §1367-a(4)(e)..................................................................................26
  §1367(1)(b)....................................................................................20
  §1367(1)(s)....................................................................................27
  §1367-a(4)(a)(xi)............................................................................27
  §116.............................................................................................22, 29
  §1300(10)......................................................................................18, 25

N.Y. Tax L
  §1610(a).......................................................................................27

**FEDERAL STATUTES**

7 U.S.C.

  §1a(19)(iv)....................................................................................4, 12
  §1a(47)(A).....................................................................................4, 12
  §1a(47)(A)(ii)................................................................................9, 10, 11, 14
  §2..............................................................................................4
  §2(a)(1)........................................................................................17
  §2(a)(1)(A)....................................................................................4, 10, 17, 19
  §6..............................................................................................4
  §7a-2(a)(1)(D)(vii).........................................................................4,5
  §9..............................................................................................15
  §16(e)(2)......................................................................................4, 16-17

15 U.S.C.
  §§ 100.........................................................................................18

18 U.S.C.
§1084 ......................................................................................................................13
§1955 ......................................................................................................................13

25 U.S.C.
§2701 ......................................................................................................................13

28 U.S.C.
§3701 et seq. ....................................................................................................3, 4, 13

31 U.S.C.
§5363 ......................................................................................................................13
§5362(1)(e) .............................................................................................................13

Dodd-Frank Wall Street Reform and Consumer Protection Act
§722, 124 Stat. 1376, 1672 ......................................................................................4

**STATE REGULATIONS**

9 NYCRR
§5324.42(o) .............................................................................................................18
§5329.37 ..................................................................................................................26
§5330.3(c) ................................................................................................................20
§5330.5 ....................................................................................................................20
§5330.8, ...................................................................................................................25
§5330.10(d)(5), ........................................................................................................25
§5330.19 ..................................................................................................................25
§5330.13 ..................................................................................................................27
§5330.34 ..................................................................................................................26
§5330.45 ..................................................................................................................26

**FEDERAL REGULATIONS**

17 C.F.R.
§§38.151(b) ..............................................................................................................21
§38.150 ....................................................................................................................21
§40.11(a) ...........................................................................................................5, 12

**RULES**

Fed. R. Civ. P.
R. 65(c) ....................................................................................................................29

**MISCELLANEOUS AUTHORITIES**

Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572 (proposed Dec. 22, 2010) (to be codified at 17 C.F.R. pts. 1, 16, and 38) ..................................................................................................................21

Senate Congressional Record, 156 Cong. Rec. S5902-01, 2010 WL 2788026............................12

PJ Ace, *Disney approved our insane AI Kalshi ad to run during the NBA Finals* 🤣, at 0:02-06 (YouTube, June 11, 2025) https://www.youtube.com/watch?v=-QMftwmyW-A.................................................................................................................6

Citadel Securities, *Kalshi Founders Tarek Mansour & Luana Lopes Lara on Turning Events into Assets*, at 3:17–3:31 (YouTube, Oct. 24, 2025) https://www.youtube.com/watch?v=Qm33FhRJVDg ................................................6

Defendants New York State Gaming Commission ("Gaming Commission"), Robert Williams, Brian O'Dwyer, John A. Crotty, Sylvia B. Hamer, Martin J. Mack, Peter J. Moschetti, Jr., Marissa Shorenstein, and Jerry Skurnik, sued in their official capacities at the Gaming Commission (together, "Defendants"), respectfully submit this memorandum of law, together with the accompanying Declaration of Katherine Rhodes Janofsky ("Decl."), in opposition to the motion for a preliminary injunction (ECF 15) filed by Plaintiff KalshiEX LLC ( "Kalshi").

## PRELIMINARY STATEMENT

Kalshi operates a multi-billion-dollar illegal mobile sports betting platform and seeks to evade New York gaming laws by claiming it is merely an exchange for benign financial derivatives. On October 24, 2025, the Gaming Commission sent Kalshi a cease-and-desist letter advising that the "sports event-contracts" the company lists through the Commodity Futures Trading Commission ("CFTC") constitute gambling under New York law, and Kalshi's conduct, advertisement, and promotion of unlicensed sports wagering violates New York Racing, Pari-Mutuel Wagering and Breeding Law ("Racing Law") §§1367(2) and 1367-a . In response, Kalshi commenced this litigation to enjoin Defendants from enforcing state law, claiming that the Racing Law is preempted by the Commodity Exchange Act ("CEA"), and that its unlawful conduct is beyond the State's reach because its "sports event-contracts" are "swaps" based on its own "self-certified" CFTC listings. (Comp. ¶47, ECF 34).

Federal district courts in two other states have denied or reversed and dissolved preliminary injunctions sought by Kalshi based on these arguments in the face of similar state gaming enforcement. *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025) ("*Martin*") (denying preliminary injunction); *KalshiEX, LLC v. Hendrick*, 2:25-cv-00575, 2025 WL 3286282 (D. Nev.

Nov. 24, 2025) (dissolving preliminary injunction) ("*Hendrick II*"). This is not a close call. Kalshi is wrong. And the sweeping preliminary injunction it now seeks must be denied.

First, Kalshi fails to demonstrate a clear and substantial likelihood of success. Kalshi's preemption argument fails because its "sports event-contracts" do not fall within the definition of "swaps" under the federal statute. Nowhere in its text or history is there any indication that Congress intended to use the CEA to become a vehicle for sports gambling. The CFTC therefore has no jurisdiction over Kalshi's sports offerings.

Even if Kalshi's offerings were "swaps," the CEA does not preempt the Racing Law or the New York State Constitution. Kalshi's field-preemption argument has no support in the CEA's text, structure, context, or legislative history, nor the centuries-old history of New York gambling prohibitions. Kalshi's argument that its own self-certification of any "swap" it lists self-sanitizes its undisputed violations of state law far beyond CFTC jurisdiction must be rejected. Following *Martin,* divisions within the CFTC made clear that entities like Kalshi that list such sports event-contracts proceed at their own risk for concurrent violations of state law. Kalshi's conflict-preemption argument fails as well because Kalshi can cite to no provision that makes dual compliance with state and federal law impossible. In addition, Kalshi's claims against the Gaming Commission are barred by the Eleventh Amendment.

Next, Kalshi's allegations of monetary damages, loss of reputation, and other harms are not credible and do not satisfy irreparable harm, particularly where state enforcement is proceeding against Kalshi in other states.

Finally, a preliminary injunction seriously risks public interests, and the equities strongly favor Defendants. The public harms of unregulated sports betting are well-documented, particularly for younger New Yorkers and persons with gambling addictions, and are detrimental

to the integrity of sports, and more.  Kalshi admits nearly 175,000 New Yorkers use its unlicensed platform.  An injunction would tie Defendants' hands from regulating gambling within state boundaries and certainly flood New York with Kalshi copycats while driving out the existing regulated industry.  Preliminary injunctive relief must be denied.

## STATUTORY AND REGULATORY BACKGROUND

### A.    NEW YORK LAW STRICTLY LIMITS SPORTS WAGERING

New York has regulated gambling since 1771.  *See Saratoga Cnty. Chamber of Com. v. Pataki*, 798 N.E.2d 1047, 1063–65 (N.Y. 2003) (Smith, J., concurring in part) (history of New York's anti-gaming laws).  The State Constitution prohibits gambling with limited express exceptions.  N.Y. Const., art. I, §9.

New York's sports wagering laws became effective in 2019, following the Supreme Court's decision in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018).  *See* Racing Law §1367.  While recognizing states' rights to authorize and regulate sports wagering within their boundaries, 584 U.S. at 470, 474, 477, *Murphy* struck down the Professional and Amateur Sports Protection Act of 1992 ("PASPA"), 28 U.S.C. §3701 et seq., a federal law that effectively banned commercial sports betting in most states.  New York legalized mobile sports wagering in 2021.  Racing Law §1367-a.

Legal mobile sports wagers are placed through licensed virtual or electronic means from a location within the state and are transmitted to and accepted by electronic equipment located at a licensed commercial casino gaming facility in the state.  *Id.* §1367-a(2)(d).  There are nine licensed mobile sports operators in New York, and each is subject to significant statutory and regulatory requirements.  *See generally,* Racing Law Art. 13, titles 3 through 8; 9 NYCRR Part 5330.  In

2024, licensees generated approximately $2 billion in gross gaming revenue, paying more than $1 billion in state taxes.  *See* Gaming Commission, 2024 Annual Report (Decl. Ex. 1 at 14).

## B.    FEDERAL REGULATION OF COMMODITY FUTURES TRADING

Derivatives are "contracts deriving their value from underlying assets."  *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 372 (D.C. Cir. 2013).  Beginning historically with grain, Congress moved commodity futures trading onto federally designated contract markets and prohibited such trading elsewhere.  *See Merrill Lynch, Pierce, Fenner, & Smith v. Curran,* 456 U.S. 353, 360–67 (1982). Today, the CEA governs trades of commodity derivatives, which must be made on CFTC-designated exchanges.  7 U.S.C. §§2, 6.  Entities apply to become designated contract markets ("DCMs").  *Id.* §§2(e), 7(a).  In 2000, the CEA was amended to allow DCMs to list contracts without prior CFTC approval by "self-certifying" that their contracts comply with applicable law. *Id*. §7a-2(a)(1)(D)(vii).  Addressing preemption of state gaming laws, Congress also made clear that the CEA supersedes "[s]tate or local law that prohibits or regulates gaming" only for certain limited derivatives (such as transactions in "security warrants," certain repurchase transactions, and certain banking products) not at issue here.  *Id.* §16(e)(2).

Following the 2008 financial crisis, and while PASPA was still in effect, Congress amended the CEA to bring the previously unregulated swap market under the CFTC.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, §722, 124 Stat. 1376, 1672 (amending 7 U.S.C.  §2(a)(1)(A)).  Today, subject to limitations, the CFTC therefore has "exclusive jurisdiction…with respect to accounts, agreements…, and transactions involving swaps or contracts of sale of a commodity for future delivery," where such transactions are "traded or executed" in particular markets or platforms, including DCMs.  7 U.S.C. §2(a)(1)(A).  Swaps are defined very specifically in the CEA. *Id*. §1a(47)(A).

Congress also enacted a special rule for event-based contracts in "excluded commodities." §7a-2(c)(5)(C) ("Special Rule"); *id.* §1a(19)(iv). The CFTC may determine if such event contracts are contrary to the public interest and prohibit them from being listed, traded, and cleared on DCMs. *Id.* §7a-2(c)(5)(C)(i)-(ii) (prohibiting event contracts determined to involve "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest"). CFTC regulations also prohibit DCMs from listing "swaps based upon an excluded commodity" related to any of these enumerated factors. 17 C.F.R. §40.11(a).

## RELEVANT FACTS[1] AND PROCEDURAL HISTORY

Kalshi operates a DCM that offers "event contracts" on "an array of substantive areas[.]" Compl., ECF 35 ¶¶16, 46. In 2023, Kalshi challenged a CFTC decision to prohibit its "political-outcome contracts" on federal elections. *KalshiEX LLC v. CFTC*, CV-23-3257, 2024 WL 4164694, at *4 (D.D.C. Sept. 12, 2024), *voluntarily dismissed*, 24-5205 (D.C. Cir. May 7, 2025). There, the district court defined "gaming" as set forth in the Special Rule to mean "playing games or playing games for stake" and noted that "sporting events" constitute "gaming" within that definition, *id.* at *10, *12; a conclusion with which Kalshi agreed, *see* Appellee's Br. at 41, *KalshiEX LLC v. CFTC*, 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024).

Despite the court's clear view that "sporting events" contracts would be "gaming," prohibited by CFTC regulations, Kalshi began self-certifying and listing "sports event-contracts" in January 2025. Compl. ¶47. Such contracts include "which teams will advance in certain rounds

---

[1] Defendants cite documentary evidence that the Court may consider "in determining whether to grant a preliminary injunction." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage"); *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 649 n.38–42 (S.D.N.Y. 2025) (relying on news articles to make findings regarding congestion pricing).

of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship." *Id.* Kalshi advertises sports betting unambiguously, in a manner practically indistinguishable from licensed mobile sports wagering:





LEFT: Screenshot of image appearing in Decl. Ex. 2.    RIGHT: Screenshot of image appearing in Decl. Ex. 3.

*See also* PJ Ace, *Disney approved our insane AI Kalshi ad to run during the NBA Finals* 🤣, at 0:02-06 (YouTube, June 11, 2025) https://www.youtube.com/watch?v=-QMftwmyW-A ("We're in Florida asking people what they put their money on! . . . I'm all in on O[klahoma] C[ity]!").

Since January, Kalshi's sports offerings have grown significantly. *See* Citadel Securities, *Kalshi Founders Tarek Mansour & Luana Lopes Lara on Turning Events into Assets*, at 3:17–3:31 (YouTube, Oct. 24, 2025) https://www.youtube.com/watch?v=Qm33FhRJVDg (by adding sports event-contracts, Kalshi went from "80 markets back in October 2024" to over "3,330 markets now"). In October, its annualized trading volume reportedly hit $50 billion (up from just $300 million in 2024), *see* Michael J. de la Merced, *Kalshi, a Prediction Market, Raises Funds and Expands Overseas*, N.Y. Times (Oct. 10, 2025) (Decl. Ex. 4), with a reported company valuation

of $5 billion in November.  Gordon Gottsegen, *Is betting on football gambling? Prediction markets are battling to redefine wagers*, Morningstar, (Nov. 24, 2025) (Decl. Ex. 5).

In March 2025, numerous state gaming commissions began issuing cease-and-desist orders against Kalshi.  *See* Ben Blatt and Amy Fan, *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market.'*, N.Y. Times (Oct. 5, 2025) (Decl. Ex. 6).  As discussed *infra* at 19, Kalshi had some early success obtaining hasty preliminary injunctions against two states' regulators; one, in Nevada, was recently reversed and dissolved because the court had granted relief in error, and the other relied heavily on that now-superseded Nevada decision.  *KalshiEX, LLC v. Hendrick*, 2:25-cv-00575, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) ("*Hendrick I*"), *rev'd and dissolved, Hendrick II*, 2025 WL 3286282; *KalshiEX LLC v. Flaherty*, 25-CV-02152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025), *appeal sub judice*, No. 25-1922 (3d Cir. May 15, 2025).[2] More considered decisions have sided with state regulators.  *Hendrick II*, 2025 WL 3286282, at *14*, Martin*, 793 F. Supp. 3d at 671 (preliminary injunction denied), *appeal docketed*, 25-1922 (3d Cir. May 15, 2025); *Massachusetts v. KalshiEx LLC*, 25-cv-12595, ECF 34 (D. Mass. Oct. 28, 2025) (granting motion to remand); *see also N. Am. Derivatives Exch. v. Nevada Gaming Control Bd.*, 2:25-CV-00978, 2025 WL 2916151 (D. Nev. Oct. 14, 2025) ("*Crypto.com*") (preliminary injunction denied); *Robinhood Derivatives v. Dreitzer*, 2:25-CV-01541, 2025 WL 3283308, at *2 (D. Nev. Nov. 25, 2025) (TRO denied).  The balance of precedent therefore supports Defendants' view that no injunction should be entered.

---

[2] A recent case denying a tribal community's preliminary injunction request against Kalshi found that plaintiffs did not have the right to sue under the CEA.  *Blue Lake Rancheria v. Kalshi*, 25-CV-06162, 2025 WL 3141202, at *7 (N.D. Cal. Nov. 10, 2025).  That case did not consider preemption and is not relevant here.

After *Martin*, CFTC divisions clarified that they are aware that the CEA's self-certification process is being used for sports-related event contracts.  CFTC Advisory Letter, CFTCLTR No. 25-36 (Sept. 30, 2025) (Decl. Ex. 7 at 1) ("CFTC Advisory").  The CFTC Advisory explained that the CFTC "has not, to date, made a determination regarding whether any such contracts involve an activity enumerated or prohibited under [the Special Rules]."  *Id.* at n.4.  It also explained that CFTC divisions are aware of "various forms of State regulatory actions and pending and potential litigation concerning the legality of sports-related event contracts listed on DCMs."  *Id.* at 2.  It therefore "cautioned" DCMs, including Kalshi, and advised them to have risk mitigation and contingency plans in place in the event they are prohibited from operating in certain states.  *Id.*

On October 24, 2025, Gaming Commission sent Kalshi a cease-and-desist letter.  On October 27, Kalshi commenced this litigation seeking emergency injunctive relief. Defendants have agreed to refrain from enforcement until the motion for preliminary injunction is resolved. ECF 34 ¶4.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary and drastic remedy."  *Walden v. Kosinski,* 153 F.4th 118, 134 (2d Cir. 2025).  "[W]hen, as here, the preliminary injunction will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," Plaintiff "must establish a clear or substantial likelihood of success on the merits."  *N.Y. State Firearms Ass'n v. James*, 157 F.4th 232, 242 (2d Cir. 2025) (quotation marks omitted); *see also N. Am. Soccer League v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018) (heightened standard for preliminary injunction also applies when a party seeks to alter long-standing dynamics). Plaintiff must also show "[(2)] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in [its] favor, and [(4)] that an injunction

is in the public interest." *James*, 157 F.4th at 241 (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

## I.    KALSHI HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.    KALSHI'S SPORTS EVENT-CONTRACTS ARE NOT "SWAPS" UNDER THE CEA

Kalshi cannot claim preemption if its "sports event-contracts" do not fall within the definition of derivatives subject to CFTC regulation under the CEA. Kalshi therefore alleges its contracts satisfy the second of the six definitions of "swap":

> [an] agreement, contract, or transaction...that provides for any purchase, sale, payment, or delivery...that is dependent on [1] the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency [2] associated with a potential financial, economic, or commercial consequence.

7 U.S.C. §1a(47)(A)(ii); (Mem. at 12). Kalshi must satisfy *both* elements within the definition for its contracts to constitute swaps, and Kalshi has failed to satisfy either.

"When interpreting a statute, we begin with the plain language of the statute, giving the statutory terms their ordinary or natural meaning." *New Jersey v. Bessent*, 149 F.4th 127, 145 (2d Cir. 2025) (quotation marks omitted); *see also Mader v. Experian Info. Sols.,* 56 F.4th 264, 269 (2d Cir. 2023) (consulting dictionaries for "ordinary meanings"). Where meaning is ambiguous, a court may use "a variety of interpretive tools, including canons, statutory structure, and legislative history." *Bessent,* 149 F.4th at 127 (citation omitted). "In the post-*Chevron* era...interpretation of the statute is a question of law, and...it is the court, and not the administrative agency, that determines its meaning." *Art & Antique Dealers League v. Seggos*, 121 F.4th 423, 435 (2d Cir. 2024) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024)).

This Court has authority to interpret the CEA, including its definition of "swap." *Crypto.com*, 2025 WL 2916151, at *6; *see also Merrill Lynch,* 456 U.S. at 386–87 (construing CEA); *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025) (same). Moreover, the CEA does not "supersede or limit the jurisdiction conferred on courts of the United States." 7 U.S.C. §2(a)(1)(A).

> **i.      Kalshi's Sports Event-Contracts Are "Outcome" Dependent, Falling Outside The CEA.**

In both *Crypto.com* and *Hendrick II*, the district court rejected preliminary injunctive relief against a state gaming regulator, finding that "sports event-contracts" like Kalshi's do not meet the definition of "occurrence," "nonoccurrence," and "extent of the occurrence of an event or contingency" set forth in Section 1a(47)(A)(ii). *Hendrick II*, 2025 WL 3286282, at *6–9; *Crypto.com*, 2025 WL 2916151, at *6–11. "Congress did not define swap as a contract on anything that happens or could happen." *Hendrick II*, 2025 WL 3286282, at *6.

The court explained that:

> [t]he ordinary meaning of the word **_occurrence_** is something happened…. [I]n the context of sports, a boxing match could either take place (occurrence), not take place (nonoccurrence), or go only three rounds (extent of the occurrence).

*Crypto.com*, 2025 WL 2916151, at *8 (emphasis added).

> The ordinary meaning of **_event_** is a happening of some significance that took place or will take place, in a certain location, during a particular interval of time … ; **in terms of sports would be the sporting event itself, not who wins it**…. [W]ho wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself.

*Id.* at *8. The court also held that "contingency" means "a contingent event." *Id.* at *8, n.9. Given this definition, the court reasoned "Crypto's self-certified contracts therefore are not 'swaps' within the CFTC's exclusive jurisdiction" because they are based on who will win. *Id.* at *9.

*Hendrick II* extended this ruling to Kalshi.  2025 WL 3286282, at *6 ("[L]ike the contracts in *Crypto*, Kalshi's event contracts are based on the outcomes of sporting events or on things that happen during a sporting event.  Thus, they are not swaps within the CEA's meaning.").

As it did in *Hendrick II*, Kalshi fatally admits that its sports event-contracts are dependent on event-based *outcomes*.  (*See, e.g.*, Compl. ¶45.)  By the same reasoning, Kalshi's contracts do not fall within the definition of "swaps" in Section 1a(47)(A)(ii).

> ii.    **Kalshi Cannot Establish That Sports Event-Contracts Are "Associated With A Potential Financial, Economic, Or Commercial Consequence."**

On its own, the plain meaning of the phrase "associated with a potential financial, economic, or commercial consequence" in Section 1a(47)(A)(ii) makes clear that "sports event-contracts" are not swaps.  Relying on the "statutory text, legislative context, the CFTC's post-enactment guidance, and federalism principles," *Hendrick II* held that this phrase

> means that the event or contingency is itself inherently joined or connected with a potential financial economic, or commercial consequence. This means that the event or contingency itself has some potential financial, economic, or commercial consequence without looking at externalities like potential downstream financial consequences such as parties extrinsic to the event betting on it. And it does not include consumer transactions that have not historically been known to be swaps, such as sports wagers.

2025 WL 3286282, at *7; *see* *7–9 (analyzing phrase).

This interpretation should be adopted here.  First, the text assigns significant limiting factors to what may be a swap: the event or contingency must be reasonably connected in the mind ("associated") with potential effects on financial, economic, or commercial conditions that are sufficiently material and proximate.  *Id.* at *7 ("the event or contingency must be inherently associated with a potential financial consequence, not just that the event or contingency may have

some potential downstream financial consequence."); *see also Horn v. Med. Marijuana,* 80 F.4th 130, 140 (2d Cir. 2023) (applying negative-implication canon).

This understanding is consistent with the meaning of "financial" and "economic" as it appears in other definitions of "swap" within Section 1a(47). *See Hendrick II*, 2025 WL 3286282, at *7; *Dubin v. United States*, 599 U.S. 110, 124 (2023) (applying noscitur a sociis canon concerning context of words); *Beecham v. United States*, 511 U.S. 368, 371 (1994) (similar, for lists). A broader reading would subsume other definitions of "swap" within Section 1a(47)(A) and render them meaningless. *See United States v. Harris*, 838 F.3d 98, 106 (2d Cir. 2016) (applying cannon against superfluity).

While the CFTC's viewpoint is accorded no deference, *see Loper*, its actions on the whole support an inference that Kalshi's sports event-contracts do not constitute a swap. CFTC regulations ban trading and clearing event contracts that "involve[], relate[] to, or reference[]" gaming. 17 C.F.R. §40.11(a)(1). The CFTC has not determined whether sports event-contracts are permitted under the Special Rule. CFTC Advisory at n.4. *See also DTCC Data Repository (U.S.) v. CFTC*, 25 F. Supp. 3d 9, 17–18 (D.D.C. 2014) (noting in context of APA challenge, self-certification does not mean the CFTC has acted to affirmatively "approve" such a listing).

The CEA's legislative history further supports that "swaps" excludes sports betting. When Congress passed Dodd-Frank, it sought to remedy regulatory failures concerning credit default swaps and other derivatives following the 2008 financial crisis. *See supra* at 4; *Hendrick II*, 2025 WL 3286282, at *7. This legislative purpose supports a definition of "swaps" as instruments meant to facilitate hedging risk. *See Inv. Co. Inst. v. CFTC*, 891 F. Supp. 162, 168 n.3 (D.D.C. 2012) (such contracts "provide a way to transfer market risk or credit"). The legislative debate even addressed that "swaps" do not reach sports betting:

> It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.

56 Cong. Rec. S5902-01, 2010 WL 2788026, at S5906-07. In a related litigation, Kalshi acknowledged that Dodd-Frank's "legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets." 24-5205 (D.C. Cir.), Appellee's Br., 2024 WL 4802698, at *41. Kalshi further argued: "in general, contracts relating to games – again, activities conducted for diversion or amusement – are unlikely to serve any 'commercial or hedging interest.'" *Id*. at *45 (quoting 156 Cong. Rec. S5906). *See also Bond v. United States*, 572 U.S. 844, 861–62 (2014) (ordinary meaning informed by realistic congressional intent).

Moreover, at the time Dodd-Frank was passed, sports betting had been illegal in 47 states for almost 20 years under PASPA, whose "important public purpose" was "to stop the spread of State-sponsored sports gambling and to maintain the integrity of our national pastime," S. Rep. No. 102-248, 1991 WL 258663, at *4 (1991). The Wire Act of 1961 generally prohibits interstate transmission of wagers on sporting events. 18 U.S.C. §1084; *see United States v. Cohen*, 260 F.3d 68, 71, 78 (2d Cir. 2001) (conviction for sports account betting). With that backdrop, Dodd-Frank cannot be understood to manifest Congressional intent to legalize and centralize sports betting under the CEA, impliedly repealing these and other federal statutes,[3] and preempting state laws. "Congress was bringing risky financial products out of the shadows that had threatened the stability of the entire U.S. financial sector…. Congress was not enabling nationwide gambling on CFTC-designated exchanges." *Hendrick II*, 2025 WL 3286282, at *9; *see also, Crypto.com*, 2025

---

[3] *See, e.g.*, 18 U.S.C. §1955; 25 U.S.C. §2701; 31 U.S.C. §5363. To the extent Kalshi would claim its "swaps" are exempt under carveouts in 31 USC § 5362(1)(e), this fails because CFTC regulations prohibit such transactions.

WL 2916151, at *10–11; *Martin*, 793 F. Supp. 3d at 679–84; *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (presumption against implied repeals).

Finally, Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) "It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010." *Hendrick II*, 2025 WL 3286282, at *9.

Thus defined, "swaps" are not what Kalshi is selling. Kalshi takes the view that "economic consequences" are financial risks against which market participants seek to "hedge their exposure," (Compl. ¶32), but cannot twist its sports contracts to meet Section 1a(47)(A)(ii) In particular, Kalshi claims that a "broad ecosystem[4] of stakeholders" may have "risk," and hypothesizes that "sponsors" could "hedge against the risk that the team or athlete underperforms," or a "sportsbook" could hedge its "exposure," without ever explaining how or whether such trading for legitimate hedging purposes actually exists. (Compl. ¶32.) Kalshi does not attempt to explain, for example, the alleged economic purpose underlying whether quarterback Jaxson Dart will throw for 175 yards or more in a designated football game. *See* Brant James, *Kalshi Adds More NFL Player Props*, InGame (Oct. 9, 2025) (Decl. Ex. 8 at 2). And the types of "consequences" Kalshi's papers seem to imply—like increased home values in a community if a sports team does well— are exactly the kinds of downstream externalities expressly rejected in *Hendrick II*.

Compared against *Hendrick II's* careful reasoning, Defendants note that *Flaherty* held Kalshi's sports contracts likely have consequences that fall within Section 1a(47)(A)(ii), but that

---

[4] Kalshi recently "welcomed" underage NYU students to its "*ecosystem*" with targeted sports betting advertisements. *Infra* at 27.

decision contains little analysis, was based on "the record before [it]," and is unpersuasive.[5] 2025 WL 1218313, at *6. The two hypothetical scenarios Kalshi presented in *Flaherty* (golf television viewership and NCAA conference funding) are unexplained, and the implied consequences exceed inherent association with risk. *Id.* (citing Kalshi's Reply, 25-cv-2152, ECF 17 at 8–9). *Flaherty* also ignores that players, teams, and other participants are prohibited from trading. *See Martin*, 793 F. Supp. 3d at 679 n.4; 7 U.S.C. §9.

In reality, Kalshi is reportedly *counting* on an entirely different kind of association in the public's mind through its marketing—*recreational gambling*. *See supra* at 6. Kalshi's platform reportedly deliberately looks like or mirrors mobile sports betting. *See, e.g.,* Eric Ramsey, *Kalshi Trading Volume Soars As Football Betting Season Kicks Off*, Legal Sports Report (Sept. 8, 2025) (Decl. Ex. 9 at 2) ("[Kalshi] introduced a new six-box layout…mirroring the way modern sports betting apps present the moneyline, spread, and total."). The evidence therefore suggests that Kalshi's market participants are sports fans encouraged to bet for fun, not for any economic purpose. "These are sports wagers and everyone who sees them knows it." *Hendrick II*, 2025 WL 3286282, at *8.

## B. EVEN IF KALSHI'S SPORTS EVENT-CONTRACTS ARE "SWAPS," THE CEA DOES NOT PREEMPT NEW YORK LAWS

Under federal preemption, "state and local laws that conflict with federal law are without effect." *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010) (internal quotation omitted). There are three types of preemption: (1) "express," (2) "field," where "Congress has legislated so comprehensively that federal law occupies an entire field of regulation

---

[5] The court also overstates the conclusion of a law review article. *Flaherty*, 2025 WL 1218313, at *6 (citing Dave Aron and Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV Gaming L.J. 53, 79–80 (2021)). The article states that a sporting event outcome "may or <u>may not</u>" have economic consequences. Aron and Jones, 12 UNLV Gaming L.J. at 80 (emphasis added).

and leaves no room for state law;" and (3) "conflict" where state law conflicts with federal law "[i] such that it is impossible for a party to comply with both or [ii] the local law is an obstacle to the achievement of federal objectives." *Id.* at 104 (internal quotation omitted). Plaintiffs bear a "considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *De Buono v. NYSA–ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) (quotation omitted). Kalshi correctly does not argue express preemption applies. (Mem. at 17–26). Its implied preemption theories fail.

### i.    The CEA Does Not Field-Preempt New York Law.

Field-preemption is "rare" and "occurs when Congress manifests an intent to occupy an entire regulatory field to the exclusion of the states." *N.Y. State Telecomms. Ass'n. v. James*, 101 F.4th 135, 147 (2d Cir. 2024). "In all pre-emption cases," courts presume that Congress did not preempt state law, "particularly" in cases involving "a field which the States have traditionally occupied." *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). "[B]ecause the States are independent sovereigns in our federal system," courts "start with the assumption that the historic police powers of the States were not meant to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (citation omitted).

Here, "the presumption against preemption applies[.]" *Martin*, 793 F. Supp. 3d at 677. States' authority to regulate gambling conducted within their borders is long established. *See, e.g., Murphy*, 584 U.S. at 458–59 (describing history of state gambling laws); *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). The historic presence of New York law regulating and policing gambling spans 250 years. *See supra* at 3. Moreover, neither the structure, context, nor legislative history of the CEA support or "establish that Congress clearly and manifestly intended to preempt state sports-betting laws." *Martin*, 793 F. Supp. 3d at 679.

Under 7 U.S.C. §16(e)(2), Congress expressly preempted state gaming laws for certain limited kinds of swaps not at issue here. *Id.* at 680–81. This "is strong evidence that Congress did not intend to regulate so comprehensively as to exclude all state law." *Id.* at 681 (citation omitted); *see Cipollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."). Had Congress wanted to preempt all state gaming law through the CEA, it certainly could have done so, *see generally Buono v. Tyco Fire Products, LP*, 78 F.4th 490 (2d Cir. 2023), but it did not—it only preempted state gaming law in these limited situations, none of which excuse Kalshi from complying with the Racing Law.

Moreover, reading the "exclusive jurisdiction" provision set forth in 7 U.S.C. §2(a)(1) on which Kalshi relies to preempt *all* state gaming law would render 7 U.S.C. §16(e)(2)—which preempts state gaming law only under limited circumstances—meaningless. This provision "does not mean that the 'field' Congress intended for the CEA to occupy includes state gambling laws, and specifically sports wagering laws." *Martin*, 793 F. Supp. 3d at 679. This inference is strengthened by the fact that Section 2(a)(1)(A) also states that nothing "supersede[s] or limit[s] the jurisdiction ... conferred on ... regulatory authorities under ... the laws of ... any State … [or] restrict[s] such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. §2(a)(1)(A). The legislative history on which Kalshi relies to interpret "exclusive jurisdiction" predates Dodd-Frank and the Special Rule. (Mem. at 11, 18, 20–21, 23–24.) "[T]he limited legislative history that exists from 2010…that bears on the scope of Congress's preemptive intent cuts against preemption." *Martin*, 793 F. Supp. 3d at 683.

The Special Rule also confirms that Congress intended for some state laws to operate alongside the CEA without preemption. "[W]here 'coordinate state and federal efforts exist within

a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one.'" *Coal. for Competitive Elec. v. Zibelman*, 272 F. Supp. 3d 554, 567 (S.D.N.Y. 2017) (quoting *Hughes v. Talen Energy Mktg.,* 578 U.S. 150, 167 (2016) (Sotomayor, J., concurring)).   The CFTC says it is not a gaming regulator.   *See Hendrick II*, 2025 WL 3286282, at *9 n.7.   Kalshi argues that it is not "the house," and that there are "crucial differences" between its exchange and a "sportsbook" that justify different regulatory schemes.   (Mem. at 14; *see also* Sottile Decl. ¶¶26–27.)   But this argument reflects a fundamental misunderstanding of the scope of New York gambling laws, which are designed to "tightly and strictly" regulate all forms of casino gambling, Racing Law §1300(10), whether the licensee is a counterparty to a wager or facilitates and profits from peer-to-peer gambling.   *See, e.g.*, 9 NYCRR §5324.42(o) (regulation of rake in casino peer-to-peer poker games); *see also Pools FAQ*, DraftKings (Decl. Ex. 10) (example of mobile sports wagering licensee administering peer-to-peer gambling offering).

Finally, as discussed, *supra* at 11–14, "[i]t is highly unlikely that Congress would have overridden state gambling laws without at least some indication in the text and legislative history," *Martin*, 793 F. Supp. 3d at 682, and it must be presumed that it did not, *see Epic*, 584 U.S. at 510. This is particularly true where federal law would significantly alter the balance of state and national authority, which a finding for Kalshi undoubtedly would.   *See Murphy*, 584 U.S. at 486*; Bond*, 572 U.S. at 858.   It is even more unlikely given the timing of the CEA's passage "because at those times it was already largely illegal federally to engage in sports gambling[.]"   *Martin*, 793 F. Supp. 3d at 683.

The two primary authorities on which Kalshi relies to support its field-preemption claim have no persuasive value.   As discussed above, *Hendrick I* has been reversed and dissolved by

*Hendrick II*.  2025 WL 3286282, at *14.  The preliminary injunction in *Flaherty* is heavily based on the *Hendrick I* decision and therefore is also unpersuasive.  Moreover, neither *Hendrick I* nor *Flaherty* applied a presumption against preemption, and each limited their analysis to interpreting 7 U.S.C. §2(a)(1)(A) without considering whether Congress manifestly intended to preempt state gaming laws with the addition of "swaps" to the CEA.  *Martin, Hendrick II,* and *Crypto.com*, by contrast, considered this question, and thus have greater persuasive value.  *Hendrick I* and *Flaherty* also gave deference to Kalshi's assertion that its own "swap" self-certification could be used to exempt it from compliance with state gaming laws based on apparent federal approval by operation of statute.  This has no basis, *see Hendrick II*, 2025 WL 3286282, at *5 ("A DCM cannot insulate itself from state regulation through self-certification where its conduct does not fall within the CFTC's exclusive jurisdiction provision."), and, following *Martin*, the CFTC has not suggested that self-certification is a federal approval that can preempt state gaming laws.  CFTC Advisory at n.4.

Plaintiff's field-preemption argument therefore fails.

### ii.    The CEA Does Not Conflict-Preempt New York Law.

Conflict preemption exists where state law conflicts with federal law "such that it is impossible for a party to comply with both or the [state] law is an obstacle to the achievement of federal objectives."  *Figueroa v. Foster*, 864 F.3d 222, 228 (2d Cir. 2017).  Burdens under both branches of conflict preemption are "heavy" and "the conflict between state law and federal policy must be a sharp one."  *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig*., 725 F.3d 65, 101 (2d Cir. 2013) (quotation omitted) ("*MTBE*").

"[I]mpossibility occurs when state law penalizes what federal law requires, or when state law claims directly conflict with federal law."  *Figueroa,* 864 F.3d at 234 (quotation omitted).

Impossibility is a "demanding defense, and [the Second Circuit] will not easily find a conflict that overcomes the presumption against preemption." *MTBE*, 725 F.3d at 97 (cleaned up). "If there was any available alternative for complying with both federal and state law—even if that alternative was not the most practical and cost-effective—there is no impossibility preemption." *Id.* at 99.

Obstacle preemption "precludes state law that poses an actual conflict with the overriding federal purpose and objective." *Id.* at 101 (internal quotation marks omitted). "What constitutes a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* (same). The "mere fact of tension" is not sufficient for preemption; the conflict must be "so direct and positive that the two acts cannot be reconciled or consistently stand together." *Id.* (same). Significantly, conflict preemption does not lie even where "it is possible, even likely, that a [state] restriction … could make it much less profitable" to operate in New York. *Seggos*, 121 F.4th at 436.

There is no evidence of impossibility or a repugnant obstacle in this case. As in field-preemption, because New York has historic police powers over gaming, the court considers whether Congress manifested its intent to preempt through the scope, structure, and purpose of the CEA. *See, e.g.*, *Figueroa*, 86 F.3d at 232. For the reasons set forth *supra* at 16–20, the answer here is no. Kalshi has therefore failed to demonstrate how the Racing Law would either conflict with or stand as an obstacle to achieving the purposes of the CEA. *See Martin*, 793 F. Supp. 3d at 686.

Kalshi has also not shown how obtaining a license in New York and otherwise complying with New York law would prevent it from complying with federal law. Indeed, state regulations permit an entity, with Gaming Commission approval, to acquire a current licensee. 9 NYCRR

§§ 5330.3(c), 5330.5.  Kalshi's claim that conducting sports wagering pursuant to Racing Law §1367(1)(b) directly conflicts with the CEA's requirement to provide "impartial access to its markets and services" under 17 C.F.R. §§38.151(b) and 38.150 was correctly rejected in *Martin* as a basis for conflict preemption.  *Martin*, 793 F. Supp. 3d at 686.  Regulatory history also shows the "impartial access" rules mandate access for participants of all economic means, not geographic locations as Kalshi suggests.  *See* Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572 (proposed Dec. 22, 2010) (to be codified at 17 C.F.R. pts. 1, 16, and 38).  Ceasing sports event-contracts in New York would therefore not run afoul of this rule.  Moreover, the CFTC has not threatened to act against DCMs that comply with state law in this way, but rather have advised to prepare for it.  CFTC Advisory at 2.  Indeed, Crypto.com has withdrawn from offering sports products in Nevada after having failed to win a preliminary injunction barring state enforcement of Nevada's gambling laws, *see Hendrick*, 25-cv-575, ECF 183-5 (D. Nev.) (Decl. Ex. 11), and now Kalshi will presumably do the same there following *Hendrick II*.

Absent any conflict, Kalshi is left with the untenable argument that New York's sports wagering laws are conflict-preempted because the CFTC has not yet delisted Kalshi's gaming contracts.  *Cf. Fellner v. Tri-Union Seafoods,* 539 F.3d 237, 247 (3d Cir. 2008) ("mere deliberate agency inaction—an agency decision not to regulate an issue—will not alone preempt state law.").

There is no preemption here.

## C.  THE ELEVENTH AMENDMENT BARS LITIGATION AGAINST GAMING COMMISSION

Gaming Commission is a state agency and therefore encompassed by New York's Eleventh Amendment immunity.  *See, e.g., Cayuga Nation v. N.Y. State Gaming Comm'n*, 775 F. Supp. 3d 651, 663 (N.D.N.Y. 2025) (dismissing Gaming Commission); *Matsko v. N.Y..*, 18-cv-857, 2022

WL 137724, at *12–13 (N.D.N.Y. Jan. 14, 2022) (same).  New York has not waived its Eleventh Amendment immunity, Congress did not abrogate states' immunity in enacting the CEA, and the state officials' exception in *Ex Parte Young*, 209 U.S. 123, 150–59 (1908), does not apply to Gaming Commission.  Gaming Commission must be dismissed.

## II.    PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM

"To establish irreparable harm, the moving party must show an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (cleaned up).

First, Kalshi has no credible allegation of irreparable monetary harm.  Any civil fines that Gaming Commission might obtain from Kalshi are not irreparable, as fines may be challenged and vacated if Kalshi is ultimately successful.  *See generally,* N.Y. Civil Practice Law & Rules Art. 78; Racing Law §116.

Kalshi's remaining allegations of monetary damages are not credible, entirely speculative, and do not constitute irreparable harm.  Kalshi fails to provide any evidence that its inability to offer sports event-contracts in New York for the duration of this lawsuit would threaten the "very viability of [its] business."  *Tom Doherty Assocs. v. Saban Ent.* 60 F.3d 27, 38 (2d Cir. 1995). Instead, Kalshi focuses on the cost of geolocating services that it claims it needs to stop operating in New York.  (Mem. 27–28).  Like *Crypto.com*, an order from the Nevada Gaming Control Board now requires Kalshi to cease operations in that state, and Kalshi must presumably now begin geolocating for reasons totally independent of New York.  *Hendrick II*, 2025 WL 3286282, at *14. Indeed, Kalshi has had months to prepare for this moment, especially given CFTC's Advisory and the multiple state enforcement actions.  *See supra* at 7–8.  Moreover, Kalshi's recent international expansion excludes 44 countries and territories, including Canada, where it is prohibited from

operating.  *See* Kalshi Exchange Notice (Oct. 23, 2025) (Decl. Ex. 12).  Kalshi's prohibitions presumably require geolocating to confirm its "sports event-contracts" are originating from Niagara Falls, New York, not Niagara Falls, Ontario.

Second, there is no credible allegation that Kalshi could lose its CFTC Certification. (Mem. at 29.)  This entirely speculative fear is unfounded as the CFTC expressly told DCMs to create contingency plans and inform customers regarding the effects of state termination of event contracts, CFTC Advisory at 2.  *See Hendrick II*, 2025 WL 3286282, at *12.  Defendants are not aware of the CFTC's decertifying other entities who have similarly ceased operations.  Even if the CFTC undertook such action in direct contradiction of its advisory, Kalshi could challenge it then.

Third, there is no credible allegation of reputational harm or loss of good-will. Where damaging facts have circulated prior to a plaintiff's application for an injunction, courts in this circuit have declined to issue injunctions because any "'damage' [wa]s already done, and cannot be undone by the injunction [it] seeks." *Alvarez v. City of New York*, 2 F. Supp. 2d 509, 514 n.5 (S.D.N.Y. 1998); *see  Star Boxing v. Tarver*,  02-CV-8446, 2002 WL 31867729, at *3 (S.D.N.Y. Dec. 20, 2002) (no irreparable harm to promoter's reputation for loss of contract where it was "already known in boxing circles" so "whatever embarrassment could arise ... ha[d] already occurred").

Here, any alleged damage to Kalshi's reputation has already occurred.  As noted above, Kalshi received multiple cease-and-desists before Gaming Commission sent its letter, and two district courts have now ruled that Kalshi is not likely to succeed on preemption.  There was also already repeated speculation in the press about whether Kalshi is engaged in unlawful sports betting. *See, e.g.*, Decl. Exs. 5, 6.

Any harm beyond this is plainly self-inflicted. Kalshi cannot claim harm from its own choice to widely advertise that its sports prediction markets are legal, even as CFTC divisions caution it and courts find otherwise. *See Laugh Factory v. Basciano*, 608 F. Supp. 2d 549, 560 (S.D.N.Y. 2009) (citing *Motorola Credit Corp. v. Uzan*, 561 F.3d 123 (2d Cir. 2009); *Robinhood*, 2025 WL 3283308, at *2 (no reputational harm following CFTC Advisory).

Fourth, Kalshi cannot claim harm that its users might suffer if their contracts are terminated. (Mem. 28–29.) "Generally, litigants in federal court are barred from asserting the constitutional and statutory rights of others in an effort to obtain relief for injury to themselves." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643 (2d Cir. 1988) (citation omitted). The exception to this rule permits "third-party standing [only] where the plaintiff can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 109 (2d Cir. 2008). Here, Kalshi has neither argued nor shown it should be permitted to assert third-party standing.

Fifth, any allegedly threatened "criminal prosecution" by Defendants is a non-starter because, as the cease-and-desist letter itself demonstrates, Defendants do not themselves engage in criminal prosecution. ECF 34-2.

Finally, there is no irreparable harm for any claimed violation of constitutional rights. Because Plaintiff's claim is meritless, there is no presumed harm. *See We The Patriots USA v. Hochul*, 17 F.4th 266, 294 (2d Cir. 2021). Moreover, constitutional deprivation typically amounts to irreparable harm in cases "involving alleged infringements of free speech, association, privacy, or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." *Barrett v. Harwood*, 967 F. Supp. 744, 746 (N.D.N.Y. 1997), *aff'd*, 189 F.3d 297 (2d Cir. 1999); *see also Chan v. U.S. Dep't of Trans.*, 23-cv-10365,

2024 WL 5199945, at *45 (S.D.N.Y. Dec. 23, 2024).  Irreparable harm is therefore presumed only

for violations of personal constitutional rights (coupled with, for example, some physical harm or

loss of liberty, *i.e.*, some tangible harm), and distinguished from provisions of the Constitution that

serve structural purposes, the violation of which are not necessarily accompanied by any tangible

harm.  *See Am. Petroleum Inst. v. Jorling*, 710 F. Supp. 421, 431 (N.D.N.Y. 1989); *see also Kane*

*v. De Blasio*, 19 F.4th 152, 171 (2d Cir. 2021) (alleged infringement of plaintiffs' First Amendment

rights not irreparable where plaintiffs faced "economic harms, principally a loss of income, while

the City reconsiders their request for religious accommodations").

The Supremacy Clause "enshrine[s] structural, rather than personal, rights," and courts in

this circuit have not found irreparable harm based on violations of the structural provisions of the

Constitution.  *See Chan*, 2024 WL 5199945, at *46 (collecting cases)*; see also Am. Petroleum*,

710 F. Supp. at 432.  Although Kalshi relies on *Jolly v. Coughlin*, that case concerned a prisoner's

personal Eighth Amendment rights.  76 F.3d 468, 482 (2d Cir. 1996).  Because Kalshi's only claim

is grounded in the Supremacy Clause, Kalshi cannot show irreparable harm.

## III.  THE EQUITIES DO NOT FAVOR A PRELIMINARY INJUNCTION

The balance of equities and the public interest weigh heavily against enjoining Defendants.

"When the government is a party to the suit, our inquiries into the public interest and the balance

of the equities merge."  *We The Patriots,* 17 F.4th at 295.  The effect of an injunction—allowing

Kalshi's sports betting activities to continue in New York unchecked and growing at an

exponential rate—poses significant harm to the public.

First, New Yorkers are harmed if Kalshi continues to engage in unsupervised sports

gambling.  *See* Racing Law §1300(10); *Hendrick II*, 2025 WL 3286282, at *13 (strong interest in

gambling regulation).  State regulators prioritize consumer protection, implementing detailed

measures for responsible gaming, age verification, and problem gambling prevention, among other

things.  *See* Office of Addiction Services and Supports ("OASAS") and Gaming Commission, Impact of Mobile Sports Wagering on Problem Gamblers (Mar. 31, 2023) (Decl. Ex. 13).  For example, sports wagering is prohibited for individuals under 21, and licensed operators must have strict verification procedures.  *See, e.g.,* 9 NYCRR §§ 5330.8, 5330.10(d)(5), 5330.19.  New York also restricts advertising, marketing, and promoting mobile sports wagering to underage persons, including prohibiting advertising set on college campuses and depicting students.  Racing Law §1367-a(4)(e); 9 NYCRR §5330.45.  Ads must display clear information about the risks of gaming and resources like 1-877-8-HOPENY.  9 NYCRR § 5330.34 (responsible gaming).

These and other numerous regulatory mechanisms not listed here exist for vital reasons.  A report by OASAS identifies ages 18–24 years as a "high-risk population" for gambling addictions. Rebecca Cooper et al., *Gambling Harms and Gambling Disorder Healthcare and Service Utilization in New York State*, Addiction Data Bulletin (No. 2025-06), (Apr. 2025) ("OASAS Report") (Decl. Ex. 14).  Between 2000 and 2024, 1-877-8-HOPENY received more than 14,000 helpline calls.  *See* Decl. Ex. 13. "As of 2022, mobile sports betting surpassed casino gambling as the primary reason for gambling-related helpline calls made by New Yorkers."  Decl. Ex. 14 at 1. Yet Kalshi markets itself broadly to attract participation from the public for recreational gambling, and individuals as young as 18 may reportedly use its platform.  *See supra* at 6.

This also reportedly includes advertising directed at college campuses.  For example, in a recent, now-apparently-deleted promotional campaign called the "Kalshi Ambassadors Program," the company advertised it is "excited to welcome . . . [many colleges, including] NYU…into our ecosystem to both trade and build.  College campuses are the best place to spark new financial movements and will play a key role in bringing the next 100M users to prediction markets."  Adam Roarty, *Kalshi Recruiting Sportsbook Operators & Targeting College Campuses*, CasinoBeats

(Sept. 22, 2025) (quoting text of Kalshi ad) (Decl. Ex. 15).   Such college-student-oriented
marketing behavior is prohibited in New York.   Defendants are not aware of any Kalshi ads that
warn about the risks of gambling.

To the extent Kalshi may claim New York lacks an interest in regulating underage sports
betting because 18-year-olds may purchase a lottery ticket under Tax Law § 1610(a), this argument
is nonsense.  Lottery tickets are a fundamentally different activity with different risks, among other
reasons.  *Murphy*, 584 U.S. at 482; *see generally*, OASAS Report.

Second, Kalshi continues to expand its proposition betting (often wagers on an individual
player's performance) and parlays.  Ben Horney, *Kalshi Adds NBA Prop Markets As Betting
Crackdowns Surge*, Front Office Sports (Nov. 14, 2025) (Decl. Ex. 16); Decl. Exs. 4, 8.  The NFL
is reportedly working with state regulators to limit this conduct given recent player scandals.  Sam
Jane and Dianna Russini, *NFL working with lawmakers, betting partners to enforce prop betting
rules amid other betting scandals*, The Athletic (Nov. 13, 2025) (Decl. Ex. 17).   Integrity
monitoring, which New York mandates, discovered many of these recent issues.  Rustin Dodd et
al., *After MLB's reckoning on sports betting offenders, what can leagues do to enforce the rules?*,
The Athletic (June 5, 2024) (Decl. Ex. 18).  Prop bets are considered particularly hazardous to the
integrity of college sports.  *See* Letter from Scott Bearby, Senior Vice President and Chief Legal
Officer, NCAA, to Kalshi, Inc. (Oct. 30, 2025) (Decl. Ex. 19).

Third, gambling on college sports involving any New York-based college team is unlawful.
Racing Law §§ 1367(1)(s), 1367-a(4)(a)(xi); *see also* 9 NYCRR § 5330.13.  Kalshi reportedly not
only offers betting on New York college sports, *see, e.g.,* Kalshi, *College Basketball (M)* (Decl.
Ex. 20), its position is likely that there is nothing to stop it from offering prop bets on college
players.  On October 30, 2025, the NCAA wrote to Kalshi expressly asking that this activity be

prohibited because of the tremendous harms, *see* Decl. Ex. 18 at 2, a request Kalshi is reportedly "reviewing." Shwetha Surendran, *NCAA sends concerns over 'integrity' to prediction market Kalshi*, ESPN (Nov. 3, 2025) (Decl. Ex. 21).

Finally, applications from new potential DCMs are piling up: since Kalshi began listing sports contracts, five new DCMs have been designated and four more are listed as "pending." CFTC, *Designated Contract Markets (DCM)* (Decl. Ex. 22). As discussed, New Yorkers have purposefully chosen to permit only nine mobile sports wagering operator licenses. An injunction will *flood* the state with exponentially more sports wagering without regulation or integrity controls. Evasion of the strict regulation New York has chosen for those privileged to participate in legalized gambling is a manifest harm to the State.

By contrast, even assuming Kalshi demonstrated some sort of irreparable monetary harm from complying with Gaming Commission's letter, Kalshi overstates its burden especially given *Hendrick II*, and the balance favors Defendants. Industry participants have also been critical about Mr. Sottile's representation as to the cost of geolocation. *See* Dan Bernstein et al., *Kalshi Puts Geolocation Tech Providers On Edge Amid Rapid Rise*, Sportico (Oct. 16, 2025) (Decl. Ex. 23). As for Kalshi's current customers: they can obtain the same services—online sports betting— through properly licensed organizations in New York and receive heightened consumer protections in the bargain.

"[T]he public has an interest in ensuring that unlicensed sports wagering does not occur on CFTC-designated exchanges, as that would be contrary to the CEA, congressional intent, CFTC regulations, and [state] law." *Crypto.com*, 2025 WL 2916151, at *11; *see also Hendrick II*, 2025 WL 3286282, at *12–14 (balance of hardships, public interest weigh against Kalshi). Although *Flaherty* ruled months ago that the equities favored Kalshi, it fails to address Defendants' evidence

of significant short-term harm. The risk to consumer protection, sports integrity, and regulatory safety nets far outweighs Kalshi's alleged money damages and thus weighs against granting a preliminary injunction.

## IV.    THE COURT SHOULD IMPOSE A BOND

In the alternative, if the Court grants Kalshi's requested injunction, Defendants respectfully request that the Court impose a $500,000 bond. Fed. R. Civ. P. 65(c); *see Flaherty*, 2025 WL 1218313, at *8 (setting $100,000 bond based statutory penalty). Violations of Racing Law §116 incur a penalty of up to $25,000 per violation per day. Kalshi admittedly has nearly 175,000 New York users. (Sottile Decl. ¶47.) A $500,000 bond amounts to a mere 20 single-day violations.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff's motion for a preliminary injunction.

Dated: New York, New York
        November 26, 2025

                            Respectfully submitted,


                            LETITIA JAMES
                            Attorney General
                            State of New York
                              *Attorney for Defendants*

                            By: /s/*Katherine Rhodes Janofsky*

                            KATHERINE RHODES JANOFSKY
                            ZACHARY MANLEY
                            Assistant Attorney General
                            28 Liberty Street, New York, NY 10005
                            (212) 416-8621
                            Katherine.Janofsky@ag.ny.gov

## **WORD COUNT CERTIFICATION**

In accordance with Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York and the Court's Individual Practices, I hereby certify that the MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION contains 8748 words (including footnotes), exclusive of cover page, tables of contents and authorities, and signature block, as established using the word count function of Microsoft Word.

By: /s/*Katherine Rhodes Janofsky*

KATHERINE RHODES JANOFSKY
Assistant Attorney General