**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KALSHIEX LLC,

        Plaintiff,

v.

ROBERT WILLIAMS, et al.,

        Defendant.

Case No. 1:25-cv-08846

**BRIEF OF INDIAN GAMING ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS, WASHINGTON INDIAN GAMING ASSOCIATION, CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION, ARIZONA INDIAN GAMING ASSOCIATION, MINNESOTA INDIAN GAMING ASSOCIATION, OKLAHOMA INDIAN GAMING ASSOCIATION, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, SAN MANUEL GAMING AND HOSPITALITY AUTHORITY, AND 17 FEDERALLY RECOGNIZED INDIAN TRIBES AS _AMICI CURIAE_ IN SUPPORT OF DEFENDANTS**

Joseph H. Webster
Elizabeth A. Bower
Jens W. Camp
HOBBS, STRAUS, DEAN & WALKER LLP
1899 L Street NW, Ste. 1200
Washington, DC 20036
Telephone: (202) 822-8282
jwebster@hobbsstraus.com
ebower@hobbsstraus.com
jcamp@hobbsstraus.com

Scott Crowell
CROWELL LAW OFFICE
Tribal Advocacy Group PLLC
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Telephone: (425) 802-5369
scottcrowell@clotag.net

Bryan Newland
POWERS, PYLES, SUTTER & VERVILLE PC
1250 Connecticut Ave N, 8th Floor
Washington, DC 20036
Telephone: (202) 349-4265
Bryan.Newland@Powerslaw.com

_Attorneys for Tribal Amici_

Michael Hoenig
YUHAAVIATAM OF SAN MANUEL NATION
422 1st Street SE
Washington, DC 20003
Telephone: (909) 936-9684
Michael.Hoenig@sanmanuel-nsn.gov

_Attorney for Yuhaaviatam of San Manuel Nation and San Manuel Gaming and Hospitality Authority_

1

**TABLE OF CONTENTS**

INTRODUCTION AND INTERESTS OF *AMICI CURIAE* .......................................................... 7

ARGUMENT .......................................................................................................................... 10

    I.    IGRA Governs Kalshi's Sports Betting Conduct on Indian Lands ................................ 11

        A.    The CEA does not exclusively govern gaming-related sports-event contracts .......... 11

            1.    The CEA does not give CFTC exclusive jurisdiction over gaming-related sports-event contracts .................................................................................. 13

            2.    The CFTC expressly prohibits Kalshi's sports-event contracts ............................. 14

            3.    The self-certification provisions of the CEA and CFTC regulations are invalid as applied to Kalshi ............................................................................. 16

        B.    The CEA does not impliedly repeal IGRA or any other applicable federal law ........ 18

            1.    IGRA protects tribes' authority to regulate online gaming on Indian lands ........... 18

            2.    Kalshi cannot overcome the presumption against implied repeal ......................... 19

            3.    Congress did not nullify PASPA and preempt the state sports betting prohibitions on which it relied to effectuate federal policy when it amended the CEA in 2010 23

        C.    Kalshi's sports-event contracts constitute "Class III Gaming" under IGRA ............. 24

    II.    Ignoring the Applicability of IGRA Raises Serious Policy Concerns and Violates Federal Indian Policy ................................................................................................. 27

CONCLUSION ...................................................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*Artichoke Joe's California Grand Casino v. Norton,*
    353 F.3d 712 (9th Cir. 2003) ...................................................................................... 10

*Bryan v. Itasca Cnty.,*
    426 U.S. 373 (1976).................................................................................................... 20

*California v. Cabazon Band of Mission Indians,*
    480 U.S. 202 (1987)...................................................................................... 10, 27, 28

*California v. Iipay Nation of Santa Ysabel,*
    898 F.3d 960 (9th Cir. 2018) ................................................................................ 19, 26

*Carter v. Carter Coal Co.,*
    298 U.S. 238 (1936)............................................................................................. 16, 17

*Epic Sys. Corp. v. Lewis,*
    584 U.S. 497 (2018)............................................................................................. 19, 22

*FCC v. Consumers' Research,*
    145 S. Ct. 2482 (2025)................................................................................................ 17

*Gaming Corp. of Am. v. Dorsey & Whitney,*
    88 F.3d 536 (8th Cir. 1996) .................................................................................. 19, 24

*Hagen v. Utah,*
    510 U.S. 399 (1994) (Blackmun, J., dissenting)............................................................ 19

*KalshiEX LLC v. CFTC,*
    No. 24-5205 (D.C. Cir. Nov. 15, 2024) ...................................................................... 16

*KalshiEX LLC v. Martin,*
    793 F.Supp.3d 667 (D. Md. 2025) .................................................................. 14, 18, 20

*KalshiEX LLC v. Martin,*
    No. 25-1892 (4th Cir. Oct. 15, 2025)............................................................... 15, 18, 26

*KalshiEX LLC v. Schuler,*
    No. 2:25-cv-1165-SDM-CMV (S.D. Ohio Oct. 7, 2025) ................................................ 15

*KalshiEX, LLC v. Hendrick,*
    No. 2:25-cv-00575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025)........................ 13, 22, 24

*MCI Telecommunications Corp. v. Am. Telephone & Telegraph Co.,*
    512 U.S. 218 (1994)................................................................................................... 24

*Michigan v. Bay Mills Indian Cmty.*,
    572 U.S. 782 (2014)................................................................................................ 27, 29

*Montana v. Blackfeet Tribe of Indians*,
    471 U.S. 759 (1985)..................................................................................................... 20

*Morton v. Mancari*,
    417 U.S. 535 (1974)..................................................................................................... 21

*N. Am. Derivatives Exch., Inc. v. Nevada* (*Crypto.com*),
    No. 2:25-cv-978, 2025 WL 2916151 (D. Nev. Oct. 14, 2025)....................... 13, 15, 22, 28

*New York v. Mountain Tobacco Co.*,
    942 F.3d 536 (2d Cir. 2019)......................................................................................... 20

*Posadas v. Nat'l City Bank of N.Y.*,
    296 U.S. 497 (1936)..................................................................................................... 19

*Robinhood Derivatives, LLC v. Dreitzer*,
    No. 2:25-cv-1541, 2025 WL 3283308 (D. Nev. Nov. 25, 2025)................................. 13, 28

*Santa Clara Pueblo v. Martinez*,
    436 U.S. 49 (1978)....................................................................................................... 27

*Shoshone-Bannock Tribes of Fort Hall Rsrv. v. U.S. Dep't of the Interior*,
    153 F.4th 748 (9th Cir. 2025) ...................................................................................... 21

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*,
    951 F.3d 1142 (9th Cir. 2020) ..................................................................................... 21

*Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians*,
    63 F.3d 1030 (11th Cir. 1995) ..................................................................................... 24

*United States v. Fausto*,
    484 U.S. 439 (1988)..................................................................................................... 19

*United States v. Lara*,
    541 U.S. 193 (2004)..................................................................................................... 27

*United States v. Mazurie*,
    419 U.S. 544 (1975)..................................................................................................... 27

*West Flagler Associates, Ltd. v. Haaland*,
    71 F.4th 1059, 1065–66 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2671 (2024) ............. 18

*West Virginia v. EPA*,
    597 U.S. 697 (2022)..................................................................................................... 24

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ................................................................................................. 12

**Statutes**

17 C.F.R. § 40.11(a) ................................................................................................. 22

17 C.F.R. § 40.11(a)(1) ............................................................................... 12, 15, 16, 22

18 U.S.C. § 1084 ...................................................................................................... 20

18 U.S.C. § 1166(d) ................................................................................................. 20

25 C.F.R. § 293.26 ................................................................................................... 19

25 C.F.R. § 502.4(c) ........................................................................................... 25, 26

25 U.S.C. § 2701(5) .......................................................................................... 10, 28

25 U.S.C. § 2702 ..................................................................................................... 21

25 U.S.C. § 2702(1) ................................................................................................. 28

25 U.S.C. § 2703(8) ................................................................................................. 10

25 U.S.C. § 2710(b)(2)(B) ....................................................................................... 28

25 U.S.C. § 2710(d)(1) ................................................................................ 20, 26, 27, 28

25 U.S.C. § 2710(d)(3) ............................................................................................ 10

25 U.S.C. § 5302(b) ................................................................................................. 27

25 U.S.C. §§ 2702 ................................................................................................... 10

28 U.S.C. § 3702 ..................................................................................................... 23

28 U.S.C. § 3704(a) ................................................................................................. 23

31 U.S.C. § 5362(1) ................................................................................................. 19

31 U.S.C. § 5362(1)(A) ............................................................................................ 25

31 U.S.C. § 5362(1)(E)(ii) ....................................................................................... 26

31 U.S.C. § 5362(10)(A) .......................................................................................... 19

7 U.S.C. § 16(e)(1)(A) ............................................................................................. 21

7 U.S.C. § 1a(19)(iv) ............................................................................................... 14

7 U.S.C. § 1a(47)(A)(ii) ........................................................................................... 13

7 U.S.C. § 2(a)(1)(A) ......................................................................................... 13, 14

7 U.S.C. § 5(a)–(b) ............................................................................................ 12, 21

7 U.S.C. § 7a-2(c)(5)(C) ......................................................................... 11, 12, 15, 21

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 100 *et seq.* .............................................. 15

**Other Authorities**

156 Cong. Rec. S5906–07 (daily ed. Jul. 15, 2010) ................................................... 15

2024 Amendments to the Lac du Flambeau Band of Lake Superior Chippewa Indians and State
of Wisconsin Gaming Compact of 1992, Part IV.A.12 (Mar. 29, 2024) .......................... 25

57 Fed. Reg. 12,392 (April 9, 1992) ....................................................................... 25

76 Fed. Reg. 44,776 (July 27, 2011) ....................................................................... 11

76 Fed. Reg. at 44,786 ......................................................................................... 16

Agreement Between the Mohegan Tribe of Indians of Connecticut and the State of Connecticut,
Section 1(nn) (Sept. 10, 2021) ............................................................................. 25

Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (Apr. 3,
2025) .............................................................................................................. 25

Exec. Order No. 13,175, § 2(c), 65 Fed. Reg. 67,249 (Nov. 6, 2000) .......................... 27

Exec. Order No. 13,647, § 1(a), 78 Fed. Reg. 39,539 (Jun. 26, 2013) ......................... 27

Farewell Address of Commissioner Kristin N. Johnson, CFTC (Sept. 3, 2025) ............... 17

Felix Cohen, Handbook of Federal Indian Law 221 (1982 ed.) .................................... 19

Jessica Welman, *Kalshi's lawyer goes hard at state-regulated gambling*, SBCAmericas, (Jul. 11,
2025) .............................................................................................................. 28

Matthew L.M. Fletcher, *In Pursuit of Tribal Economic Development as a Substitute for
Reservation Tax Revenue*, 80 N.D. L. Rev. 759, 774 (2004) ...................................... 29

National Indian Gaming Commission, FY 2023 Gross Gaming Revenue Report 4–5 (July 2024)
....................................................................................................................... 10

S. Rep. No. 100-446, at 6 (1988) ........................................................................... 24

## INTRODUCTION AND INTERESTS OF *AMICI CURIAE*

The Indian Gaming Association ("IGA"), National Congress of American Indians

("NCAI"), Washington Indian Gaming Association ("WIGA"), California Nations Indian

Gaming Association ("CNIGA"), Arizona Indian Gaming Association ("AIGA"), Minnesota

Indian Gaming Association ("MIGA"), Oklahoma Indian Gaming Association ("OIGA"), United

South and Eastern Tribes Sovereignty Protection Fund ("USET SPF"), San Manuel Gaming and

Hospitality Authority ("SMGHA"), and 17 federally recognized Indian Tribes ("Amici Tribes")[1]

(collectively, "Tribal Amici") submit this amicus curiae brief in support of the Defendants'

response to KalshiEX, LLC's ("Kalshi") motion for preliminary injunction and temporary

restraining order.

IGA is an inter-tribal non-profit organization comprised of 124 federally recognized

Indian Tribes that operate gaming enterprises throughout Indian Country and other non-voting

members, which represent organizations, tribes, and businesses engaged in tribal gaming

enterprises around the country.  IGA's mission is to advance tribal economic, social, and

political interests, and to preserve and promote tribal sovereignty, self-sufficiency, and economic

development by advocating for tribally owned governmental gaming enterprises.

NCAI is the oldest and largest national organization comprised of American Indian and

Alaska Native tribal governments and their citizens.  Since 1944, NCAI has advised and

educated the public, tribal nations, state governments, and the federal government on a broad

---

[1] The Amici Tribes include: Agua Caliente Band of Cahuilla Indians; Elk Valley Rancheria; Karuk Tribe; Kickapoo Traditional Tribe of Texas; Klamath Tribes; Lytton Rancheria of California; Mashantucket Pequot Tribal Nation; Mescalero Apache Tribe of the Mescalero Reservation; Pechanga Band of Indians; Picayune Rancheria of Chukchansi Indians of California; Pueblo of Acoma; Pueblo of Sandia; Rincon Band of Luiseño Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Table Mountain Rancheria; and Yuhaaviatam of San Manuel Nation.

range of issues involving tribal sovereignty, self-government, treaty rights, and policies affecting tribal nations, including jurisdiction, taxation, and gaming issues. NCAI currently represents more than 275 tribal nations. NCAI works daily to strengthen the ability of tribal nations to ensure the health and welfare of their communities.

WIGA is a non-profit organization of tribal government leaders representing 23 federally recognized Indian tribes in the State of Washington. WIGA's purpose is to educate and disseminate information to the Indian gaming community, federal and state governments, and the general public concerning issues related to gaming in Indian Country. WIGA advocates on behalf of Washington's Indian gaming community to promote government relations and effective communication between tribes and the State. WIGA aims to promote, protect, and preserve the general welfare of Indian tribes through the development of sound policies and practices with respect to the conduct of gaming activities in Indian Country.

AIGA is a non-profit association comprised of eight federally recognized Tribes. AIGA is committed to protecting and promoting the welfare of tribes striving for self-reliance by supporting tribal gaming enterprises on Arizona Indian lands. AIGA provides educational, legislative, and public policy resources for tribes, policymakers, and the public on Indian gaming issues and tribal community development. AIGA is deeply committed to maintaining and protecting tribal sovereignty and self-governance.

CNIGA is a non-profit organization that represents 54 federally recognized tribal governments located within the State of California. CNIGA acts as a planning and coordinating agency for legislative, policy, legal, and communications efforts on behalf of its members, especially with respect to gaming-related matters.

8

MIGA was founded in 1987 to bring member tribes together to educate Minnesotans about the impacts of tribal gaming and to speak with a unified voice on public policy matters. MIGA is currently comprised of elected leaders from nine of the eleven federal recognized Indian tribes in Minnesota. MIGA continues to support and advocate for tribal gaming operations while also defending against the off-reservation expansion of gaming.

OIGA is a non-profit organization of Indian Nations and other non-voting members representing organizations, tribes, and businesses engaged in tribal gaming enterprises in Oklahoma. OIGA's mission is to promote the general welfare of the Oklahoma Indian Tribes through the development of sound policies and practices with respect to the conduct of gaming enterprises in Indian Country. OIGA's purpose is to educate and disseminate information to tribal, federal, and state governments and the general public on issues relating to tribal gaming.

USET SPF is a non-profit, inter-tribal organization advocating on behalf of 33 federally recognized tribal nations from the Northeastern Woodlands to the Everglades and across the Gulf of Mexico. USET SPF is dedicated to promoting, protecting, and advancing the inherent sovereign rights and authorities of tribal nations and in assisting its membership in dealing effectively with public policy issues. USET SPF works at the regional and national level to educate federal, state, and local governments about the unique historic and political status of its member tribal nations.

SMGHA is a governmental instrumentality of Yuhaaviatam of San Manuel Nation created for the purpose of independently carrying out the investment in, and ownership and management of, gaming and hospitality businesses outside of the San Manuel Reservation.

The Amici Tribes are 17 federally recognized Indian Tribes within the meaning of the Indian Gaming Regulatory Act ("IGRA"). *See* 25 U.S.C. § 2703(5). Each of the Amici Tribes is

a separate and distinct tribal government with the sovereign authority to conduct and regulate gaming activities on its Indian lands.  The Amici Tribes all have a direct and immediate interest in maintaining their sovereign rights over gaming, including sports betting, on their Indian lands.

Together, the Tribal Amici all have a shared, strong interest in this case because of its potential to have a significant impact on their or their member tribes' rights regarding gaming on Indian lands, as well as Indian gaming and tribal governmental revenue as a whole.  Such revenue is vital and provides funding for essential government services, tribal programs, and economic development needed to reach the goals of self-governance and self-sufficiency.

## ARGUMENT

Indian tribes are sovereign nations with primary jurisdiction over their lands and activities occurring on their lands.  In accordance with this principle, both the United States Supreme Court and Congress have recognized tribes' inherent and exclusive sovereign right to conduct and regulate gaming on their Indian lands.  *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987); 25 U.S.C. § 2701(5).  Congress enacted the Indian Regulatory Gaming Act ("IGRA") to provide a comprehensive federal regulatory framework for tribal gaming, including a mechanism for tribes and states to negotiate compacts governing Class III gaming, including sports betting.  *See* 25 U.S.C. §§ 2702, 2703(8), 2710(d)(3).  Based on this process, some states have negotiated compacts wherein tribes are the exclusive operators of certain types of gaming within the state.  *E.g.*, *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 718 (9th Cir. 2003).  The revenue generated by tribal gaming supports thousands of jobs in hundreds of communities and provides critical funding to state and local

governments through revenue-sharing agreements, tax revenue, and economic stimulus. In this regard, IGRA has been incredibly successful.[2]

KalshiEX, LLC ("Kalshi") has unlawfully and unfairly entered into the gaming market, which adversely impacts tribal gaming revenue and infringes upon the benefit of tribes' bargained-for compacts. By offering sports-event contracts to people on Indian lands under the guise of commodity trading pursuant to the Commodity Exchange Act ("CEA"), Kalshi impedes tribes' inherent sovereign right to regulate gaming activity on those lands. Kalshi's arguments justifying this infringement—that the CEA gives the Commodity Futures Trading Commission ("CFTC") exclusive jurisdiction over Kalshi's sports bets, including on Indian lands—are both legally incorrect and require this Court to conclude that Congress intended the CEA to repeal IGRA.

Contrary to Kalshi's arguments: (1) the CEA does not exclusively govern its gaming-related sports-event contracts; (2) such contracts are expressly prohibited by the CEA and CFTC regulations; (3) the CEA does not impliedly repeal IGRA; and (4) federal, state, and tribal gaming laws (including IGRA) apply to and govern its sports wagering activity.

Because Kalshi has failed to establish a likelihood of success on the merits, this Court should deny Kalshi's motion for preliminary injunction and temporary restraining order.

## I.      IGRA Governs Kalshi's Sports Betting Conduct on Indian Lands

### A.      The CEA does not exclusively govern gaming-related sports-event contracts

In 2010, Congress amended the CEA, in part, to allow for "event contracts." *See* 7 U.S.C. § 7a-2(c)(5)(C). Recognizing that some might try to exploit these so-called event contracts to

---

[2] *See, e.g.*, National Indian Gaming Commission, FY 2023 Gross Gaming Revenue Report 4–5 (July 2024), available at https://www.nigc.gov/wp-content/uploads/2025/02/GGR23_Final.pdf.

offer gaming, Congress enacted the "Special Rule" establishing categories of contracts contrary to the public interest, including gaming and those that contravene state and federal law.  *Id.* Shortly after Congress enacted the Special Rule, the CFTC adopted implementing regulations, whereby it exercised its discretion to categorically declare as against the public interest and explicitly prohibit any event contract that "involves, relates to, or references … gaming, or an activity that is unlawful under any State or Federal law."  17 C.F.R. § 40.11(a)(1); *see also* 76 Fed. Reg. 44,776 (July 27, 2011).

Kalshi's sports betting operation rests entirely on an assumption that Kalshi itself—by self-certifying that its own gaming activities are legitimate swaps—can preemptively decide that its gaming activities do not violate the CEA, CFTC regulations, IGRA, or other federal statutes. *See* Pl. Mot. for Prelim. Inj. at 7, 14–15 (ECF No. 16).  But it is inconceivable that Congress would have granted a private, for-profit entity the power to authorize and conduct nationwide sports betting—including on Indian lands—without explicitly stating as much, especially in the face of comprehensive statutes and regulations governing gaming on Indian lands.  It is axiomatic that "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Ignoring this history and longstanding principles of federal statutory interpretation, Kalshi now presents an alternate reality—one in which a statutory scheme whose scope is limited to addressing the risk, discovery, and dissemination of commodity pricing information, *see* 7 U.S.C. § 5(a)–(b), exclusively governs nationwide sports betting, including that which occurs on Indian lands, thereby repealing the comprehensive regulatory scheme set forth in IGRA for gaming on tribal lands and similar structures set up by state legislatures and regulators within

their respective gaming jurisdictions.  This cannot be the case.  Any preemptive effect that the CEA has only applies to lawful transactions that fall under the CFTC's exclusive jurisdiction. *See* 7 U.S.C. § 2(a)(1)(A).  Kalshi's sports-event contracts are neither.

> 1.      *The CEA does not give CFTC exclusive jurisdiction over gaming-related sports-event contracts*

Kalshi rests its case on the argument that the CEA grants "exclusive jurisdiction" to the CFTC over its sports-event contracts, and therefore preempts state law and, in effect, repeals IGRA by denying jurisdiction to other regulators.  *See* Pl. Mot. for Prelim. Inj. at 4–5, 16–17 (ECF No. 16).  However, Kalshi's sports-events contracts are not valid "swaps" or transactions based on "excluded commodities."  Specifically, Kalshi's sports-event contracts are not dependent on the *occurrence*, *nonoccurrence, or extent of the occurrence* of a sports event—i.e., whether the sports event occurs or the extent to which it occurs—but rather on the *outcome* of the sports event—i.e., which team wins.[3]  Nor is there any financial, commercial, or economic consequence" associated with Kalshi's sports-event contracts. Aside from whether the purchaser of a sports event contract wins or loses his bet, Kalshi's sports-event contracts have no direct financial consequences for the purchaser.[4]  The CFTC therefore does not have exclusive jurisdiction over these sports-events contracts.

---

[3] This is precisely what the Nevada District Court held in three recent decisions.  *N. Am. Derivatives Exch., Inc. v. Nevada* (*Crypto.com*), No. 2:25-cv-978, 2025 WL 2916151, at *9 (D. Nev. Oct. 14, 2025) (holding sports-event contracts are not "swaps" because they "turn on the *outcome* of the live event, … not on the '*occurrence, nonoccurrence, or the extent of the occurrence*' of a live event" (emphasis added)); *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 3286282, at *3 (D. Nev. Nov. 24, 2025); *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-1541, 2025 WL 3283308, at *1 (D. Nev. Nov. 25, 2025).

[4] To constitute a valid "swap," an event contract must be "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).  Similarly, an "excluded commodity" means, among other things, "an occurrence, extent of an occurrence, or contingency … that is—(I) beyond the control of the parties to the relevant contract,

Moreover, the CFTC's "exclusive jurisdiction" is not universal; 7 U.S.C. § 2(a)(1)(A) provides a savings clause, which states, "[e]xcept as hereinabove provided, nothing contained in this section shall … supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission *or other regulatory authorities under the laws of the United States* or of any State …." *Id.* (emphasis added).

The CEA neither supersedes IGRA nor limits the jurisdiction of tribes or the National Indian Gaming Commission ("NIGC") to regulate gaming and enforce IGRA compacts on Indian lands. Rather, the CEA's savings clause expressly reserves the authority of the NIGC and Tribal gaming authorities over gaming on Indian lands, in accordance with IGRA. *See KalshiEX LLC v. Martin*, 793 F.Supp.3d 667, 681 (D. Md. 2025) ("[A]lthough the savings clause in the [CEA's] exclusive jurisdiction provision cuts both ways …, given the presumption against preemption, its ambiguity means that on balance it cuts against a finding of field preemption.").

   2.   *The CFTC expressly prohibits Kalshi's sports-event contracts*

Kalshi's sports bets are not swaps under the CEA's definition, but even if they were, they are categorically prohibited by the CFTC as contrary to the public interest and are therefore invalid and outside the scope of the CFTC's "exclusive" jurisdiction. *See* 17 C.F.R.

---

agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). Here, Kalshi's sports-event contracts do not meet either definition because they are not dependent on the *occurrence*, *nonoccurrence, or extent of the occurrence* of a sports event, but rather on the *outcome* of the sports event. *See Crypto.com*, 2025 WL 2916151, at *9; *Hendrick*, 2025 WL 3286282, at *8.

Further, as pointed out by the Nevada District Court, the event itself must be "inherently associated with potential financial, economic, or commercial consequences" and "externalities like whether people bet on the event or contingency, or whether the event's occurrence or nonoccurrence causes downstream financial consequences, are not sufficient." *Hendrick*, 2025 WL 3286282, at *7–*8. The court also held that Kalshi's sports-event contracts are not valid swaps, in part, because swaps "do not include consumer transactions[,] . . . such as sports wagers." *Id.* at *6–8.

§ 40.11(a)(1).  The Special Rule grants the CFTC discretion to determine whether event contracts are "contrary to the public interest" if they involve gaming, unlawful activity under federal or state law, or certain other activities contrary to the public interest, like assassinations. 7 U.S.C. § 7a-2(c)(5)(C)(i).  When the CFTC makes such a determination, the CEA expressly prohibits those categories of contracts.  *Id.* § 7a-2(c)(5)(C)(ii).  Here, "[t]he CFTC made that public interest determination on a blanket basis when it promulgated § 40.11(a)," which prohibits event contracts related to gaming or unlawful activity under federal or state law.  *See Crypto.com*, 2025 WL 2916151, at *10.[5]

Further, in promulgating this blanket prohibition, the CFTC acted consistently with Congress's intent that the Special Rule prevent the usage of event contracts "to enable gambling," particularly sports betting.[6]  In fact, as Senator Lincoln—one of the principal architects of the Special Rule—explained in a colloquy on the Senate floor:

> [It] is our intent … [that the Special Rule] prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts."  It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament.  These types of contracts would not

---

[5] That Kalshi may believe "sports betting" is not contrary to the public interest is irrelevant; the CFTC, in its discretion, already made the determination that event contracts involving gaming are categorically contrary to the public interest.  17 C.F.R. § 40.11(a)(1).

[6] Kalshi has also suggested that its sports-event contracts are different from gaming or "sports betting" because there is no betting against the "house."  Appellant Br. at 18–19, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Oct. 15, 2025).  Not so.  A "house" is not a necessary element of gambling.  For example, pari-mutuel wagering—which is a type of betting system in which all bets or wagers are placed together in a "pool" and players are betting against each other rather than a "house"—is generally considered gaming and directly mirrors what Kalshi is offering. *See* N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 100 *et seq.*  Further, even if sports betting does require a "house" (it does not), Kalshi meets this standard because its subsidiary, "Kalshi Trading," sets bet prices, holds the opposite side to its customers on trades, and effectively acts as the "house." *See* Pl. Br. Supp. Prelim. Inj. Ex. 3 at 3–5, *KalshiEX LLC v. Schuler*, No. 2:25-cv-1165-SDM-CMV (S.D. Ohio Oct. 7, 2025), ECF No. 11-3.

> serve any real commercial purpose.  Rather, they would be used
> solely for gambling.

156 Cong. Rec. S5906–07 (daily ed. Jul. 15, 2010).  The CFTC's announcement of § 40.11

reinforces its rationale for the blanket prohibition:

> [I]ts prohibition of … "gaming" contracts is consistent with
> Congress's intent [for the CEA's Special Rule] to "prevent
> gambling through the futures markets" and to "protect the public
> interest from gaming and other events contracts."

76 Fed. Reg. at 44,786 (citations omitted).

Kalshi's sports-event contracts involve gaming and therefore expressly violate

§ 40.11(a)(1) and fall outside the scope of the CFTC's exclusive jurisdiction.  First, because

Kalshi's sports-event contracts constitute sports betting, they necessarily involve gaming in

violation of § 40.11(a)(1).  Kalshi even conceded as much in a prior case before the D.C. Circuit.

*See* Appellee Br. at 17, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024), Doc.

No. 2085055 ("An event contract … involves 'gaming' if it is contingent on a game or a game-

related event—like the Kentucky Derby, Super Bowl, or Masters golf tournament, all of which

were mentioned in the provision's only legislative history.").

Thus, Kalshi's sports-event contracts are not lawful transactions under the exclusive

jurisdiction of the CFTC.  Therefore, the CEA does not preempt or otherwise conflict with

IGRA, and IGRA governs all sports-event contracts offered on Indian lands.

### 3.    *The self-certification provisions of the CEA and CFTC regulations are invalid as applied to Kalshi*

Kalshi argues that, in the absence of CFTC action, its own self-certification that its

gaming contracts as lawful swaps unilaterally establishes these products are *bona fide* financial

instruments under the CEA, and preempts longstanding federal and state law and regulation to

the contrary.  This is wrong as a matter of law and an unconstitutional violation of the private

nondelegation doctrine, which guards against precisely the type of unchecked, privately exercised powers that Kalshi relies upon to list and trade its sports bets. *See, e.g.*, *Carter v. Carter Coal Co.,* 298 U.S. 238, 311 (1936) ("This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business.").

While the Supreme Court routinely upholds congressional delegations of power to federal agencies, it pays particular attention when those delegations are to private entities. *See, e.g.*, *id.* at 311; *FCC v. Consumers' Research*, 145 S. Ct. 2482 (2025). Recently, in *FCC v. Consumers' Research*, the Supreme Court reinforced its nondelegation precedent, finding that the permissibility of a private delegation depends upon whether the agency retains oversight and ultimate decision-making authority over the private entity's actions. There, the Court upheld the delegation to a private entity, determining that it played merely "an advisory role" and the final decision-making authority rested with the agency. *Consumers' Research* at 2508.

Here, the self-certification provisions empower Kalshi—a private, for-profit entity—to define, structure, and launch its own sports betting enterprise, yet simultaneously fail to provide any mechanism for advance public comment, mandatory agency oversight, or standards by which the CFTC may implement its discretion whether to stay a self-certification. *See* Farewell Address of Commissioner Kristin N. Johnson, CFTC (Sept. 3, 2025), available at https://www.cftc.gov/PressRoom/SpeechesTestimony/opajohnson25?utm_source=substack&utm_medium=email (warning that CFTC "[has] too few guardrails and too little visibility into the prediction market landscape"). Therefore, as applied to Kalshi, the self-certification provisions violate the private nondelegation doctrine.

**B.**     **The CEA does not impliedly repeal IGRA or any other applicable federal law**

By asserting that the CFTC has exclusive jurisdiction over sports betting (including that which occurs on Indian lands), Kalshi effectively contends that the CEA impliedly repealed IGRA.  Kalshi even made this argument before the Maryland District Court, stating that even if "IGRA's definition of 'gaming'" encompassed sports event contracts, "the CEA's exclusive jurisdiction provision would displace any attempt by tribes to regulate those contracts."  Pl. Reply Supp. Prelim. Inj. at 8, *Martin*, No. 1:25-cv-01283, ECF No. 29.  However, Kalshi has recently argued that the CFTC's alleged exclusive jurisdiction over its sports-event contracts does not impliedly repeal IGRA because "IGRA gives Native American tribes the authority to regulate gaming 'on Indian lands,' … but does not authorize tribes to regulate gaming available over the internet."  Appellant Br. at 55, *Martin*, No. 25-1892, ECF No. 16 (quoting 25 U.S.C § 2701).

The Court should reject these arguments because IGRA authorizes tribes to regulate gaming activities on Indian lands, including the placement of wagers from Indian lands over the internet; and the presumption against implied repeals applies here, where the CEA does not authorize DCMs to offer sports betting.

*1.     IGRA protects tribes' authority to regulate online gaming on Indian lands*

Ironically, in the very same paragraph that Kalshi makes the argument before the Fourth Circuit that IGRA cannot authorize tribes to regulate online gaming, it cites the *West Flagler Associates, Ltd. v. Haaland* decision, in which the D.C. Circuit held that IGRA allows states and tribes to "allocate jurisdiction" over the regulation of internet gaming conducted by a tribe throughout the state, including on its Indian lands.  71 F.4th 1059, 1065–66 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2671 (2024).  IGRA's implementing regulations also expressly prescribe

18

the bounds for when tribes can regulate online gaming pursuant to the terms of their IGRA compacts. *See* 25 C.F.R. § 293.26.

Moreover, the Unlawful Internet Gambling Enforcement Act ("UIGEA") comports with IGRA, in that under both statutes, when an individual physically located on Indian lands places or initiates a bet or wager, that bet or wager takes place on Indian lands, even if it is placed online.[7] *See e.g.*, 31 U.S.C. § 5362(10)(A); *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 967 (9th Cir. 2018) (rejecting argument that "patron's action in selecting a wager" constitutes a "pre-gaming communication, … not gaming activity" under the UIGEA because "[t]hat conduct is … subject to the provisions of the UIGEA as a 'bet or wager' that is initiated through the internet" (quoting 31 U.S.C. § 5362(1))).

Further, IGRA facilitates a comprehensive federal scheme for the regulation of online class III gaming by way of compacting. *See*, *e.g.*, *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 546 (8th Cir. 1996). A decision in Kalshi's favor would upend IGRA's inter-jurisdictional framework for class III gaming by allowing DCMs unilaterally—i.e., without the consent of tribes or states, or approval by the Secretary of the Interior—to offer sports betting on Indian lands.

### 2. *Kalshi cannot overcome the presumption against implied repeal*

The Supreme Court applies the "'strong presumption' that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510

---

[7] It is, of course, possible for online wagers to be treated as occurring somewhere other than the player's physical location, but such treatment requires statutory authorization. *See, e.g.*, 25 C.F.R. § 293.26. Neither the CEA nor its implementing regulations provide such deeming authority for Kalshi's sports bets.

(2018) (citing *United States v. Fausto*, 484 U.S. 439, 452, 453 (1988)). Congress's intent to repeal must be "clear and manifest." *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936). The Indian canons of construction[8] also require courts to resolve statutory ambiguities in favor of tribes. *Bryan v. Itasca Cnty.*, 426 U.S. 373, 392 (1976); *New York v. Mountain Tobacco Co.*, 942 F.3d 536, 548 (2d Cir. 2019) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985))).

Here, Congress did not express the requisite intent for implied repeal. If the Court accepts Kalshi's position that its sports-event contracts—which constitute sports betting and class III gaming under IGRA—are swaps subject to the CFTC's exclusive jurisdiction, then it must also accept the underlying assumption that Congress intended to upend the entire federal framework for Indian gaming and repeal key provisions of IGRA.[9] *See, e.g.*, 25 U.S.C. § 2710(d)(1). Additionally, IGRA's criminal provisions provide the United States Department of Justice ("DOJ") with "exclusive jurisdiction" over criminal prosecutions of applicable gambling laws in Indian country, unless a tribe agrees to transfer jurisdiction to the state. 18 U.S.C. § 1166(d). Under Kalshi's theory, the CEA likewise impliedly repealed DOJ's jurisdiction over such criminal prosecutions (which it did not) because it is impossible for the CFTC to exercise exclusive jurisdiction over sports-event contracts while the DOJ exercises its exclusive

---

[8] "[C]ourts 'have developed canons of construction that treaties and other federal action should when possible be read as protecting Indian rights and in a manner favorable to Indians.'" *Hagen v. Utah*, 510 U.S. 399, 442 n.1 (1994) (Blackmun, J., dissenting) (quoting Felix Cohen, Handbook of Federal Indian Law 221 (1982 ed.)).

[9] In addition to IGRA, Kalshi's sports-event contracts violate other federal laws, including the Wire Act, 18 U.S.C. § 1084. *See Martin*, 793 F.Supp.3d at 683 (holding that Kalshi's proposed interpretation of the CEA "would necessarily entail at least a partial implied repeal of the IGRA and the Wire Act").

jurisdiction over IGRA-related gaming prosecutions. Further, the CEA explicitly disclaims the CFTC's jurisdiction over such DOJ prosecutions. *See* 7 U.S.C. § 16(e)(1)(A) ("Nothing in this chapter shall supersede or preempt … criminal prosecution under any Federal criminal statute.").

Further, federal courts have established that later-enacted statutes of general applicability cannot repeal earlier-enacted legislation that is specifically designed to advance the United States' special relationship with Indians, without a clear statement from Congress. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550 (1974); *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142 (9th Cir. 2020); *Shoshone-Bannock Tribes of Fort Hall Rsrv. v. U.S. Dep't of the Interior*, 153 F.4th 748 (9th Cir. 2025). These cases further establish that when there is ambiguity as to whether a later-enacted statute of general applicability repeals an earlier-enacted statute applied specifically for the benefit of tribes, the question of repeal "must be resolved by the Indian canons of construction"—i.e., in tribes' favor. *See Shoshone-Bannock*, 153 F.4th at 765–766 (holding the Federal Land Policy and Management Act did not impliedly repeal a 1900 law specifically protecting a tribe's usufructuary rights to ceded lands).

Here, Congress passed legislation—IGRA—specifically to protect tribes' ability to regulate class III gaming on Indian lands. *See* 25 U.S.C. § 2702. Yet, when it amended the CEA in 2010, Congress did not explicitly reference IGRA or class III gaming on Indian lands; nor did it expressly exempt wagering on the outcome of sporting events from existing federal laws regulating sports betting. Rather, by the plain language of the CEA, Congress intended the statute to apply only to the commodities trading market (focusing on the risk, discovery, and dissemination of commodity pricing information), *not* Indian gaming. *See* 7 U.S.C. § 5(a)–(b). Indeed, Congress went so far as to enact the Special Rule, which shows a clear Congressional intent to *disallow* any "gaming" activity on DCMs at all, *see* 7 U.S.C. § 7a-2(c)(5)(C), and the

21

CFTC acted consistently with Congress's intent by promulgating the blanket prohibition of event contracts involving gaming and illicit activities, *see* 17 C.F.R. § 40.11(a)(1).  This point is emphasized by the fact that the CEA and IGRA only overlap here due to Kalshi's backdoor attempt to evade comprehensive gaming regulations.[10]

Further, Kalshi cannot meet the "heavy burden" of proving Congress intended to repeal IGRA because there is a reasonable interpretation of the CEA that gives full effect to both statutes: the CFTC's exclusive jurisdiction does not extend to Kalshi's sports bets.  *See Epic Sys. Corp.*, 584 U.S. at 510.  Instead, compliance with both statutory regimes is entirely possible, and nothing within IGRA's restraints on class III gaming on Indian lands obstructs or invalidates the provisions of the CEA.  Kalshi can still allow users located on Indian lands to trade on permissible event contracts under the CEA, such as the future prices of commodities like wheat or corn.  It can even engage in class III gaming on Indian lands, including sports betting, so long as it is in compliance with IGRA.

---

[10] Further, under Kalshi's theory, simply calling a sports wager a "swap"—regardless of whether it is actually a valid "swap"—and listing it for trade on a DCM automatically grants the CFTC exclusive jurisdiction, to the detriment of all other regulatory authorities.  *See* Pl. Mot. for Prelim. Inj. at 11, 14–15 (ECF No. 16).  What, then, would prevent Kalshi from calling "contracts" on other traditional forms of gaming—such as roulette and lotteries—"swaps" and subjecting them to the exclusive jurisdiction of the CFTC?  According to Kalshi, CFTC inaction—despite the CFTC categorically banning "gaming" contracts via 17 C.F.R. § 40.11(a)—is all that is required to bless contracts blatantly designed for no other purpose than to enable gambling.

Kalshi's theory would likewise strip this Court of its own jurisdiction to interpret the law and determine what, under the terms of the CEA, constitutes a "swap."  As Kalshi has argued, that determination is exclusively up to the CFTC and would only be reviewable pursuant to an Administrative Procedures Act challenge against the CFTC.  *See* Pl.'s Resp. in Opp. to Emergency Mot. to Dissolve Prelim. Inj. at 7, *Hendrick*, No. 2:25-cv-00575 (Oct. 31, 2025), ECF No. 183.  But, as the Nevada District Court recently held, "the CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap … [and] [n]othing in the CEA takes statutory interpretation away from courts."  *Crypto.com*, 2025 WL 2916151, at *6; *see also Hendrick*, 2025 WL 3286282, at *5.

Finally, even if there were a conflict (there is not), the CEA's silence as to class III gaming on Indian lands and its effect on IGRA means it is, at most, ambiguous as to whether the CEA repealed IGRA. That ambiguity must be resolved in tribes' favor under the Indian canons of construction.

>    3.    *Congress did not nullify PASPA and preempt the state sports betting prohibitions on which it relied to effectuate federal policy when it amended the CEA in 2010*

Kalshi must show that by amending the definition section of the CEA in 2010, Congress swept aside a federal statute (the Professional and Amateur Sports Protection Act ("PASPA")) that broadly prohibited sports betting based on then-existing state laws—state laws that, under Kalshi's theory, were preempted. *See* 28 U.S.C. §§ 3702, 3704(a). In other words, according to Kalshi, Congress (silently and by implication) nullified the strong policy in PASPA against sports betting, and preempted the means Congress chose to effectuate that policy. And, under Kalshi's theory, Congress did that without acknowledging it had effected such an extensive repeal or conferring on the CFTC any specific powers to prevent addiction and corruption deemed essential by every state that now allows sports betting.[11] It would make no difference if Kalshi were correct that its preemption argument is limited to sports betting actually conducted on a DCM (which it is not); that would still mean that Congress authorized the very activity that it had required states to prohibit, without even setting any standards to regulate such activity (sports betting). That is not credible.

Whether Congress overturned a federal policy against sports betting and displaced state regulatory authority with billions of dollars and significant risks of corruption and addiction due

---

[11] Kalshi touts the regulatory standards for DCMs. Pl. Mot. for Prelim. Inj. at 7 (ECF No. 16). But those standards have nothing to do with gambling addiction or sports corruption.

to lack of proper regulation is a major question.  Under the Major Questions Doctrine, courts have "'reason to hesitate before concluding that Congress' meant to confer" agency authority in cases where the agency has asserted a "breadth" of authority over matters of "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).  In such cases, considering "both separation of powers principles and a practical understanding of legislative intent," there must be "clear congressional authorization." *Id.* at 724.  As the Court explained, "Congress [does not] typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *Id.* at 723 (quoting *MCI Telecommunications Corp. v. Am. Telephone & Telegraph Co.*, 512 U.S. 218, 229 (1994)).

Here, the Major Questions Doctrine precludes interpreting the 2010 amendment to the definition of swap as upending both state laws regulating sports betting and a federal statute that relied on those state laws to carry out federal policy against sports betting but that went unnoticed for fifteen years.  Rather, as the Nevada District Court aptly put it in *Hendrick*, "It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010."  2025 WL 3286282, at *9.

C.      **Kalshi's sports-event contracts constitute "Class III Gaming" under IGRA**

IGRA's regulatory regime is comprehensive, and occupies the entire field of gaming on Indian lands.  *See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians*, 63 F.3d 1030, 1033 (11th Cir. 1995) (IGRA was "intended to expressly preempt the field in the governance of gaming activities on Indian lands" (quoting S. Rep. No. 100-446, at 6 (1988))); *Gaming Corp.*, 88 F.3d at 544.  IGRA—not the CEA—therefore preempts the field Kalshi has now occupied.

24

IGRA's implementing regulations define "Class III Gaming" to expressly include "sports betting." [12] 25 C.F.R. § 502.4(c).  The term "sports betting" is generally understood to mean:

> [T]he staking or risking by any person of something of value upon the outcome of … a sporting event … upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome.

31 U.S.C. § 5362(1)(A) (defining "bet or wager" under the UIGEA).  Specifically regarding what "sports betting" means under IGRA, the Department of the Interior has affirmatively approved tribal-state gaming compacts that define "sports betting" to include exactly the type of betting that Kalshi offers. [13]

Kalshi very clearly offers sports betting: contracts that stake or risk something of value upon the outcome of a sporting event based on the understanding that the person will receive something of value based on that outcome.  Kalshi does not deny this, and in fact advertises its products specifically as "sports betting." [14]  Instead, Kalshi maintains the CFTC has exclusive

---

[12] In its regulations, the NIGC defined "class III gaming" to include "*sports betting*."  25 C.F.R. § 502.4(c) (first published at 57 Fed. Reg. 12,392 (April 9, 1992)) (emphasis added).

[13] *See, e.g.*, 2024 Amendments to the Lac du Flambeau Band of Lake Superior Chippewa Indians and State of Wisconsin Gaming Compact of 1992, Part IV.A.12 (Mar. 29, 2024) (defining "event wagering" as "accepting wagers on the outcomes of, and occurrences within, sports and non-sports games, competitions, and matches"); Agreement Between the Mohegan Tribe of Indians of Connecticut and the State of Connecticut, Section 1(nn) (Sept. 10, 2021) (defining "sports wagering" as "risking or accepting any money … or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, … and (B) based on (1) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event, or (2) the individual performance statistics of an athlete or athletes in a sporting event or a combination of sporting events").

[14] *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (Apr. 3, 2025), available at https://nexteventhorizon.substack.com/p/ten-times-kalshi-said-people-could.

jurisdiction over its sports bets as "swaps" or transactions based on "excluded commodities." Pl. Mot. for Prelim. Inj. at 4–5, 11 (ECF No. 16). As discussed above, this argument fails.

Thus, Kalshi offers class III gaming (sports betting) in violation of IGRA—Kalshi has not obtained a license to offer its sports betting pursuant to tribal ordinance or resolution; nor has Kalshi been authorized to conduct its sports betting pursuant to any tribal-state compact. *See* 25 U.S.C. § 2710(d)(1) (class III gaming on Indian lands is only lawful if it is: (1) authorized by tribal ordinance or resolution; (2) located in a state that permits such gaming; and (3) conducted in accordance with a tribal-state gaming compact). Across the board, Kalshi does not geographically restrict its sports-event contracts and, therefore, offers such sports betting on Indian lands in violation of IGRA.

Kalshi has also recently argued that UIGEA's definition of "bet or wager" excludes transactions on DCMs, and that this exclusion should be read into IGRA to avoid a conflict between the two statutes. *See* Appellant Br. at 55, *Martin*, No. 25-1892. While UIGEA may provide insight as to what the term "sports betting" generally means, the exceptions to such definition from UIGEA should not be read into IGRA. As Kalshi points out, UIGEA exempts trading on DCMs when "conducted … under the [CEA]." *See* 31 U.S.C. § 5362(1)(E)(ii). However, that exclusion not only requires such trading to be lawful—which, as established, Kalshi's is not—but is also specific only to UIGEA and does not change the core understanding of what "sports betting" means. Moreover, IGRA contains no similar exclusion for class III gaming, which expressly includes "sports betting."[15] *See* 25 C.F.R. § 502.4(c).

---

[15] While gaming under IGRA can involve bets or wagers as the words are commonly used, *see* 25 C.F.R. § 502.4(c), there is no indication, let alone clear intent, that Congress meant for IGRA to be limited to the technical definition—including all the exceptions—provided in an entirely separate statute. Furthermore, "UIGEA does not make gambling legal or illegal directly," *Iipay*, 898 F.3d at 965, but rather ensures that the entire process of placing and accepting wagers is

Thus, each bet Kalshi offers on Indian lands violates IGRA, undermines tribal sovereignty, and reduces tribal gaming revenue and government funding.

## II.    Ignoring the Applicability of IGRA Raises Serious Policy Concerns and Violates Federal Indian Policy

Kalshi's sports-event contracts violate well-established federal Indian policy.  The Supreme Court has "consistently recognized that Indian tribes retain 'attributes of sovereignty over both their members and their territory.'" *Cabazon*, 480 U.S. at 207 (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975)).  While "the Constitution grants Congress broad general powers to legislate in respect to Indian tribes," *United States v. Lara*, 541 U.S. 193, 200 (2004), "[Indian tribes] remain 'separate sovereigns pre-existing the Constitution,'" *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)).

Congress has expressly declared its commitment to supporting Tribal self-determination and self-governance.  25 U.S.C. § 5302(b).  The Executive Branch has consistently affirmed this policy.  *See e.g.*, Exec. Order No. 13,175, § 2(c), 65 Fed. Reg. 67,249 (Nov. 6, 2000); Exec. Order No. 13,647, § 1(a), 78 Fed. Reg. 39,539 (Jun. 26, 2013).

In *Cabazon*, the Supreme Court recognized the importance of "the congressional goal of Indian self-government, including its overriding goal of encouraging tribal self-sufficiency and economic development[,]" and noted that federal agencies "ha[ve] sought to implement these policies by promoting tribal bingo enterprises."  480 U.S. at 216–17 (internal quotations omitted).  Additionally, tribal casinos often provide "the sole source of revenues for the

---

lawful.  Under IGRA, engaging in class III gaming on Indian lands is prohibited unless in accordance with an IGRA compact.  25 U.S.C. § 2710(d)(1).  Neither the CEA nor UIGEA repeals this pillar.

operation of the tribal governments and the provision of tribal services" and that, in some instances, tribal casinos "are also the major sources of employment on the reservations." *Id.* at 218–19.   Following *Cabazon*, Congress declared in IGRA that "[t]he purpose of [IGRA] is … to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments …." 25 U.S.C. § 2702(1).[16]

Kalshi tramples upon established federal Indian policy by usurping the rights of tribes to regulate gaming on Indian land and benefit from such gaming.  IGRA mandates that tribes "have the exclusive right to regulate gaming activity on Indian lands." 25 U.S.C. §§ 2701(5), 2710(d)(1)(C).  Kalshi violates this exclusive right, which is particularly dangerous because it does not comply with any gaming regulations that protect consumers, ensure fairness, or mitigate negative gaming impacts.[17]

Finally, Kalshi is siphoning revenue from tribal governments in violation of federal Indian policy.  IGRA requires all revenues from tribal gaming be used for governmental or charitable purposes.  25 U.S.C. § 2710(b)(2)(B).  As Justice Sotomayor explained in *Bay Mills*: "[T]ribal gaming operations cannot be understood as mere profit-making ventures that are

---

[16] To the extent Kalshi argues, as others have, that the policy concerns raised by Tribal Amici are for Congress to decide, *see* Pl.'s Resp. Amici Curiae Brief at 5, *Crypto.com*, No. 2:25-cv-00978, (D. Nev. Sept. 29, 2025) ECF No. 92; Pl.'s Resp. to Brief of Amici Curiae at 6*, Dreitzer*, No. 2:25-cv-01541 (D. Nev. Oct. 14, 2025) ECF No. 49, Congress has already done so through IGRA, which was not repealed by the CEA.

[17] This lack of responsible gaming measures and consumer protections, which are required by *legal* gaming operations, is dangerous and contrary to the public interest.  Recently, Josh Sterling (a former CFTC employee and the lawyer representing Kalshi) dismissed such responsible gaming concerns, stating: "People are adults, and they're allowed to spend their money however they want it, and if they lose their shirt, that's on them."  Jessica Welman, *Kalshi's lawyer goes hard at state-regulated gambling*, SBCAmericas, (Jul. 11, 2025), available at https://sbcamericas.com/2025/07/11/kalshi-nclgs-sports-contract-debate/?amp.

wholly separate from the Tribes' core governmental functions." 572 U.S. at 810 (Sotomayor, J., concurring). Many tribes have come to rely on gaming revenue because destructive former federal policies "left a devastating legacy" on tribes that are "largely unable to obtain substantial revenue by taxing tribal members … [because] there is very little income, property, or sales [that tribal governments] could tax." *Id.* at 812–13 (quoting Matthew L.M. Fletcher, *In Pursuit of Tribal Economic Development as a Substitute for Reservation Tax Revenue*, 80 N.D. L. Rev. 759, 774 (2004)). The revenue generated by tribal gaming supports thousands of jobs in hundreds of communities and provides critical funding to state and local governments through revenue-sharing agreements, tax revenue, and economic stimulus. If Kalshi continues to offer illegal nationwide online sports betting, the impact on tribal governments will be devastating.

## CONCLUSION

For the foregoing reasons, the Tribal Amici respectfully request that the Court deny Kalshi's motion for preliminary injunction.

Dated this 8th day of December, 2025.                    Respectfully submitted,

/s/ Joseph H. Webster
Joseph H. Webster (*pro hac vice* pending)
Elizabeth Bower (*pro hac vice* forthcoming)
Jens W. Camp (*pro hac vice* pending)
Hobbs, Straus, Dean & Walker LLP
1899 L Street NW, Ste. 1200
Washington, DC 20036
Telephone: (202) 822-8282
jwebster@hobbsstraus.com
ebower@hobbsstraus.com
jcamp@hobbsstraus.com

/s/ Scott Crowell
Scott Crowell (*pro hac vice* pending)
Crowell Law Office
Tribal Advocacy Group PLLC
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336

Telephone: (425) 802-5369
scottcrowell@clotag.net

/s/ Bryan Newland
Bryan Newland (*pro hac vice* forthcoming)
Powers, Pyles, Sutter & Verville PC
1250 Connecticut Ave N, 8th Floor
Washington, DC 20036
Telephone: (202) 349-4265
Bryan.Newland@Powerslaw.com

*Attorneys for Tribal Amici*

/s/ Michael Hoenig
Michael Hoenig (*pro hac vice* pending)
Yuhaaviatam of San Manuel Nation
422 1st Street SE
Washington, DC 20003
Telephone: (909) 936-9684
Michael.Hoenig@sanmanuel-nsn.gov

*Attorney for Yuhaaviatam of San Manuel Nation*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2025, I electronically filed the foregoing document

with the Clerk for the United States District Court for the Southern District of New York using

the CM/ECF system, which will send notification of this filing to the attorneys of record and all

registered participants.

DATED:  December 8, 2025

  /s/ Joseph H. Webster
Joseph H. Webster


**CERTIFICATE OF WORD COUNT**

In accordance with Rule 7.1(c) of the Local Rules of the United States District Courts for

the Southern and Eastern Districts of New York and the Court's Individual Practices, I hereby

certify that this proposed brief contains 7334 words (including footnotes), exclusive of cover

page, tables of contents and authorities, and signature block, as measured by the word count

function of Microsoft Word.

DATED:  December 8, 2025

  /s/ Joseph H. Webster
Joseph H. Webster