**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

KALSHIEX LLC,

*Plaintiff*,

vs.

ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission; SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission; and NEW YORK STATE GAMING COMMISSION,

*Defendants*.

Case No.: 1:25-cv-08846-AT

**PLAINTIFF'S REPLY IN SUPPORT OF ITS**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I. KALSHI IS LIKELY TO SUCCEED ON THE MERITS .................................................. 1

A. Kalshi's Contracts Are Swaps or Other CFTC-Regulated Derivatives. .................. 1

B. Defendants' Swaps Argument Is an Improper Collateral Attack on the CFTC's Oversight of Kalshi. ......................................................................................... 4

II. THE CEA PREEMPTS NEW YORK'S GAMING LAWS AS APPLIED TO KALSHI. ......................................................................................................................... 5

A. New York's Gambling Laws Are Expressly Preempted as Applied to Kalshi. ........ 5

B. New York's Gambling Laws Are Field Preempted as Applied to Kalshi. ............... 5

C. New York's Gambling Laws Are Conflict Preempted as Applied to Kalshi. ........... 7

D. Rule 40.11 Reinforces the CFTC's Exclusive Jurisdiction. ...................................... 8

E. The Presumption Against Preemption Does Not Apply. ......................................... 9

III. KALSHI WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION. ............................................................................................................. 9

IV. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR KALSHI. ............. 11

CONCLUSION ................................................................................................................ 12

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ....................6

*Am. Petro. Inst. v. Jorling*,
710 F. Supp. 421 (N.D.N.Y. 1989) ....................11

*Armour & Co. v. Ball*,
468 F.2d 76 (6th Cir. 1972) ....................7

*Barclays Cap. Inc. v. Theflyonthewall.com, Inc.*,
650 F.3d 876 (2d Cir. 2011) ....................7

*Big Lagoon Rancheria v. California*,
789 F.3d 947 (9th Cir. 2015) ....................4

*Bigelow v. Virginia*,
421 U.S. 809 (1975) ....................10

*CFTC v. Trade Exch. Network Ltd.*,
117 F. Supp. 3d 29 (D.D.C. 2015) ....................1, 4

*Chi. Mercantile Exch. v. SEC*,
883 F.2d 537 (7th Cir. 1989) ....................5

*Deposit Ins. Agency v. Superintendent of Banks of N.Y.*,
482 F.3d 612 (2d Cir. 2007) ....................11

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
565 U.S. 606 (2012) ....................4

*Dubin v. United States*,
599 U.S. 110 (2023) ....................2

*Free v. Bland*,
369 U.S. 663 (1962) ....................7

*Horn v. Medical Marijuana*,
80 F.4th 130 (2d Cir. 2023) ....................2

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) ....................5

*KalshiEX LLC v. CFTC*,
No. 1:23-cv-03257, 2024 WL 4164694 (D.D.C. Sep. 12, 2024) ....................1, 4

*KalshiEX LLC v. Flaherty*,
No. 25-cv-02152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025)....5, 11

*KalshiEX LLC v. Hendrick*,
No. 2:25-cv-00575 (D. Nev. Nov. 26, 2025)....10

*KalshiEX LLC v. Martin*,
No. 25-1892 (4th Cir. Oct. 15, 2025)....6

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988)....10, 11

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980)....6

*Long Island R.R. Co. v. Int'l Ass'n of Machinists*,
874 F.2d 901 (2d Cir. 1989)....10

*Loren v. New York*,
99 F.3d 402 (2d Cir. 1995)....10

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)....9, 10, 11

*N. Am. Derivatives Exch., Inc. v. Nev. Gaming Control Bd.* (*Crypto*),
2025 WL 2916151 (D. Nev. Oct. 14, 2025)....1, 4

*Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*,
26 F.3d 1508 (10th Cir. 1994)....1

*Puerto Rico v. Franklin Cal. Tax-free Tr.*,
579 U.S. 115 (2016)....9

*Really Good Stuff, LLC v. BAP Invs., L.C.*,
813 F. App'x 39 (2d Cir. 2020)....11

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
60 F.3d 27 (2d Cir. 1995)....10

*Toy Mfrs. of Am., Inc. v. Blumenthal*,
806 F. Supp. 336 (D. Conn. 1992)....11

*United States v. Bedi*,
15 F.4th 222 (2d Cir. 2021)....5

*United States v. Harris*,
838 F.3d 98 (2d Cir. 2016)....2

*United States v. Locke*,
529 U.S. 89 (2000) ....................................................................................................9

*UnitedHealthcare of N.Y. Inc. v. Lacewell*,
967 F.3d 82 (2d Cir. 2020) ....................................................................................................10

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
549 F.3d 100 (2d Cir. 2008) ....................................................................................................11

*Wyeth v. Levine*,
555 U.S. 555 (2009) ....................................................................................................9

**Statutes**

5 U.S.C. § 702 ....................................................................................................4

5 U.S.C. § 706 ....................................................................................................4

7 U.S.C. § 1a ....................................................................................................1, 2, 3

7 U.S.C. § 2 ....................................................................................................3, 5

7 U.S.C. § 13a-2 ....................................................................................................6, 7

7 U.S.C. § 16 ....................................................................................................6

N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1300 ....................................................................................................7

N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1301 ....................................................................................................7

N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1367-a ....................................................................................................7, 8

**Other Authorities**

17 C.F.R. § 38.5 ....................................................................................................4

17 C.F.R. § 40.2 ....................................................................................................5

17 C.F.R. § 40.11 ....................................................................................................3, 5, 8, 9

CFTC Release No. 9033-25, *CFTC's Review of Nadex Sports Contract Submissions* (Jan. 14, 2025),
https://www.cftc.gov/PressRoom/PressReleases/9033-25 ....................................................................................................9

Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572 (Dec. 22, 2010) ....................................................................................................8

Event Contracts, 89 Fed. Reg. 48968 (June 10, 2024) ....................................................................................................3, 4, 8

*Event*, Webster's Encyclopedic Unabridged Dictionary of the English Language: Deluxe Edition (1st ed. 2001) ....................1

*Event*, Random House Webster's Pocket Am. Dictionary (5th ed. 2008) ....................1

H.R. Rep. No. 93-975 (1974) ....................2

H.R. Rep. No. 93-1383 (1974) ....................6

H.R. Rep. No. 106-711, pt. 2 (2000) ....................6

*KalshiEX LLC v. CFTC*, Appellant Br. No. 24-5205, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) ....................6, 8

Provisions Common to Registered Entities, 76 Fed. Reg. 44776 (July 27, 2011) ....................8

## I. KALSHI[1] IS LIKELY TO SUCCEED ON THE MERITS.

### A. Kalshi's Contracts Are Swaps or Other CFTC-Regulated Derivatives.

Defendants are mistaken (at 9-11) that an event contract turning on an "outcome" cannot be a swap. Swaps may be based on the occurrence or nonoccurrence of an "event" or "contingency." 7 U.S.C. § 1a(47)(A)(ii). Both terms encompass outcomes.

To Kalshi's knowledge, the District of Nevada is the first and only U.S. court to conclude that "outcome" is an archaic definition of "event." *N. Am. Derivatives Exch., Inc. v. Nev. Gaming Control Bd.* (*Crypto*), 2025 WL 2916151, at *7 (D. Nev. Oct. 14, 2025). Many dictionaries disagree. *See, e.g.*, *Event*, Webster's Encyclopedic Unabridged Dictionary of the English Language: Deluxe Edition (1st ed. 2001) ("the outcome, issue, or result of anything"); *Event*, Random House Webster's Pocket Am. Dictionary (5th ed. 2008) ("something that happens"). An outcome is understood to be "something that happens." The 2024 presidential election was an event, but the outcome—President Trump's win—was, too.

Courts and the CFTC recognize that an "event" is "the outcome or consequence of anything," *Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*, 26 F.3d 1508, 1514-15 (10th Cir. 1994), and event contracts turning on outcomes are subject to the CFTC's jurisdiction, *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *1 (D.D.C. Sep. 12, 2024). *See also CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 32 (D.D.C. 2015) (CEA applies to contracts tied to "the outcome of real-world events"). A rule providing that event contracts cannot be based on outcomes would pose intractable interpretive difficulties: all outcomes are merely contingent events.

*Second*, Defendants are wrong (at 11) that sports events are not "associated with" potential financial consequences. Sports events have *actual* and *significant* financial consequences for

---

[1] Capitalized terms have the meaning given to them in ECF No. 16.

numerous stakeholders—sponsors, advertisers, broadcasters, and more. They readily meet the swap definition, which requires only a *potential* consequence. Defendants' argument is untenable, given their claimed authority to prohibit *all* Kalshi sports-event contracts, requiring a showing that *no* sports events are associated with such consequences.

*Third*, Defendants argue (at 11-12) that "statutory text, legislative context, the CFTC's post-enactment guidance, and federalism principles" justify reading "inherent" into the statute. *Horn v. Medical Marijuana* does not support Defendants' rewrite: when Congress includes limitations, courts should not infer more. 80 F.4th 130, 139-40 (2d Cir. 2023). Congress limited swaps to events "associated"—not *inherently* associated. 7 U.S.C. § 1a(47)(A)(ii).

Defendants' citations to *Dubin* and *Beecham* (at 12) are equally misplaced. Neither case applies to a definition like Section 1a(47), which provides a flexible framework with six broad, overlapping categories. *See, e.g.*, *Dubin v. United States*, 599 U.S. 110, 124 (2023) (interpreting "trio of verbs" reflecting "ordinary understanding of identity theft"). So, too, with *United States v. Harris* (at 12), which expressly recognized the anti-superfluity canon must yield where Congress creates overlapping provisions. 838 F.3d 98, 105-06 (2d Cir. 2016). Section 1a(47)'s overlapping definitions ensure comprehensive regulatory coverage. For example, subpart (iv) defines "swap" to include any agreement "that is, or in the future becomes, commonly known to the trade as a swap"—a category that encompasses most or all other subparts. 7 U.S.C. § 1a(47)(A)(iv); *see* H.R. Rep. No. 93-975, at 76 (1974) (CEA would cover "all futures trading that might now exist or might develop in the future"). *Harris* confirms this overlap is consistent with Congress's intent and poses no superfluity problem. Furthermore, Defendants' proposed reading would not avoid superfluity, as many (perhaps all) of the swaps listed in Section 1(a)(47)(A)(iii) are based on *inherently* financial, economic, or commercial events.

*Fourth*, Defendants err in claiming (at 8, 12) that the CFTC does not recognize sports-event contracts as swaps, and that its "actions on the whole support an inference that Kalshi's sports-event contracts do not constitute a swap." The CFTC has recognized that contracts involving the "outcome" of a "sports game" are "agreements, contracts, transactions, or swaps in excluded commodities" subject to CFTC jurisdiction. 89 Fed. Reg. 48968, 48972, 48976 (June 10, 2024). And the CFTC's own regulation, 17 C.F.R. § 40.11, identifies event contracts as "swaps in excluded commodities" (like the CEA provision under which it was promulgated). Defendants misconstrue a recent CFTC advisory, which merely acknowledged that the CFTC has not conducted a public interest review of sports-event contracts pursuant to the Special Rule. Janofsky Decl. Ex. 7, at 2 n.4. That does not change the fact that the CFTC has not challenged Kalshi's listings, and clearly views such contracts to fall within its jurisdiction as "swaps in excluded commodities," *infra* II.D.

*Fifth*, Defendants misrepresent Kalshi's comments in a prior litigation (at 13). There, Kalshi clarified that "there may be some games that do have extrinsic consequences." Wong Decl. Ex. 5, at 74:15-16. Moreover, the CEA's definition of "swap" sweeps broadly, covering Kalshi's sports-event contracts, which have significant financial consequences for a host of stakeholders. *See* 7 U.S.C. § 1a(47)(A)(ii).

*Finally*, even if the Court accepts Defendant's reading of "swap," the CFTC's exclusive jurisdiction also extends to "future[s]" and "option[s]" on DCMs. 7 U.S.C. § 2(a)(1)(A). The events on which Kalshi's contracts are based fall within the definition of "excluded commodity," including any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract, agreement, or transaction," and "associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). Unlike the definition of "swap," this

definition does not contain the term "event," so *Crypto* provides no basis to exclude Kalshi's contracts from CEA coverage. Event contracts like Kalshi's have been deemed transactions in excluded commodities. *KalshiEX*, 2024 WL 4164694, at *2 ("Event contracts are subject to regulation under the CEA as 'excluded commodities.'"); *Trade Exch. Network Ltd.*, 117 F. Supp. 3d at 37-38 (rejecting argument that event contracts "did not involve a 'commodity' regulated under the CEA").

**B. Defendants' Swaps Argument Is an Improper Collateral Attack on the CFTC's Oversight of Kalshi.**

Defendants contest (at 9-10) whether Kalshi's contracts fall within the CFTC's exclusive jurisdiction. But their real complaint is with the CFTC for permitting Kalshi to offer them. The Administrative Procedure Act ("APA") provides the proper channel for that complaint. *See* 5 U.S.C. §§ 702, 706(2). Circumventing the APA subjects parties "to conflicting interpretations of federal law by several different courts (and the agency), thereby threatening to defeat the uniformity that Congress intended." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 615 (2012); *see also Big Lagoon Rancheria v. California*, 789 F.3d 947, 954 (9th Cir. 2015) (collateral attack on circumventing APA would constitute "the sort of end-run" that Congress prohibited).

The CFTC believes it has exclusive jurisdiction; in 2024, it issued a proposed rule resting on the premise that event contracts involving "the outcome" of a "sports game" fell within its jurisdiction. 89 Fed. Reg. 48968, 48973-76. It has exercised that jurisdiction, demanding Kalshi submit a demonstration of compliance with the CEA for its initial sports-event contracts. *See* Wong Decl. Ex. 3, at 1; 17 C.F.R. § 38.5(b). Kalshi did so. Wong Decl. Exs. 3-4. The CFTC took no further action, allowing Kalshi's sports-event contracts to be listed, traded, executed, and cleared. Had the CFTC deemed Kalshi's contracts impermissible, it would have had the ability to

stay the contract, or even subject it to public interest review. 17 C.F.R. §§ 40.2(c), 40.11(c). It did not. If Defendants wish to challenge that determination, the APA (or congressional action) is the appropriate remedy.

## II. The CEA Preempts New York's Gaming Laws as Applied to Kalshi.

### A. New York's Gambling Laws Are Expressly Preempted as Applied to Kalshi.

The CEA grants the CFTC "exclusive jurisdiction" to regulate derivatives trading on DCMs. Mot. 11-19. The grant of "exclusive jurisdiction" to a federal agency preempts state intrusion on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).[2]

### B. New York's Gambling Laws Are Field Preempted as Applied to Kalshi.

The CEA "supersedes . . . state regulatory authorities' jurisdiction for contracts on a CFTC-designated exchange." *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *5 (D.N.J. Apr. 28, 2025). Section 2(a) defines the field Congress occupied: "transactions involving swaps" and "future[s]" contracts "traded or executed on" a DCM. 7 U.S.C. § 2(a)(1)(A). Defendants essentially ask this Court to rewrite the CEA to make the CFTC's jurisdiction exclusive *except for state gambling laws*. But "it is not the job of judges to effectively rewrite the statute" to effectuate extra-textual assumptions about Congress's unstated purposes. *United States v. Bedi*, 15 F.4th 222, 229 (2d Cir. 2021).

Contrary to Defendants' suggestion (at 17), Section 16 strongly supports Kalshi. Congress enacted Section 16(e)(2) to prevent states from applying their gaming laws to transactions on excluded electronic trading facilities and certain transactions that are exempted from the CEA, just

[2] Defendants agree (at 5) that the CFTC "may determine" if event contracts covered by the Special Rule are contrary to the public interest. Thus, the CFTC would have jurisdiction to bar Kalshi's sports-event contracts on public interest grounds. Where "the CFTC has jurisdiction, its power is exclusive." *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989).

as states already could not apply their gaming laws to *on-DCM* transactions. *See* H.R. Rep. No. 106-711, pt. 2, at 71 (2000) ("current" CEA already "supersedes and preempts" state laws as to on-DCM transactions and what is now Section 16(e)(2) clarified that "the CEA supersedes and preempts State gaming and bucket shop laws" as to exempt transactions as well). Each of the transactions cross-referenced in Section 16(e)(2) *need not occur on DCMs*: that is why Congress had to specify that state laws are preempted. It would have been redundant to specify preemption as to transactions on DCMs: Section 2(a) already accomplished that.

Defendants argue (at 17-18) that "Congress intended for some state laws to operate alongside the CEA without preemption." Correct, but only as to *off-exchange* trading, 7 U.S.C. § 16(e)(1)(B), or state efforts to enforce "general civil or criminal antifraud statute[s]," *id.* § 13a-2(7). Those limitations are in the CEA's text. When Congress allows state law to operate in this space, it speaks expressly. States cannot apply their gambling laws to ban trading on DCMs—the heart of the preempted field. *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992) (state laws that "would directly affect trading on or the operation of a futures market . . . [are] preempted"); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) ("[C]ourts have held that [Section] 2(a)(1) of the CEA preempts the application of state law."). The conference report to the 1974 amendments unambiguously states Congress's intent to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974). And the CFTC has recognized that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant Br. at *27, *KalshiEX LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024).

History refutes Defendants' claim (at 18) that Congress did not intend to preempt state gambling laws. Before the CEA, many states regulated futures trading as unlawful gambling. *See* Kalshi Br. at A1-16, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Oct. 15, 2025) (listing dozens

of pre-CEA state laws regulating futures trading as a type of "gambling" or "bucket shop"). Congress in 1974 thus unquestionably intended to preempt gambling laws when it granted the CFTC exclusive jurisdiction over trading on federal exchanges.[3]

**C. New York's Gambling Laws Are Conflict Preempted as Applied to Kalshi.**

Defendants concede (at 19) that the CEA could preempt state law if dual compliance is impossible or the state law creates a sufficient obstacle, but argue (at 20) that no such conflict exists here. But the CEA, which expressly spells out states' authority to apply state law in the derivatives space, excludes a state's right to dictate what contracts a DCM may offer. *See* 7 U.S.C. § 13a-2(1) (permitting states to enforce the CEA against parties "other than a [designated] contract market"). While Defendants invoke state police power to justify application of their gambling laws, state law must yield to conflicting federal law no matter how "clearly within a State's acknowledged power" it resides. *Free v. Bland*, 369 U.S. 663, 666 (1962).

Defendants contend (at 17-18) that enforcement of New York law would complement rather than conflict with federal law. But the CEA "manifests a congressional intent to prescribe uniform standards." *Armour & Co. v. Ball*, 468 F.2d 76, 83 (6th Cir. 1972); *Barclays Cap. Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 897 (2d Cir. 2011) (where the purpose of federal legislation is legal uniformity, state regulation is preempted).

Defendants suggest (at 20) that Kalshi can get a New York gaming license. But licensure requires individuals to be physically within New York when "wagering"—conflicting with the CEA. N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1367-a(4)(a)(ii). Defendants argue (at 21) that the CEA's requirement to provide "impartial access" mandates access for "participants of all

[3] Defendants' reliance on the "scope" of New York's (at 18) law is misplaced. *See* N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1300 (legislative purpose is to regulate casinos). Kalshi is not a casino. *Id.* § 1301(7).

economic means, not geographic locations." But "[a]ccess to a DCM should be based on the financial and operational soundness of a participant, rather than discriminatory or other improper motives." 75 Fed. Reg. 80572, 80579 (Dec. 22, 2010). DCMs cannot discriminate within any "particular category" of market participants—including geography. *Id.* And because licensure is discretionary, the Commission can veto licenses for entities offering on-exchange products—also in clear conflict with the CEA. *Id.*; N.Y. Rac. Peri-Mut. Wag. & Breed. Law § 1367-a(7)(d).

**D. Rule 40.11 Reinforces the CFTC's Exclusive Jurisdiction.**

Defendants are incorrect (at 5, 12) that the CFTC has banned sports-event contracts through 17 C.F.R. § 40.11. While Defendants focus on subsection (a), subsection (c) provides for the CFTC's public-interest review process applicable to all contracts in the enumerated categories, including those involving "gaming." *See* Appellant Br. at *14, *KalshiEX LLC*, 2024 WL 4512583. Unless the CFTC has initiated public-interest review of a contract, a DCM may list it.

"[R]egistered entities may always certify products pursuant to the procedures in § 40.2," and if the CFTC determines "that the submission may violate the prohibitions in § 40.11(a)(1)-(2)," the CFTC "may" subject the contract to a 90-day review. 76 Fed. Reg. 44776, 44786 (July 27, 2011). The CFTC's proposed 2024 rulemaking (never adopted) confirmed that the CFTC "interprets [the Special Rule] to contemplate that the Commission engage in a two-step inquiry" finding whether (1) a contract involves "gaming" and, if so, then determining (2) whether it is "contrary to the public interest" rather than a categorical ban. 89 Fed. Reg. 48968, 48970-71; Appellant Br. at *11-12, *KalshiEX LLC*, 2024 WL 4512583. The CFTC has followed this two-step process in other reviews undertaken under Section 40.11, including its review of Kalshi's

political-event contracts, and its more recent review of sports-event contracts offered by Kalshi's competitor.[4] The second step would be unnecessary if Section 40.11 were a categorical ban.

### E. The Presumption Against Preemption Does Not Apply.

Defendants (at 16) cite *Medtronic*, arguing a presumption against preemption applies. But, where a statute "contains an express pre-emption clause, [courts] do not invoke any presumption against pre-emption." *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (citation modified).

Defendants argue (at 16) the presumption applies because New York has traditionally regulated gambling. But the question is whether *trading on DCMs* has been regulated (it has not). *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case.") (citation modified). No presumption applies "when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). The federal government has regulated derivatives trading since the Grain Futures Act of 1922, and has done so exclusively since the 1974 amendments to the CEA.

## III. KALSHI WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION.

Defendants claim (at 22-23) that Kalshi's harm is "entirely speculative." But Defendants threaten Kalshi with civil sanctions. Compl. Ex. 2. If Kalshi does not comply, it will "expose [itself] to potentially huge liability." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). And if Kalshi complies, it will "suffer the injury of obeying [state] law during the

---

[4] *See, e.g.*, CFTC Release No. 9033-25, *CFTC's Review of Nadex Sports Contract Submissions* (Jan. 14, 2025), https://www.cftc.gov/PressRoom/PressReleases/9033-25.

pendency of the proceedings." *Id.*[5] Such a "Hobson's choice" is quintessential irreparable harm. *Id.*; *UnitedHealthcare of N.Y. Inc. v. Lacewell*, 967 F.3d 82, 90 (2d Cir. 2020) ("When a private plaintiff claims that a federal law protects it from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." (citation modified)).

Defendants are wrong (at 22-23) that Kalshi has begun, or been compelled, to geofence domestically or internationally.[6] Declaration of Xavier Sottile, filed herewith ("Dec. Sottile Decl.") ¶¶ 7, 10-11; *see KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575 (D. Nev. Nov. 26, 2025), ECF No. 242 (no enforcement proceedings before motion to stay decision). Defendants do not dispute that doing so would cost Kalshi tens of millions of dollars. *See* Oct. Sottile Decl. ¶¶ 14-28, ECF No. 18. And Kalshi could not recoup that cost. Mot. 21; *Loren v. New York*, 99 F.3d 402, 402 (2d Cir. 1995). Nor would recovery make Kalshi whole. *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 37 (2d Cir. 1995). The loss of a unique product or opportunity can constitute irreparable harm because it causes unrecoverable loss of goodwill and future prospects. *Id.* Defendants' demand would harm Kalshi's competitive position and irreparably damage its relationships with its partners and consumers. Dec. Sottile Decl. ¶ 14. An injunction is required to avoid irreparable harm. Mot. 21.

Defendants erroneously argue (at 24) that Kalshi "cannot claim harm that its users might suffer." But harm "to the public" may be considered in a preliminary injunction analysis. *Long Island R.R. Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901, 910 (2d Cir. 1989). *Kane* and *W.R.*

---

[5] In *Morales*, injunctive relief was proper because the *threatened* penalties left "no adequate remedy at law," even though the airlines could theoretically defend against, or later undo, penalties. 504 U.S. at 381-82.

[6] Crypto.com did not stop offering sports-event contracts in Nevada, but rather voluntarily restricted Nevada residents (in Nevada or otherwise) from accessing them, an outcome, that, if compelled, would be unconstitutional. *Bigelow v. Virginia*, 421 U.S. 809, 823 (1975).

*Huff* are inapposite; those cases concern third-party standing, not irreparable harm. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643-44 (2d Cir. 1988); *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 109-10 (2d Cir. 2008).[7]

The other cases cited by Defendants (at 24-25) stand for the narrow proposition that a structural constitutional claim does not, without more, create a presumption of irreparable harm. *See Am. Petro. Inst. v. Jorling*, 710 F. Supp. 421, 433 (N.D.N.Y. 1989) (finding no "clear-cut irreparable injury . . . underscored by the absence of any threats to enforce" regulations). Here, Kalshi faces the recognizable, imminent, irreparable harm of having to choose between ceasing its federally authorized activity or facing state enforcement of a preempted law. *See Morales*, 504 U.S. at 381; *Toy Mfrs. of Am., Inc. v. Blumenthal*, 806 F. Supp. 336, 340-41 (D. Conn. 1992) (plaintiffs demonstrated irreparable harm where they were threatened with enforcement of a state law they challenged as preempted).

## IV. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR KALSHI.

Finally, Defendants claim (at 25-28) that enjoining the enforcement of preempted state laws regulating advertising, proposition betting, and collegiate sporting events would undermine the public interest. But "the interests favor injunction" because "the public interest is not served by the enforcement of an unconstitutional law." *Flaherty*, 2025 WL 1218313, at *7 (citation modified); *see also Deposit Ins. Agency v. Superintendent of Banks of N.Y.*, 482 F.3d 612, 618 (2d Cir. 2007) (there is a "federal interest in assuring the supremacy of [federal] law"); ECF No. 16 at 19-23. The question is not whether Kalshi should be regulated, but rather by whom. The answer

[7] That Kalshi has emergency mechanisms for unwinding trades—generally reserved for serious cybersecurity incidents or physical disasters, *see* Dec. Sottile Decl. ¶ 13—does not undermine the fact that deploying those mechanisms would harm both Kalshi and its users. *Id.* ¶ 14; *Really Good Stuff, LLC v. BAP Invs., L.C.*, 813 F. App'x 39, 44 (2d Cir. 2020) ("[L]oss of reputation and goodwill constitutes irreparable harm."). A party that plans for disaster still suffers when the disaster strikes.

is clear: The CFTC has "exclusive jurisdiction" over trading on derivatives exchanges.

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary injunction.

Dated this 15th day of December, 2025.

Respectfully submitted,

/s/ *Grant R. Mainland*
Grant R. Mainland
Andrew L. Porter
Karen Wong
Nicole Valente
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
GMainland@milbank.com
APorter@milbank.com
KWong3@milbank.com
NValente@milbank.com

Joshua B. Sterling (*pro hac vice*)
William E. Havemann (*pro hac vice*)
**Milbank LLP**
1101 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586
JSterling@milbank.com
WHavemann@milbank.com

*Attorneys for Plaintiff*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 3496 words.