# Exhibit 1



47

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT
                                                CIVIL ACTION
                                                NO.  2584CV02525

### COMMONWEALTH OF MASSACHUSETTS

#### vs.

### KALSHIEX, LLC

## MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND DEFENDANT'S MOTION TO DISMISS

The defendant, KalshiEX, LLC ("Kalshi"), operates a nationwide "prediction" market derivatives exchange, on which traders can purchase either a "yes" or "no" position on "event contracts," including the outcome of sporting events.  If the correct resulting position is chosen, the trader receives a payment.  Kalshi's event contract exchange is registered as a "Designated Contract Market" ("DCM") with the Commodity Futures Trading Commission ("CFTC"), but is not licensed to offer sports wagering in Massachusetts.  On September 12, 2025, the Commonwealth filed a complaint seeking a declaration that Kalshi is operating in violation of Massachusetts's sports wagering law, G.L. c. 23N ("Sports Wagering Law"), as well as monetary and injunctive relief.  Presently before the court is the Commonwealth's motion for a preliminary injunction and Kalshi's motion to dismiss on federal preemption grounds.  After a hearing on December 9, 2025, and consideration of the materials submitted, the Commonwealth's motion is **ALLOWED**, and Kalshi's motion is **DENIED**.

### LEGAL AND FACTUAL BACKGROUND

The following undisputed facts are taken from the Complaint and submitted record, with further facts reserved for later discussion.

1. Kalshi's Business

Kalshi is a Delaware limited liability company with a principal place of business in New York City. It allows Massachusetts consumers to purchase its event contracts on its website and through its mobile application ("app"), which is available to both Android and Apple smartphone users. Kalshi event contracts are also offered on Robinhood, a stock-trading platform that is also accessible via a webpage and mobile app. Kalshi's trades operate so that the combined investment cost from both sides of an event contract (the yes and no positions) equal a dollar, with the correct position receiving the one-dollar-payout after the event occurs. Before the event occurs, the price for the yes or no position fluctuates, depending on the likelihood of each outcome. Kalshi has an affiliated entity that places buy and sell orders, ensuring that both yes and no contracts can be purchased for any given event at all times. It also has an affiliated clearinghouse under common ownership that finalizes and settles contracts and issues payouts.

Kalshi launched its platform in 2021, with event contracts focused on topics including inflation, the consumer price index, unemployment, and macroeconomic benchmarks. In October 2024, Kalshi began offering political event contracts, which invited users to take positions on issues such as which party would control Congress, or whether a presidential candidate would win a particular swing state. In January 2025, Kalshi began offering sports-related event contracts. Examples included predicting the winner of New England Patriots games, or the Women's Tennis Association tournament. Sports-related event contracts quickly became the majority of Kalshi's trading volume (about seventy percent between February 25, 2025, and May 17, 2025), and it profited more from its sports-related event contracts than licensed sports wagering platforms Draftkings and Fanduel during that same timeframe. In August and September 2025, Kalshi added contracts for the number of touchdowns a given

player will score in a game, how much a given team will win by, the overall total score in a game, and on various combinations of sports outcomes.

The manner in which Kalshi's contracts are offered mirrors other digital gambling experiences, including through continuous feedback and engagement loops that are modeled after operant conditioning and slot machine dynamics, leaderboard rankings, and countdown clocks. Users may also create profiles and avatars to publicly compete with other users on Kalshi's site. Kalshi borrows gambling terminology, using the term "football spread" when referring to a point spread contract. A point spread bet is a defined sports wager in Massachusetts. See G.L c. 23N, §3. Likewise, over/under, proposition, and parlay contracts are now being offered, which likewise are defined sports wagers under G.L c. 23N, §3. Prior to March 2025, Kalshi referred to itself in advertisements as "the first nationwide legal sports betting platform," and its CEO has referred to its offerings as "bets." It now describes itself as a "regulated exchange dedicated to trading," where "investments [are] directly tied to the outcome of specific events."

As of June 2025, Kalshi has about two million users nationwide, and is valued at over two billion dollars.

2. CFTC Regulation of Kalshi

In 2020, the CFTC registered Kalshi as a DCM. The CFTC is an independent federal agency charged under the Commodity Exchange Act ("CEA") with regulating derivative markets, including those that offer events contracts. 7 U.S.C. § 2(a)(1). Consistent with the above description of Kalshi's business, "[a]n event contract is a derivative contract for which the 'payoff is based on a specified event, occurrence, or value'—for example, the level of snowfall from a certain storm or the dollar amount of hurricane damage." *KalshiEX LLC* v. *Commodity*

3

*Futures Trading Comm'n*, 119 F.4th 58, 61 (D.C. Cir. 2024), quoting CFTC, Contracts &

Products: Event Contracts, https://perma.cc/4FPT-L2SN. "Businesses and individuals can use

event contracts to hedge against economic risk." *Id.* (citation omitted). See *KalshiEX LLC* v.

*Martin*, 793 F. Supp. 3d 667, 671 (D. Md. 2025) ("*Martin*").

      Under the CEA, only federally regulated exchanges can offer event contracts. 7 U.S.C. §

2(e). As an alternative to the CFTC's pre-approval of a particular event contract, under the CEA,

a DCM may self-certify to the CFTC that a contract it seeks to offer complies with the CEA and

the CFTC's regulations. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2. However, since 2010, the CEA

has included a "Special Rule" under which the CFTC can review and prohibit specific types of

event contracts if it determines those contracts are "contrary to the public interest." 7 U.S.C. §

7a-2(c)(5)(C)(i). In particular, the Special Rule provides:

> In connection with the listing of agreements, contracts, transactions, or swaps in excluded
> commodities that are based upon the occurrence, extent of an occurrence, or contingency
> . . . by a designated contract market . . ., the [CFTC] may determine that such agreements,
> contracts, or transactions are contrary to the public interest if the agreements, contracts,
> or transactions involve: (I) activity that is unlawful under any Federal or State law;
> (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (VI) other similar activity
> determined by the [CFTC], by rule or regulation, to be contrary to the public interest.

*Id.*By regulation, the CFTC has ninety days to determine whether to prohibit a DCM's proposed

event contract under the Special Rule. 17 C.F.R. § 40.11(c). During this review, the DCM

cannot list or trade the contract. 17 C.F.R. § 40.11(c)(1).

      Kalshi self-certified to the CFTC each of its sports event contracts. The CFTC has taken

no regulatory action against Kalshi under the Special Rule as to any of these contracts.

However, on September 30, 2025, certain CFTC divisions issued a "Staff Advisory" to all DCMs

and certain other regulated entities, "to be prepared for all foreseeable conditions that may result

from facilitating the trading and clearing of sports-related event contracts for customers, market

4

participants, and clearing members." The letter further "caution[ed] . . . DCMs . . . that State regulatory actions and pending and potential litigation, including enforcement actions, should be accounted for with appropriate contingency planning, disclosures, and risk management policies and procedures." As relevant to this case, further explanation and discussion of the CEA's jurisdiction over, and regulation of, DCMs will be set forth below.

### 3. Sports Wagering in Massachusetts

Following the United States Supreme Court's decision in *Murphy* v. *National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018), Massachusetts enacted the Sports Wagering Law in 2022. See G.L. c. 23N; *Murphy*, 584 U.S. 453 (holding that the federal Professional and Amateur Sports Protection Act's restriction on states' ability to regulate sports gambling violates the anticommandeering doctrine). The Sports Wagering Law defines sports wagering as: "the business of accepting wagers on sporting events or portions of sporting events," while "wager" is defined as a sum of money or thing of value risked on an uncertain occurrence." G.L. c. 23N, § 3. An entity's eligibility to accept sports wagers in the Commonwealth is conditioned on state licensure by the Massachusetts Gaming Commission ("MGC"), under a regulatory framework promulgated pursuant to the Sports Wagering Law, G.L. c. 23N. See 205 Code Mass. Regs. §§ 202-258. Both the application for licensure, and any license granted, are subject to fees. G.L. c. 23N, §§ 6, 7. An apportioned fee is also collected for the state's Public Health Trust Fund, to support efforts combating compulsive gambling and to aid in understanding the social and economic effects of gambling. G.L. c. 23N, §§ 15(e), 23. If licensure is granted, the MGC levies a twenty percent excise tax on sports wagering adjusted gross receipts for mobile wagers. G.L. c. 23N, § 14.

5

A licensed sports wagering operator in Massachusetts is subject to several obligations under the statutory and regulatory framework, including: 1) implementing responsible gambling features; 2) reporting suspected illegal activity; 3) preventing certain individuals from wagering on sporting events, including those related to the event and the sports wagering operator; 4) preventing underage sports wagering through the use of electronic age and identity verification; 5) offering users betting limits, as well as employing other methods to promote responsible gaming; and 6) complying with the Massachusetts voluntary self-exclusion program, which allows gamers to exclude themselves from casino gambling and sports wagering. See G.L. c. 23N, §§ 4(d)(2), 11, 13(d); 205 Code Mass. Regs. §§ 248.16, 256.07. Kalshi has not applied for a Massachusetts sports wagering license, and is not licensed in the state to offer sports wagering.

3. Present Action

On September 12, 2025, the Commonwealth commenced this action. The Complaint asserts a single claim for violation of G.L. c. 23N, § 5(a), based on Kalshi's alleged operation of a sports betting platform in Massachusetts without a license. On the same day, the Commonwealth filed a motion for a preliminary injunction "seeking to enjoin Kalshi from offering and accepting sports wagers while this action is pending, unless and until it obtains a license from the MGC."[1]

## DISCUSSION

### I. Commonwealth's Motion for Preliminary Injunction

Before issuing a preliminary injunction, the court "must determine that the plaintiff has shown a likelihood of success on the merits of the case at trial." *Commonwealth* v. *Mass.*

---

[1] Massachusetts is not the only state seeking enforcement action against Kalshi. Attorneys General from Nevada, New Jersey, Maryland, Ohio, Illinois, Montana, and Arizona, have sent cease and desist letters to Kalshi seeking to end its unlicensed operation in those states, as well.

*CRINC*, 392 Mass. 79, 87 (1984), citing *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 617 (1980). "If the plaintiff is the Attorney General, the judge must then determine that the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public." *Commonwealth* v. *Fremont Inv. & Loan*, 452 Mass. 733, 741 (2008) (citation omitted).

## A. Likelihood of Success on the Merits

In its opposition to the Commonwealth's motion, Kalshi does not argue that its sports-related event contracts do not meet the definition of sports wagering in the Commonwealth. Neither does it challenge the Commonwealth's assertion that it is operating in Massachusetts without a license. Rather, consistent with its litigation strategy in other states that have challenged its operation, Kalshi argues that the Commonwealth's attempt to regulate its exchange through the state's Sports Wagering Law is preempted by federal law. As explained below, I disagree.

### 1. The Law of Preemption

Under the Supremacy Clause of the United States Constitution, Congress has "the power to preempt state law," which it may exercise either expressly or impliedly. *Capron* v. *Office of Attorney Gen. of Massachusetts*, 944 F.3d 9, 20-21 (1st Cir. 2019), quoting *Arizona* v. *United States*, 567 U.S. 387, 399 (2012). "Express preemption occurs only when a federal statute explicitly confirms Congress's intention to preempt state law and defines the extent of that preclusion." *Grant's Dairy--Maine, LLC* v. *Commissioner of Maine Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 15 (1st Cir. 2000), citing *English* v. *General Elec. Co.*, 496 U.S. 72, 78-79 (1990). Implied preemption can occur in one of two ways: field preemption or conflict preemption. *Massachusetts Ass'n of HMO* v. *Ruthardt*, 194 F.3d 176, 179 (1st Cir. 1999).

7

"Field preemption occurs when a federal regulatory scheme is so pervasive as to warrant an inference that Congress did not intend the states to supplement it. . . . Conflict preemption takes place either when compliance with both state and federal regulations is impossible or when state law interposes an obstacle to the achievement of Congress's discernible objectives." *Grant's Dairy--Maine, LLC*, 232 F.3d at 15 (1st Cir. 2000) (citations omitted). Only implied preemption is at issue in this case.

Implied preemption analysis rests on two fundamental principles. *Wyeth* v. *Levine*, 555 U.S. 555, 565 (2009). First, "the purpose of Congress is the ultimate touchstone." *Id*., quoting *Medtronic, Inc*. v. *Lohr*, 518 U.S. 470, 485 (1996). Congressional intent is informed by examining the federal law at issue, as well as Congress's history of regulating in that area. *Id*. at 566; *Crosby* v. *National Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Second, every preemption case starts with the presumption that Congress did not intend to displace state law. *Wyeth*, 555 U.S. at 565. Because this presumption rests on "respect for the States as independent sovereigns in our federal system," *id*. at 565 n.3 (internal quotation marks omitted), it is especially strong in areas where states traditionally wield police powers. *Id*. at 565. See *English*, 496 U.S. at 79; *New York Pet Welfare Ass'n, Inc*. v. *New York*, 850 F.3d 79, 86-87 (2d Cir. 2017). The regulation of gambling falls squarely within a state's "core," historic police powers. *Abdow* v. *Attorney Gen*., 468 Mass. 478, 489 (2014). Accordingly, the presumption guides the court's analysis in this case. See *Robinhood Fin. LLC* v. *Secretary of Commonwealth*, 492 Mass. 696, 717 (2023) (Because State securities laws . . . fall within a field of "'traditional' [S]tate regulation," the assumption guides our analysis"), quoting *Oneok, Inc*. v.

8

*Learjet, Inc.*, 575 U.S. 373, 374 (2015).[2]  "The party asserting preemption bears the burden of establishing it." *Stephens* v. *Target Corp.*, 694 F. Supp. 3d 1136, 1141 (D. Minn. 2023).

2. Field Preemption

Kalshi argues that the Sports Wagering Law is field-preempted as applied to Kalshi's sports-related event contracts under the CEA's statutory text, and due to its statutory purpose, its drafting history, and the "comprehensive" federal regulatory scheme for DCMs.  As stated in *Martin*, "Kalshi's burden with respect to its field preemption claim is to establish that Congress clearly and manifestly intended to strip states of their authority to regulate gambling if the company offering such wagering opportunities has been approved to sponsor a [DCM] for commodities trading."  793 F. Supp. 3d at 677.  Consistent with the court's conclusion in *Martin*, applying the presumption to the facts here, Kalshi fails to meet its burden.

Beginning with statutory text, under the CEA, the CFTC has "exclusive jurisdiction" over all "transactions involving swaps" and "future delivery contracts" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A).  A savings clause further states: "[e]xcept as herein provided, nothing contained in this section shall . . . supersede or limit the jurisdiction . . . conferred on . . . other regulatory authorities under the laws of the United States or any State."  *Id.*  The United States Supreme Court has explained that the CEA's exclusive jurisdiction provision was intended to "consolidate federal regulation of commodity

---

[2] Citing *United States* v. *Locke*, 529 U.S. 89, 108 (2000), Kalshi nevertheless asserts that the presumption against preemption does not apply in this case because the federal government has a significant history of legislating in the field of futures and derivatives markets.  In determining Congress's intent to preempt, however, the relevant frame of reference is the targeted state law — here, the Sports Wagering Law.  After *Locke*, the United States Supreme Court clarified that "the presumption against preemption is not triggered only if there is a significant history of extensive federal regulation *to the exclusion of state regulation*."  *Massachusetts Ass'n of Private Career Sch.* v. *Healey*, 159 F. Supp. 3d 173, 215 (D. Mass. 2016) (emphasis added), quoting and discussing *Wyeth*, 555 U.S. at 565 n.3.  As stated, states have historically regulated local gambling through their police powers.  See, e.g., *Marvin* v. *Trout*, 199 U.S. 212, 224 (1905).  For the same reasons, the Maryland District Court likewise concluded that the presumption applies.  See *Martin*, 793 F. Supp. 3d at 676-677.

9

futures trading in the [CFTC]" and to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc*. v. *Curran*, 456 U.S. 353, 386-387 (1982) ("*Merrill Lynch*"). When originally enacted in 1974, the exclusive jurisdiction provision concerned only future delivery contracts; in 2010, the Dodd-Frank Wall Street Reform And Consumer Protection Act ("Dodd-Frank") added swaps to the CFTC's exclusive jurisdiction. See 7 U.S.C. § 2(a); Pub. L 111-203, 124 Stat. 1376 (July 21, 2010). For purposes of this decision, I assume without deciding that Kalshi's event contracts are swaps.

Kalshi argues that the CFTC's exclusive jurisdiction over transactions involving swaps, as confirmed by the "except as hereinabove provided" language in the savings clause, must mean that Congress intended to preempt state sports gaming laws that would otherwise require licensure of DCMs. But its view of the relevant field of preemption is overly broad, particularly in light of the presumption against preemption. Although I agree that the exclusive jurisdiction provision evidences an intent to preempt *some* state law, I disagree that it extends as far as state gaming laws. While it would make sense for Congress to displace a state's targeted attempt to regulate a derivative market, for example, or to clarify the roles of separate federal agencies, as addressed in *Merrill Lynch*, that logic does not suggest Congress intended to displace traditional state police powers, such as gambling regulation — particularly in the absence of the express language so stating.

As the court recognized in *Martin*, "in assessing field preemption, courts must avoid 'interpreting the scope of the preempted field too broadly.'" 793 F. Supp. 3d at 679, quoting *Sikkelee* v. *Precision Airmotive Corp*., 822 F.3d 680, 689 (3d Cir. 2016). See generally, *Martin ex rel. Heckman* v. *Midwest Exp. Holdings, Inc*., 555 F.3d 806, 809 (9th Cir. 2009) (aviation

10

preemption analysis looks "to the pervasiveness of federal regulations in the specific area covered by the tort claim or state law at issue"). That none of the CEA preemption cases Kalshi cites in support of its exclusive jurisdiction argument concern state gambling regulation, or the CEA's preemption of other equivalent historical state police powers, speaks to its overbroad view of relevant preemptory field. See, e.g., *Leist* v. *Simplot*, 638 F.2d 283, 285 (2d Cir. 1980) (concerning the existence of private right of action under CEA).

A lack of preemption here is further supported by looking at the CEA as a whole. The Special Rule, as quoted *supra*, which also was added by Dodd-Frank, Pub. L 111-203, 124 Stat. 1376 (July 21, 2010), provides the CFTC with the authority to prohibit event contracts that "involve . . . activity that is unlawful under . . . State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). This language "reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful. The fact that Congress expressly authorized the [CFTC] to prohibit particular categories of transactions as contrary to the public interest *based on the fact that the conduct at issue would violate state law* severely undercuts Kalshi's suggestion that Congress intended to displace all state laws that would otherwise apply to transactions that fall within the scope of the CEA." *Martin*, 793 F. Supp. 3d at 680 (emphasis in original).

The CEA's express preemption provision, 7 U.S.C. § 16(e), also reflects Congress's intended scope of preemption. That provision expressly states that the CEA preempts state gaming regulations as to certain types of operations, see *id.*,[3] which Kalshi does not argue apply

---

[3] 7 U.S.C.A. § 16(e)(2) provides:

> This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of--
>
> (A) an electronic trading facility excluded under section 2(e) of this title; and
>
> (B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

here. The statute does not, however, provide that the CEA preempts state gaming laws of general application, *or state sports wagering laws.* That Congress chose to explicitly preempt only some state gaming laws indicates an intent to limit the scope of preemption to only those expressly stated areas.[4] See *Martin*, 793 F. Supp. 3d at 681.

Finally, my conclusion is consistent with "the traditional balance between state and federal regulation of gaming." *KalshiEX, LLC* v. *Hendrick*, 2025 WL 3286282, at *8 (D. Nev. 2025) ("*Hendrick*"). See *Martin*, 793 F. Supp. 3d at 682 ("the Supreme Court has long recognized, states have strong interests in regulating gambling"), citing *Murphy*, 584 U.S. 453. As the Nevada District Court observed in ruling against Kalshi in similar litigation, if indeed Congress had intended "such a sea change" in the regulatory landscape of gambling regulation, surely it would have said so explicitly. *Hendrick*, 2025 WL 3286282, at *8 (citation omitted). Moreover, in adding swaps to the CEA in 2010,

> Congress was bringing risky financial products out of the shadows that had threatened the stability of the entire U.S. financial sector, and which had catastrophic ripple effects on the U.S. and world economies during the financial crisis of 2007-2008. Congress was not enabling nationwide gambling on CFTC-designated exchanges. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin* v. *Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010.

*Hendrick*, 2025 WL 3286282, at *9.[5] This conclusion is further strengthened by the fact that the 2010 Dodd-Frank amendments occurred at a time when federal law prohibited nearly all state-

---

[4] For the same reasons stated in *Martin*, I reject Kalshi's argument that § 16(e)(2) somehow means the opposite based on a distorted reading of the prior subsection. See 793 F. Supp. 3d at 681.

[5] Although *Henrick* reached its decision by concluding that Kalshi's sports event contract were not "swaps" under the CEA, rather than through a preemption analysis, Congressional intent was integral to that conclusion, — i.e., "what Congress was trying to achieve when it added swaps to the CEA." 2025 WL 3286282, at *9.

level regulated sports betting, prior to the Supreme Court's 2018 ruling in *Murphy*. See *Martin*, 793 F. Supp. 3d at 683. Nothing in the 2010 legislative history of the CEA suggests that *any* member of Congress envisioned or intended that predictive market "swaps" would include the sports event contracts offered by Kalshi, or intended CFTC authority over swaps to displace state police power to regulate gaming. See Senate Report 111-176.

For these reasons, Kalsi has failed to establish that Massachusetts's Sports Wagering Laws are field preempted by the CEA.[6]

### 3. Conflict Preemption

As already noted, "[a] state law is preempted by conflict preemption when 'it is impossible for a private party to comply with both state and federal requirements' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Triumph Foods, LLC* v. *Campbell*, 742 F. Supp. 3d 63, 72 (D. Mass. 2024), S.C., 156 F.4th 29 (1st Cir. 2025), quoting *English*, 496 U.S. at 79. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Maine Forest Prod. Council* v. *Cormier*, 51 F. 4th 1, 6 (1st Cir. 2022), quoting *Crosby*, 530 U.S. at 373. The presumption against preemption likewise applies to conflict preemption. *Robinhood Fin. LLC*, 492 Mass. at 717.

Kalshi's various conflict preemption arguments are all variations on a theme — allowing Massachusetts to impose its sports gambling regulations and licensing scheme on Kalshi would lead to "chaos" disrupting Congress's intent to have the CFTC uniformly regulate and enforce derivatives markets. For many of the reasons already discussed, the arguments are unavailing. Requiring Kalshi to become licensed to offer its sports related event contracts in Massachusetts

---

[6] I likewise find persuasive the several other reasons the *Martin* court discussed in concluding that the CEA does not preempt state gaming laws. See 793 F. Supp. 3d at 682-684.

13

neither displaces federal derivatives regulations or enforcement efforts, nor frustrates Congress's purpose in consolidating regulatory power in the CFTC. The Sports Wagering Law is an exercise of traditional state police power. It imposes an *additional* regulatory burden on an event contract platform that seeks to offer sports related event contracts, in service of the public health. It is not a competing attempt to regulate derivatives markets, or an outright ban on event contracts in the state. That both systems may operate in harmony demonstrates a lack of frustration to Congress's intent. See *Zuri-Invest AG* v. *Natwest Fin. Inc.*, 177 F. Supp. 2d 189, 197 (S.D.N.Y. 2001) ("There can be no implied conflict preemption when the federal and state laws co-exist in harmony"); *Vanlaningham* v. *Campbell Soup Co.*, 492 F. Supp. 3d 803, 806 (S.D. Ill. 2020) (same). See also *Martin*, 793 F. Supp. 3d at 686 ("Kalshi has not shown how obtaining a license in Maryland and otherwise complying with Maryland law would prevent it from complying with federal law").[7] The undercurrent to Kalshi's argument is that it would prefer to avoid the burden and expense of state licensure. That is an insufficient reason, however, to overcome the strong presumption against conflict preemption in this case.[8]

Because Kalshi has failed to establish that the CEA preempts the Sports Wagering Law, the Commonwealth is likely to succeed on the merits of its single claim that Kalshi requires licensure under G.L. c. 23N to offer sports-related event contracts in the Commonwealth.

---

[7] Kalshi cites a November 13, 2025, letter the MGC sent to licensed sports betting operators in support of its conflict preemption argument. I agree with the Commonwealth, however, that the letter does not state an intention to prohibit sports-related event contracts in Massachusetts. See Valente Ex. 5. Because it is a problem of its own making, Kalshi's ability to comply with federal regulations due to the disruption the issuance of an injunction would cause likewise has no bearing on the conflict preemption analysis.

[8] Kalshi raised the same conflict preemption arguments it raises here in *Martin*. 793 F. Supp. 3d at 685-686. I concur in the *Martin* court's analysis and rejection of each of those arguments. See *id*.

### B. **Public Interest**

"Because the Attorney General, in the name of the Commonwealth, brings this case to carry out her statutory mandate to enforce [the Sports Wagering Law, see G.L. c. 23N, 4(g),] it is necessary to consider whether the preliminary injunction order promotes the public interest." *Fremont Inv. & Loan*, 452 Mass. at 751. As detailed above, the Sports Wagering Law and its related regulations require vetting and licensure through the MGC, and the payment of taxes and fees, partly to support public health measures related to gambling. The MGC also oversees and supervises licensed, operating entities for compliance with state laws and regulations. Licensed entities must undertake measures to avoid unlawful wagers, underage betting, and to aid in preventing gambling addiction. There is no real question that licensure, and the consequent oversight, of sports wagering operations in the state serve both public health and safety, and the Commonwealth's financial interest. Seeking enforcement against non-complying entities also serves the public interest of fair competition and equal oversight among all sports wagering operations in the state.

Kalshi's opposition centers on its claim that compliance with an injunction will harm Massachusetts Kalshi users, risk its DCM status and reputation, and pose burdensome feasibility challenges. On the first point, the Commonwealth states in its brief that it is not seeking to unwind existing event contracts that Massachusetts users have purchased. I agree that the injunctive relief ordered will be forward-looking only, which will minimize disruption but require Kalshi to begin complying with Massachusetts law.

On the remaining points, even assuming they are relevant to the analysis, Kalshi's argument is not compelling. First, Kalshi knowingly proceeded in Massachusetts and other states that require sports wagering entities to be licensed, even after the CFTC warned it to be

15

cautious in light of ongoing state enforcement efforts. Thus, any hardship it faces in removing its non-compliant Massachusetts offerings is of its own making. There can be little question that Kalshi well understood that its business model—especially once it began offering bets on sporting events—came into direct conflict state enforcement regimes; Kalshi chose to take that risk head-on. Second, compliance with state regulations is a typical challenge many federally regulated, nationwide companies face as part of their normal business operations because of our federal system. I am therefore unconvinced that compliance with a preliminary injunction in this case poses an unusual degree of hardship for Kalshi to overcome, or will be fatal to its business or CFTC designation. See *Hendrick*, 2025 WL 3286282, at *12-*13 (noting, in the context of a public interest analysis, that "there is no evidence before [the court] that the CFTC would take adverse action against Kalshi for complying with court orders and state law while the various lawsuits play out," citing a lack CFTC enforcement action against another CFTC designated entity that limited its offerings based on location following state enforcement action).

Accordingly, upon weighing the competing arguments, requiring Kalshi to be licensed to offer its sports-related event contracts in Massachusetts serves the public interest.

## C. Conclusion

Because the Commonwealth has succeeded both in demonstrating that it is likely to succeed on the merits of its claim that Kalshi requires licensure under G.L. c. 23N, and that such licensure will serve the public interest, its motion for a preliminary injunction is **ALLOWED**.

## II. Kalshi's Motion to Dismiss

Because Kalshi's motion to dismiss is predicated entirely on its preemption argument, which fails for the reasons outlined above, that motion also fails. Accordingly, the motion to dismiss is **DENIED**.

16

## ORDER

For the foregoing reasons, the Commonwealth's motion for a preliminary injunction is **ALLOWED**. Kalshi's motion to dismiss is **DENIED**. The Commonwealth is entitled to a preliminary injunction prohibiting Kalshi from offering sports-related event contracts in the absence of the required license under the Sports Wagering Law. At the hearing both parties discussed, but did not resolve, certain details of the Commonwealth's requested injunction, including how to prohibit new contracts without impacting already existing contracts. For that reason, I will enter a preliminary injunction consistent with this decision on the following schedule: i) not later than January 21, 2026 at 4:00 p.m. the Commonwealth shall submit a proposed preliminary injunction consistent with this decision; ii) not later than January 23, 2026 at 10:00 a.m., Kalshi may submit a response to the Commonwealth's proposed order; iii) if either side requests to be heard or if I determine a hearing is necessary, a hearing will take place on Friday, January 23, at 12:00 noon, after which I will enter a preliminary injunction. Any motion to stay may also be raised in this time period. If both parties wish to confer with respect to the terms of the preliminary injunction and request to extend these deadlines, they may notify the clerk and I will respond promptly to any such joint request.

**So ordered.**

Christopher K. Barry-Smith
Justice of the Superior Court

DATE: January 20, 2026

17