UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KALSHIEX LLC,

                            Plaintiff,

        -against-

ROBERT WILLIAMS, in his official capacity as
Executive Director of the New York State
Gaming Commission; BRIAN O'DWYER, in his
official capacity as Chair and Commissioner of
the New York State Gaming Commission; JOHN
A. CROTTY, in his official capacity as
Commissioner of the New York State Gaming
Commission; SYLVIA B. HAMER, in her
official capacity as Commissioner of the New
York State Gaming Commission; MARTIN J.
MACK, in his official capacity as Commissioner
of the New York State Gaming Commission;
PETER J. MOSCHETTI, JR., in his official
capacity as Vice Chair and Commissioner of the
New York State Gaming Commission;
MARISSA SHORENSTEIN, in her official
capacity as Commissioner of the New York State
Gaming Commission; JERRY SKURNIK, in his
official capacity as Commissioner of the New
York State Gaming Commission; and the NEW
YORK STATE GAMING COMMISSION,

                            Defendants.

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** 7/7/2026

25 Civ. 8846 (AT)

**OPINION**
**AND**
**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, KalshiEX LLC ("Kalshi"), moves for a temporary restraining order and

preliminary injunction against the New York State Gaming Commission (the "Gaming

Commission") and the following Gaming Commission officials: Robert Williams, Executive

Director and Commissioner, Brian O'Dwyer, Chair and Commissioner, Peter J. Moschetti, Jr.,

Vice Chair and Commissioner, and Commissioners Jerry Skurnik, John A. Crotty, Marissa

Shorenstein, Martin J. Mack, and Sylvia B. Hamer (collectively, "Defendants"). *See* Proposed

Order to Show Cause ("POTSC"), ECF No. 15.  Kalshi seeks an order enjoining Defendants

from enforcing New York state gambling laws against its offering of sports-related event contracts in New York during the pendency of this action.  *See id.*; *see also* Mem., ECF No. 16; Wong Decl. I, ECF No. 17; Sottile Decl. I, ECF No. 18; Opp., ECF No. 52; Janofsky Decl., ECF No. 53; Reply, ECF No. 76; Sottile Decl. II, ECF No. 75; Wong Decl. II, ECF No. 79; Sur-reply, ECF No. 86.  For the reasons stated below, Kalshi's motion is denied.

**BACKGROUND[1]**

I.    Event Contracts

The Commodity Exchange Act ("CEA") provides a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356, 360–67 (1982).  Under the CEA, the Commodity Futures Trading Commission ("CFTC") regulates the trade of financial derivatives.  "A derivative is a financial instrument or contract whose price is directly dependent upon (i.e.[,] derived from) the value of one or more underlying assets—for example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Commodity Futures Trading Comm'n ("KalshiEX D.D.C.")*, No. Civ. 23-3257, 2024 WL 4164694, at *1 (D.D.C. Sep. 12, 2024) (internal quotation marks and citations omitted), *appeal dismissed*, No. Civ. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025).

Subject to certain exceptions, the CFTC has "exclusive jurisdiction" to regulate various types of derivatives.  Section 2(a)(1)(A) of the CEA states that the CFTC:

> shall have exclusive jurisdiction . . . with respect to accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution

---

[1] Having reviewed the parties' briefing, the Court finds that the material facts are not in dispute and, therefore, decides Plaintiffs' motion for a preliminary injunction without a hearing.  *See* ECF No. 67 at 2 ("The parties have conferred and agree that there are no relevant facts in dispute that necessitate an evidentiary hearing and disputed facts are amenable to complete resolution on a paper record.").

> facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the [CFTC] pursuant to section 23 of this title.

7 U.S.C. § 2(a)(1)(A).

This lawsuit concerns a specific type of derivative called an "event contract." *See* Am. Compl. ¶ 2, ECF No. 35 ("Kalshi . . . offers consumers the chance to trade in many types of event contracts, including, as relevant here, sports-event contracts."). An event contract is a type of derivative contract "whose payoff is based on a specified event, occurrence, or value." *KalshiEX D.D.C.*, 2024 WL 4164694, at *2. Buyers of event contracts may trade "several possible outcomes" on any future event, and most commonly, they will trade either a "yes" or "no" position. Am. Compl. ¶ 27. The seller of an event contract implicitly takes the opposite position regarding the outcome of the event. If the buyer takes a position on a possible outcome of a future event and then that outcome actually occurs, they will receive a payment from the seller. *Id*.

> For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025. A purchaser may trade on either the 'yes' or the 'no' position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

*Id.* Traders can buy or sell event contracts for a specific value any time before they expire.

An entity that seeks to list and publicly trade its event contracts must apply to the CFTC to be a designated contract market ("DCM"). *See* 7 U.S.C. §§ 2(e), 7(a). Under the CEA, DCMs are permitted to list contracts without prior CFTC approval by self-certifying that those contracts comply with applicable law. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2 (a)(2) (requiring DCMs to wait one business day before publicly trading self-certified contracts). In 2010, when Congress amended the CEA under the Dodd-Frank Wall Street Reform and Consumer Protection Act, it created a "[s]pecial rule for review and approval of event contracts and swaps contracts"

3

(the "Special Rule").  7 U.S.C. § 7a-2(c)(5)(C)(i).  Under the Special Rule, the CFTC can review and prohibit certain types of contracts when those contracts are "contrary to the public interest" because they involve "activity that is unlawful under any Federal or State law," "terrorism," assassination," "war," "gaming," or "other similar activity determined by the [CFTC] by rule or regulation to be contrary to public interest."  *Id.* § 7a-2(c)(5)(C)(i).  Agreements, contracts, or transactions that the CFTC determines are contrary to public interest "may [not] be listed or made available for clearing or trading on or through a registered entity."  *Id.* § 7a-2(c)(5)(C)(ii).[2]

## II.    Kalshi's Sports-Event Contracts

Kalshi, a financial services company, operates a prediction market that allows users to buy and sell event contracts on its platform.  Am. Compl. ¶ 16.  The CFTC has certified Kalshi as a DCM.  *See id.* ¶¶ 2, 4, 16; Mem. at 6.

On January 22, 2025, Kalshi self-certified several contracts relating to sporting events ("sports-event contracts") and began to list them on its exchange.  Am. Compl. ¶ 47.  Kalshi's sports-event contracts allow users to place positions on the "outcomes of sports events," for example, "which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship."  *Id.* ¶¶ 32, 47.

Under New York law, any gambling enterprise that offers sports gaming, including wagering, must obtain a license from the Gaming Commission, the state agency that regulates gambling in New York.  *See* N.Y. Rac. Pari-Mut. Wag. & Breed. Law ("Racing Law") §§ 1367(2)(a), 1367-a(4)(b); *see also id.* § 1367(1)(x) ("'Sports wagering' means wagering on sporting events or any portion thereof, or on the individual performance statistics of athletes

---

[2] On June 10, 2026, the CFTC issued a notice of proposed rulemaking regarding the Special Rule for prediction market event contracts.  *See* Press Release, CFTC, CFTC Seeks Public Comment on Notice of Proposed Rulemaking Concerning Event Contracts Involving Enumerated Activities, Release No. 9249-26 (June 10, 2026), available at https://www.cftc.gov/PressRoom/PressReleases/9249-26.

participating in a sporting event, or combination of sporting events . . . ."); Am. Compl. ¶ 25. The offer of sports gaming in New York in violation of its gambling laws may risk civil and criminal penalties. *See* Racing Law §§ 104(9), 116; N.Y. Penal Law § 225.00 *et seq.* Kalshi is not licensed with the Gaming Commission to offer sports wagering. Am. Compl. ¶ 48; *see* Opp. at 1–2.

By letter dated October 24, 2025, the Gaming Commission directed Kalshi to "cease and desist from illegally operating, advertising, promoting, administering, managing, or otherwise making available an unlicensed mobile sports wagering platform in New York State in connection with any sports event." Ex. 2 at 4, ECF No. 35-2.[3] The Gaming Commission advised Kalshi that "[s]ports wagering may be conducted, advertised or promoted in New York only by entities licensed by the [Gaming] Commission." *Id.* at 3.

On October 27, 2025, Kalshi initiated this action against the Gaming Commission and its members in their official capacities, seeking declaratory and injunctive relief and arguing that the CFTC has exclusive jurisdiction over the sports-event contracts traded on Kalshi's exchange, such that the Gaming Commission lacks the authority to enforce New York gambling laws against Kalshi. *See generally* Compl., ECF No. 1; *see also* Am. Compl.; POTSC; Mem. Defendants contend that the Gaming Commission's regulation of Kalshi's sports-related event contracts is not preempted by the CEA. *See generally* Opp.

Various amici jointly filed a brief in support of Defendants, arguing that Kalshi has "unlawfully and unfairly entered into the gaming market," and that "[b]y offering sports-event contracts to people on Indian lands under the guise of commodity trading pursuant to [the CEA,] Kalshi impedes tribes' inherent sovereign right to regulate gaming activity on those lands."

---

[3] Citations to "Ex." Refer to the exhibits filed with the amended complaint at ECF No. 35.

Tribal Amici Br. at 11, ECF No. 66.

### III.    Nationwide Litigation

Courts in other jurisdictions have considered similar motions by Kalshi, seeking to enjoin state gaming commissions from enforcing state law against it.  Courts have found both in Kalshi's favor, granting its preliminary injunction motion, *see, e.g.*, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026); *KalshiEX LLC v. Orgel*, No. 26 Civ. 34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026), and against it, denying its motion, *see, e.g.*, *Kalshiex LLC v. Schuler* ("*Schuler II*"), No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026); *KalshiEX LLC v. Johnson*, No. 26 Civ. 1715, 2026 WL 958171 (D. Ariz. Apr. 8, 2026); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025).

## DISCUSSION

### I.    Eleventh Amendment Immunity

As a preliminary matter, the Court addresses the issue of Eleventh Amendment immunity as to the Gaming Commission.  Defendants argue that Kalshi's claims against the Gaming Commission should be dismissed because it is a state agency covered by the Eleventh Amendment's immunity, which bars suit against the states, including "state agents and state instrumentalities that are, effectively, arms of a state."  *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (citation omitted); *see also* Opp. at 21–22.  The *Ex parte Young* doctrine allows suits like Kalshi's for prospective injunctive relief against New York state officers in their official capacities, notwithstanding Eleventh Amendment immunity. *Reed v. Goertz*, 598 U.S. 230, 234 (2023) (citing *Ex parte Young*, 209 U.S. 123, 159–161

(1908)); *see also Vega v. Semple*, 963 F.3d 259, 281 (2d Cir. 2020).[4]  Defendants contend, however, that the *Ex parte Young* doctrine does not extend to Kalshi's claims against the Gaming Commission because it has not waived its Eleventh Amendment immunity and Congress did not abrogate states' immunity in enacting the CEA.  Opp. at 21–22.  Kalshi has not responded to the Gaming Commission's Eleventh Amendment defense in its briefing.  *See generally* Mem.; Reply.  The Court agrees with Defendants.  *See Walker v. New York State Dep't of Health*, 788 F. Supp. 3d 427, 490–91 (E.D.N.Y. 2025) (holding that the *Ex parte Young* exception "does not extend to suits against state agencies"); *Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651, 663 (N.D.N.Y. 2025) (dismissing the Gaming Commission from the action because none of the cases cited by the plaintiff "with respect to [the issue of the Gaming Commission's immunity] support the proposition that a state agency may be made a proper party to the suit because its constituent members are simultaneously sued pursuant to *Ex parte Young*").  Accordingly, the Gaming Commission is dismissed from the action because it is immune from suit under the Eleventh Amendment.

II.    Preliminary Injunction

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public

---

[4] The Court's conclusion that Kalshi's claims may proceed against the individual Gaming Commission members in their official capacities for the purposes of determining Kalshi's motion is without prejudice to Defendants' raising an Eleventh Amendment defense in a motion to dismiss.

interest." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. at 20).

"[W]hen, as here, the preliminary injunction will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, it should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *N.Y. State Firearms Ass'n v. James*, 157 F.4th 232, 242 (2d Cir. 2025) (quoting *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014)); *see also Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010).  Kalshi must, therefore, "establish a clear or substantial likelihood of success on the merits." *New York State Firearms Ass'n*, 157 F.4th at 242 (quoting *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (per curiam)).

A.  Likelihood of Success on the Merits

The merits of this case center on whether New York gambling laws are preempted by federal law as applied to Kalshi's sports-event contracts.  Kalshi argues that it has demonstrated a likelihood of success on the preemption issue that its sports-event contracts are exclusively regulated by the CFTC.  *See* Mem. at 10.  Defendants contend that Kalshi cannot show a likelihood of success on the merits because sports-event contracts do not fall within CFTC regulation and, therefore, may be regulated by New York law.  *See* Opp. at 9.  For the reasons explained below, the Court finds that New York gambling laws as applied to Kalshi's sports-event contracts are not preempted by the CEA and Kalshi has not, therefore, made a clear or substantial showing that it is likely to succeed on the merits.

1. Preemption Legal Standard

Under the Supremacy Clause, federal law prevails when it conflicts with state law.  *See* U.S. Const. art. VI, cl. 2 ("[T]he laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *Arizona v. United States*, 567 U.S. 387, 398–99 (2012).  "In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives."  *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010) (citations and internal quotation marks omitted).

"The key to the preemption inquiry is the intent of Congress."  *Id.* at 104.  "If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains."  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).  That is, even when a federal statute contains an express preemption clause, the Court must still consider whether Congress' preemptive intent may be inferred from the scope of the statute such that "Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law."  *Id.* at 76–77 (citations omitted).  "[T]he party asserting that federal law preempts state law bears the burden of establishing preemption."  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013).

2.  Express Preemption

Kalshi argues that the CEA expressly preempts New York gambling laws as applied to its sports-event contracts because the CFTC has "exclusive jurisdiction" over "transactions involving swaps," including Kalshi's sports-event contracts, that are "traded or executed" on DCMs like Kalshi. Mem. at 8, 11–13; (citing 7 U.S.C. § 2(a)(1)(A)); *see* Reply at 1–4. Defendants contend that Kalshi's sports-event contracts are not "swaps" within the meaning of the CEA and are, therefore, not explicitly preempted. *See* Opp. at 9–15.

Courts apply "a presumption against preemption with respect to areas where states have historically exercised their police powers." *N.Y. SMSA Ltd. P'ship*, 612 F.3d at 104; *see Altria Grp.*, 555 U.S. at 77 ("When addressing questions of express or implied pre-emption, we begin our analysis with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. . . . That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States." (citations and internal quotation marks omitted). "The scope of laws regulating gambling and lotteries is clearly a matter of predominantly state concern." *Chun v. State of N.Y.*, 807 F. Supp. 288, 292 (S.D.N.Y. 1992); *see KalshiEX, LLC v. Schuler* ("*Schuler I*"), No. 25 Civ. 1165, 2026 WL 657004, at *8 (S.D. Ohio Mar. 9, 2026) ("The enactment of gambling laws is clearly a proper exercise of the state's police power in an effort to promote the public welfare." (citations and internal quotation marks omitted)); *Martin*, 793 F. Supp. 3d at 677 ("It is well recognized that regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme." (quotation omitted)); *Flaherty*, 172 F.4th at 234 (Roth J., dissenting) ("Throughout U.S. history, gambling regulation has been largely left to the state legislatures.").

10

The presumption against preemption, therefore, applies to this case, and the Court must analyze whether Kalshi has demonstrated that in enacting the CEA, it was the "clear and manifest purpose of Congress" to preempt New York's authority to regulate gambling where a DCM, like Kalshi, offers sports-event contracts on its platform. *In re MTBE Prods. Liab. Litig.*, 725 F.3d at 96 (citation omitted).

To discern Congress' intent, the Court begins with the CEA's text. It is clear that Congress intended the CEA to preempt certain areas of derivative trading—specifically, as relevant to this action, the CEA grants the CFTC "exclusive jurisdiction . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A). For the purposes of resolving Kalshi's motion, consistent with the approach of other courts, the Court assumes without deciding that Kalshi's sports-event contracts are swaps under the CEA. *See Schuler II*, 2026 WL 1295806, at *3; *see also Commonwealth v. Kalshiex, LLC*, No. 2584 Civ. 2525, 2026 LX 33147, at *13 (Mass. Super. Ct. Jan. 20, 2026); *Martin*, 793 F. Supp. 3d at 675.[5]

The Court does not, however, end its inquiry there. Although it is clear from the CEA's text that Congress intended for the CFTC to have exclusive jurisdiction over swap transactions on DCMs, the Court must also determine the scope of that preemption—that is, "at what point the state regulation sufficiently interferes with federal regulation that it should be deemed [preempted]." *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210 (2d Cir. 2011) (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505

---

[5] The Court notes that some courts considering this issue in other jurisdictions have found that Kalshi's sports-event contracts are swaps within the meaning of the CEA, *see, e.g.*, *KalshiEX LLC v. Johnson*, No. 26 Civ. 1715, 2026 WL 1223373, at *4–5 (D. Ariz. May 5, 2026), and other courts have not, *see, e.g.*, *Schuler*, 2026 WL 657004, at *4–7.; *see also QCX LLC v. Nessel*, No. 26 Civ. 710, 2026 WL 1166362, at *2–3 (W.D. Mich. Mar. 10, 2026) (finding that a different prediction contract market's sport-related products do not fall within the CEA's definition of a swap).

U.S. 88, 107, 112 (1992)); *see also Altria Grp.*, 555 U.S. at 76.  The scope of Congress' intent to displace state law with its grant of exclusive jurisdiction to the CFTC can be determined by considering both field and conflict preemption as applied to Kalshi's sports-event contracts.  *See N.Y. SMSA Ltd. P'ship*, 612 F.3d at 104 ("Even where a federal law contains an express preemption clause, the court still may be required to consider implied preemption as it considers 'the question of the substance and scope of Congress' displacement of state law.'" (quoting *Altria Grp.*, 555 U.S. at 543)); *see also id.* ("By their nature, field preemption and conflict preemption are usually found based on implied manifestations of congressional intent.").

   3. Implied Preemption

    a. Field Preemption

  The Court first considers the issue of field preemption, which is implicated where congressional action reflects a "decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401.  The basic premise of field preemption is that "[s]tates may not enter, in any respect, an area the [f]ederal Government has reserved for itself." *Id.* at 402.  Accordingly, "[i]n rare cases, the Court has found that Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (citation and quotation marks omitted).

  Kalshi argues that Congress has "preempted the field of regulating trading on DCMs . . . implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation." Mem. at 11.  Defendants contend that New York law is not field preempted as to Kalshi's sports-event contracts because Congress did not intend to regulate so broadly as to exclude all state law.  *See* Opp. at 16–17.

Kalshi's field preemption argument, "like all preemption arguments, must be grounded in the text and structure of the statute at issue." *Garcia*, 589 U.S. at 208 (citation and quotation marks omitted). Although § 2 of the CEA grants the CFTC "exclusive jurisdiction" with respect to "transactions involving swaps" on a DCM, this grant is not without limits. Section 2 specifies that "nothing contained in th[e] section shall . . . supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the United States or of any State." 7 U.S.C. § 2(a)(1)(A). This provision evinces Congress' intent to leave room for states to regulate certain activities that may have otherwise been covered by the CEA. *See Schuler II*, 2026 WL 1295806, at *5 ("[T]he presence of a savings clause [like in § 2] usually signals that Congress does not mean to preempt the field." (emphasis removed)); *Martin*, 793 F. Supp. 3d at 679 ("[T]he fact that the CEA has some field-preemptive effect does not mean that the 'field' Congress intended for the CEA to occupy includes state gambling laws, and specifically sports wagering laws."); *id.* (holding that the clause in § 2 "on balance [] cuts against a finding of field preemption").

The scope of the CEA's preemption is further clarified by looking at the CEA's structure as a whole. Congress' enactment of the Special Rule in 7 U.S.C. § 7a-2(c) demonstrates its intent that some state law and regulation should operate in tandem with the CEA. Under the Special Rule, the CFTC has authority to prohibit event contracts that are "contrary to the public interest" because they "involve . . . [, *inter alia*,] activity that is unlawful under any Federal or State law" or "gaming." 7 U.S.C. §7a-2(c)(5)(C)(i). That is, the Special Rule's "plain text clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful." *Martin*, 793 F. Supp. 3d at 680 (emphasis in original). Further, because Congress "expressly authorized the [CFTC] to prohibit particular categories of transactions as

13

contrary to the public interest *based on the fact that the conduct at issue would violate state law*[,]" this provision "severely undercuts Kalshi's suggestion that Congress intended to displace all state laws that would otherwise apply to transactions that fall within the scope of the CEA." *Id.* at 680 (emphasis in original).  Moreover, given that the power to regulate gambling is a traditional police power exercised by New York, the Court also declines to interpret the CEA's grant of exclusive jurisdiction as leaving "no room for supplementary state legislation."  *Garcia*, 289 U.S. at 208; *Schuler II*, 2026 WL 1295806, at *4–5; *Dep't of Revenue of Oregon v. ACF Indus.*, Inc., 510 U.S. 332, 345 (1994) ("When determining the breadth of a federal statute that impinges upon or pre-empts the States' traditional powers, we are hesitant to extend the statute beyond its evident scope.").

Finally, Congress' intended scope of preemption under the CEA is demonstrated in the Act's express prohibition of state regulation in certain contexts.  For example, § 16 prohibits the regulation of transactions involving swaps by state gambling laws in certain limited circumstances.  *See* 7 U.S.C. § 16(e) (superseding and preempting "any State or local law that prohibits or regulates gaming or the operation of bucket shops" as it relates to certain electronic trading facilities or certain agreements that are excluded or exempted from the CEA).  Neither of these circumstances is presented in this action, and Kalshi does not argue that the Court should find otherwise.  *See generally* Mem.; Reply.  Section 16 also prohibits state regulation of transactions involving swaps in other contexts like insurance contracts.  *See, e.g., id.* § 16(h) ("A swap . . . may not be regulated as an insurance contract under the law of any State.").  These provisions provide "strong evidence" that when enacting § 2 of the CEA with a grant of exclusive jurisdiction to the CFTC, Congress did not intend to regulate so broadly as to exclude all state gambling laws from regulating transactions involving swaps.  *See Martin*, 793 F. Supp.

14

at 681.  Therefore, Kalshi has not demonstrated a likelihood of success on the merits that New York's gambling laws are field preempted as applied to its sports-event contracts.

b.  Conflict preemption

Next, the Court considers the issue of conflict preemption.  Kalshi argues that New York's gambling laws are conflict-preempted as applied to Kalshi's sports-event contracts because it would be impossible for Kalshi to comply with both state and federal law and because New York's laws are an obstacle to the accomplishment and execution of the full objectives of the CEA.  *See* Mem. at 16.  Defendants contend that Kalshi has failed to provide evidence demonstrating how New York gambling laws would conflict with or stand as an obstacle to achieving the purposes of the CEA.  *See* Opp at 20.  The Court agrees and holds that Kalshi has not shown that conflict preemption likely applies.

Conflict preemption of state law occurs where "'it is impossible for a private party to comply with both state and federal law' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Genna v. Sallie Mae, Inc.*, No. 11 Civ. 7371, 2012 WL 1339482, at *8 (S.D.N.Y. Apr. 17, 2012) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000)).  Under the "purposes and objectives" inquiry, courts consider "whether the state law interferes with a method the federal law uses to promote its goal."  *Id.* (quoting *United States Smokeless Tobacco Mfg. Co., LLC v. City of New York*, 703 F. Supp. 2d 329, 334 (S.D.N.Y. 2010)).  The "mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting

15

preemption." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (quotation marks omitted).

First, Kalshi has not shown that it is impossible to comply with both New York gambling laws and the CEA. Kalshi contends that if it were required to comply with New York law, it would violate the CFTC's requirement that a DCM provide "impartial access to its markets and services" because Kalshi would be required to limit access to its exchange to persons living only in New York, which would be impossible for a nationwide platform such as Kalshi. *See* Mem. at 18–19. Not so. The purpose of the impartial access requirement is to prevent DCMs from having certain discriminatory access requirements for their platform; it does not require DCMs to offer contracts nationwide. *See* 17 C.F.R. § 38.151(b) (providing that impartial access includes "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner"); Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 (proposed Dec. 22, 2010) (to be codified at 17 C.F.R. pts. 1, 16, and 38) ("The purpose of the proposed impartial access requirements is to prevent DCMs from using discriminatory access requirements as a competitive tool against certain participants."). There is nothing preventing Kalshi from obtaining a license pursuant to New York law and establishing a category of New York market participants that does not discriminate within that New York-resident category. *See* 75 Fed. Reg. at 80579 ("A DCM can satisfy the requirement that membership and participation criteria are impartial, transparent, and non-discriminatory by establishing clear and impartial guidelines and procedures for granting access to its facilities and publishing such guidelines and procedures on its Web site. Such requirements may establish different categories of market participants, but may not discriminate within a particular category."); *Martin*, 793 F. Supp. 3d at 686 ("Kalshi's point is not a basis for holding that conflict preemption exists and that

16

Maryland's laws are preempted simply because *not* obtaining a license limits Kalshi's geographical access. . . . So long as Kalshi obtains a license and complies with Maryland sports gambling laws, those laws would not pose an obstacle to Kalshi making the sports gambling portion of its platform available to users in Maryland."); *Schuler I*, 2026 WL 657004, at *9 ("Kalshi offers nothing but its own *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'").  Although complying with New York gambling laws imposes an additional regulatory requirement on Kalshi, that requirement is not squarely contrary to federal law.  Kalshi's attempt, therefore, to avoid that requirement is unavailing.

Second, New York's gambling laws as applied to Kalshi's sports-event contracts do not frustrate Congress' objectives underpinning the CEA or serve as an obstacle to the CEA's regulatory scheme.  Kalshi argues that "once [it] was approved as a CFTC-designated contract market, Kalshi was authorized to list its [sports-]event contracts by self-certifying that the contracts comported with federal law."  Mem. at 18.  Kalshi contends that New York's attempt to regulate its sports-event contracts "would substantially interfere with the CFTC's discretion" to review Kalshi's self-certification on the ground that it was "contrary to the public interest" because the CFTC ultimately "chose not to do so."  *Id.* (quoting 7 U.S.C. § 7a-2(c)(5)(C)(i)).

This argument lacks merit and misinterprets the authority of Kalshi's self-certification of its sports-event contracts.  As stated above, the CEA's text and structure, as well as the historical context of New York's interest in regulating gambling through its police power, demonstrate that Congress did not intend to preempt all state actions that may relate to DCMs.  Instead, the CEA leaves room for states to regulate tangential issues that may arise from trading swaps and other financial products on DCMs.  As other courts have noted, the congressional record for the CEA

17

supports the view that when enacting the Special Rule, Congress sought to prohibit the exact types of event contracts that Kalshi seeks to offer. *See Flaherty*, 172 F.4th at 240 (Roth J., dissenting). For example, when discussing the Dodd-Frank Act, Senator Blanche Lincoln of Arkansas stated that the purpose of the Special Rule is to "prevent the creation of futures and swaps markets that would allow citizens to profit from devastating events." 156 Cong. Rec. S5906 (2010). Senator Lincoln further explained that "it would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and [the] Masters Golf Tournament," which would be contracts that "would not serve any real commercial purpose" but "[r]ather, . . . would be used solely for gambling." *Id.* at S5906–07. Kalshi states that its contracts not only allow users to take positions and profit from devastating events, *e.g.*, "whether an earthquake will take place in Los Angeles County before December 31, 2025," Am. Compl. ¶ 27, but also sporting events, *e.g.*, "which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship," *id.* at ¶ 47. Further, although Kalshi can list any contract that it self-certifies, its self-certification is not tantamount to a declaration that the contract is lawful. The CFTC holds the authority to determine whether a contract is legal. *See* 7 U.S.C. § a-2(c)(5)(C)(i) ("The [Gaming] Commission may determine that . . . [event] contracts . . . are contrary to the public interest" if they involve "gaming"); 17 C.F.R. § 40.11(a)(1) ("A registered [DCM] shall not list for trading or accept for clearing on or through the registered entity any . . . agreement, contract, transaction, or swap . . . that involves, relates to, or references . . . gaming"). The Court declines to comment on CFTC's decision not to exercise its authority under the Special Rule or 17 C.F.R. § 40.11 with respect to Kalshi's sports-event contracts. However, "the agency's inaction is not proof that the sports-event contracts are regulated by or permissible under the CEA—and the Court has

18

concluded they are not." *Schuler I*, 2026 WL 657004, at \*9. Therefore, New York's gambling laws, which seek to regulate gaming in the state, complement rather than conflict with federal law. Because Kalshi has failed to show likelihood of success on the merits as it relates to the issue of preemption, this factor weighs against the issuance of a preliminary injunction.

### B. Irreparable Harm

To satisfy the irreparable harm requirement, Kalshi "must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor,* 481 F.3d 60, 66 (2d Cir. 2007)). Irreparable harm must be an injury that "cannot be remedied by an award of monetary damages." *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 690 (S.D.N.Y. 2025) (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015)).

Kalshi argues that without an injunction, it will face the threat of civil and criminal enforcement by the Gaming Commission, disruption to its business in New York and nationwide, including the cost of "comprehensively geolocat[ing] its users on a state-by-state basis," and harm to its reputation, including the possibility that the CFTC could revoke Kalshi's designation as a DCM. Mem. at 20–22. Although the prospect of being subject to criminal prosecution could demonstrate a showing of irreparable injury, *see Black v. Cakor Rest., Inc.*, No. 22 Civ. 1447, 2022 WL 17689840, at \*6 (S.D.N.Y. Dec. 15, 2022), Kalshi's harms "are largely monetary." *Hendrick*, 817 F. Supp. 3d at 1035. As Defendants contend, any civil fines that may be levied against Kalshi can be challenged and vacated if Kalshi ultimately prevails on the merits, which, as stated above, is unlikely. *See* Opp. at 22. Kalshi's argument that

19

geolocating its users on a state-by-state basis would constitute irreparable injury is unpersuasive because the ordinary burdens and costs of complying with government regulation are typically insufficient to constitute irreparable harm. *See Wheely USA, Inc. v. City of New York*, No. 26 Civ. 1057, 2026 WL 972924, at *7 (S.D.N.Y. Apr. 10, 2026) (citing *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005)). Kalshi has not presented any evidence that the possibility of the CFTC's revocation of its designation as a DCM is more than mere speculation. Over the past year, Kalshi has litigated this issue in various jurisdictions across the country and has been denied injunctive relief in certain of those jurisdictions, but the CFTC has not altered Kalshi's DCM status. Therefore, on balance, the irreparable injury factor weighs against the granting of a preliminary injunction.

### C. Balance of the Equities

The Court considers the balance of the equities between the parties and the public's interest together. *See Walden v. Kosinski*, 153 F.4th 118, 141 (2d Cir. 2025) ("[W]ith respect to the factors of the public interest and the balance of the equities, '[i]n a suit against the government, balancing of the equities merges into [the Court's] consideration of the public interest.'" (quoting *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021))). Kalshi argues that the public has an interest in "ensuring that preempted New York laws are not enforced against federally regulated entities" and that Kalshi users will experience harm if New York laws are enforced against Kalshi by experiencing "intractable technological difficulties on a very short timeframe." Mem. at 23. Defendants contend that the equities weigh in their favor because "New Yorkers are harmed if Kalshi continues to engage in unsupervised sports gambling," especially individuals between the ages of 18 and 24 who are a "'high-risk population' for gambling addictions"; that Kalshi's expansion of "proposition betting" which

usually involves "wagers on an individual player's performance" often is "hazardous to the integrity of college sports"; that gambling on college sports involving any New York-based college team is unlawful under state law; and that if Kalshi continues to operate, other potential DCMs listing sports contracts will proliferate. Opp. at 25–28. Defendants' interests in regulating gaming in New York and ensuring that the Gaming Commission has the ability to effectuate statutes enacted by its state representatives heavily outweigh the interests articulated by Kalshi. It is well established that "[a] prohibition on a state from 'effectuating statutes enacted by representatives of its people' itself inflicts 'a form of irreparable injury.'" *Duffy*, 784 F. Supp. 3d at 690 (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)); *see also id.* (collecting cases). Accordingly, the balance of the equities and the public's interest weigh in favor of Defendants.

Because all four *Winter* factors weigh against the issuance of a preliminary injunction, Kalshi's motion is denied.

III.    Motion to Seal

Kalshi seeks an order sealing two exhibits filed in connection with its reply brief. *See* ECF No. 74. Defendants do not object. *See generally* Opp.; Sur-reply. The exhibits are judicial documents to which the presumption of the common law right of access attaches. *See Coach IP Holdings, LLC v. ACS Grp. Acquisitions LLC*, No. 23 Civ. 10612, 2024 WL 3965936, at *1 (S.D.N.Y. Aug. 27, 2024); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). However, because the exhibits contain confidential information that Kalshi submitted to the CFTC, including certain proprietary business information, competing privacy interests outweigh the presumption of access. *See SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832, 2022 WL 329211, at *3 (S.D.N.Y. Feb. 3, 2022). Moreover, the proposed redactions at ECF Nos. 79-1

through 2 are narrowly tailored to protect that privacy interest.  Therefore, Kalshi's motion to seal is granted.

## CONCLUSION

For the foregoing reasons, Kalshi's motion for a preliminary injunction is DENIED. Kalshi's motion to seal is GRANTED.  The Clerk of Court is respectfully directed to terminate the motion at ECF Nos. 74 and terminate the New York State Gaming Commission from the docket.

SO ORDERED.

Dated: July 7, 2026
      New York, New York

_____
ANALISA TORRES
United States District Judge

22